

REDACTED

DEVELOPMENT AND OPERATING AGREEMENT

BETWEEN

NANA REGIONAL CORPORATION, INC.

AND

COMINCO AMERICAN INCORPORATED

OCTOBER 11, 1982

**Exhibit 1**
**Page 1 of 9**

1.17     "Natives of the NANA Region" means the stockholders

of NANA whose stock carries voting rights, and the

descendants and spouses of such stockholders.

Exhibit 1
Page 2 of 9

ARTICLE V.

FEASIBILITY OF DEVELOPMENT

5.1    General Objectives of NANA and Cominco.

5.1.1.  Congress, by ANCSA, charged NANA with the responsibility of implementing many of the provisions of ANCSA in conformity with the real economic and social needs of the Natives of the NANA Region, with maximum participation by the Natives of the NANA Region in decisions affecting their rights and property.  Congress, by the Alaska National Interest Lands Conservation Act of December 2, 1980 94 Stat. 2371 ("ANILCA"), recognized and confirmed that subsistence uses by Natives on public lands and on lands conveyed to them pursuant to ANCSA are essential to their physical, economic, traditional and cultural existence.  In the NANA Region, the Natives' subsistence resources include, but are not limited to, caribou, fish, sea mammals and birds.  Cominco expressly recognizes and acknowledges the aforementioned responsibility of NANA and recognizes and acknowledges that the protection and enhancement of subsistence resources in the NANA Region are of critical concern to NANA, the Natives of the NANA Region and the Congress of the United States.  Accordingly, development of the Red Dog Property pursuant to this Agreement will take place only if it is determined, pursuant to the procedures set forth in this Article V, that it can be undertaken in a manner consistent with the Subsistence Needs of the Natives of the NANA Region and that, when undertaken in this manner, such development is economically feasible. Such development shall also be carried out in a manner consistent with the other physical, cultural, social and economic needs of the Natives of the NANA Region and in a manner that will have a minimal adverse effect on the NANA Region's physical environment.  NANA's objective is to develop an economically feasible mine consistent with the Subsistence needs and physical, cultural, social and economic needs of the Natives of the Nana Region.

**Exhibit 1**
**Page 3 of 9**

ARTICLE X

EMPLOYMENT

10.1  Employment Goals and Policy.

10.1.1.  Beginning in calendar year 1982, as many as
possible of the employees required by Operator or any contractor or
subcontractor in connection with any activities under this Agreement
to be undertaken in Alaska shall be Natives of the NANA Region, includ-
ing employees for Exploration Work, development and production activi-
ties and supervisory and managerial positions.  It is the goal of NANA
and Cominco that by not later than twelve years after commencement of
production from the first Mine on the Red Dog Property, to the extent
feasible, one hundred percent (100%) of such employees shall be Natives
of the NANA Region.  To that end, whenever employees are hired for
jobs relating to any activities to be undertaken in Alaska under this
Agreement, such employment shall be offered first to available Natives
of the NANA Region who are qualified for the job or, if none are
qualified and except as otherwise provided in Section 10.1.3, to those
who meet job-related standards of fitness and ability which indicate
that with a reasonable amount of on-the-job training as outlined

Exhibit 1
Page 4 of 9

in the Employment Plan the person could satisfactorily perform the job.

10.1.2 If Natives of the NANA Region are unavailable as provided above, then Operator shall, to the extent permitted by law, give preference to qualified job applicants in the following order of priority:

(a)    individuals who have been residents of the NANA Region for at least two years;

(b)    individuals who have been residents of Northwest Alaska for at least two years;

(c)    individuals who have been residents of Alaska for at least two years;

(d)    any other job applicant.

10.1.3.    If there are no Natives of the NANA Region qualified and available for nonrecurring jobs with a duration of two months or less after inquiry to NANA in the manner prescribed by the Employment Plan for the names of such available and qualified Natives, the Operator may hire persons qualified for such jobs without regard to the requirements of Section 10.1.1 and 10.1.2 for reasons of essential and/or expeditious performance.  It is recognized that emergency situations may arise where it is necessary for Operator to bring in specialists from outside of the NANA Region and the State of Alaska without regard to the requirements of this Article X if a breakdown of equipment, metallurgical and/or water treatment process problem, structural failure or some similarly serious problem occurs.  This emergency power will be detailed in the Employment Plan.  Operator need not provide training for jobs described in this Section 10.1.3, unless otherwise required by the Employment Plan.

10.2    Training and Employment Plan.

In furtherance of the goals and policies described in Section 10.1, NANA and Operator shall with due diligence, working in

Exhibit 1
Page 5 of 9

conjunction with the Management Committee, develop a mutually satis-
factory plan for the training and employment of Natives of the NANA
Region (the "Employment Plan"). NANA and Operator will attempt to
secure State and/or Federal funding to cover as much as possible of
the cost of the Employment Plan. The Employment Plan shall, among
other things, provide that:

(a)    A personnel officer (the "Personnel Officer") be
appointed and be responsible for implementing, supervising
and managing the Employment Plan. Until the Personnel Officer
is appointed NANA will perform the functions of the Personnel
Officer as requested by Operator. If no Personnel Officer
is appointed within thirty (30) days after the Production
Decision, NANA shall thereafter be reimbursed by Operator
for any salary and other expenses it incurs in performing
the functions of the Personnel Officer requested by the
Operator, the amount of any such reimbursement to be a cost
of the Project. The Personnel Officer shall be someone
selected by NANA; provided, that Operator may submit nominees
for NANA's consideration and shall have the right to veto
any selection made by NANA and to terminate the employment
of any Personnel Officer for cause. Operator shall give
NANA a written explanation of the basis for any such veto or
termination;

(b)    NANA shall be responsible for providing Operator,
any contractors or subcontractors, and the Personnel Officer,
on a continuing basis, with the names of any Natives in the
NANA Region eligible for preference employment pursuant to
Section 10.1.1, their employment status, preferred type of
employment, training, experience, education and availability;

**Exhibit 1**
**Page 6 of 9**

- 72 -

(c)    The type and scope of training will take into account the type and number of jobs expected to be available, the estimated number of available Natives of the NANA Region eligible for training and employment hereunder, the qualification level of such persons and the experience requirements of various job categories.

10.3    Wages and Benefits.

There shall be no discrimination in the amount or rate of wages and fringe benefits paid to employees on the basis of race, color, religion, sex, national origin, age, physical or mental handicaps, or status as a disabled veteran.

10.4    Unions.

If Operator should have a collective bargaining relationship with one or more unions representing employees employed in connection with the Project, it shall not enter into any agreement which prevents the full compliance with this Article X.  Non-Operator shall be notified of and be afforded the opportunity to have a representative attend and observe any negotiations Operator may have with a union, it being agreed that Operator will control any such negotiations.

10.5    Compliance with Applicable Laws.

Nothing in this Agreement shall require NANA or Cominco, or any contractors or subcontractors, to violate Title VII of the Civil Rights Act of 1964, as amended, Executive Order 11246, as amended, the National Labor Relations Act, ANCSA, or any other law or regulation relating to employment.

10.6    Scholarships.

Operator shall provide up to Thirty Thousand Dollars ($30,000) each calendar year for a scholarship program for the Natives of the NANA Region.  The scope and focus of the program, giving due consideration to the need to develop mining and geological expertise in the NANA Region, and the method of awarding scholarships shall be

Exhibit 1
Page 7 of 9

determined by the Management Committee; provided, that Operator may assist NANA in selecting recipients of scholarships and the recipients selected will be agreeable to both NANA and Operator if the Operator chooses to participate in the selection process; provided further, that it is the intent of the parties to award scholarships pursuant to this provision to students who meet the eligibility requirements of the program and both parties will make a good faith effort to fulfill this intent.

Exhibit 1
Page 8 of 9

STATE OF ALASKA            )
                           : ss
THIRD JUDICIAL DISTRICT    )

THIS IS TO CERTIFY that on the _12th_ day of _October_,
1982, before me, the undersigned Notary Public, personally appeared
_John Shively_ to me known and known to me to be the
_Vice President_ of the NANA REGIONAL CORPORATION, INC., the corporation
named in the foregoing Development and Operating Agreement, and he
acknowledged to me that he has in his official capacity aforesaid,
executed the foregoing Development and Operating Agreement as the free
act and deed of the said corporation for the uses and purposes therein
stated.

WITNESS my hand and notarial seal the day and year last written.

Notary Public for Alaska
My commission expires: 10-20-82



                WASHINGTON
STATE OF XXXXXX            )
COUNTY OF SPOKANE          : ss
XXXXXXXXXXXXXXXXXXXXXXX    )

THIS IS TO CERTIFY that on the _14th_ day of _October_,
1982, before me, the undersigned Notary Public, personally appeared
_George D Tikkanen_ to me known and known to me to be the
_Vice President, Exploration_ of COMINCO AMERICAN INCORPORATED, the corporation
named in the foregoing Development and Operating Agreement, and he
acknowledged to me that he has in his official capacity aforesaid,
executed the foregoing Development and Operating Agreement as the free
act and deed of the said corporation for the uses and purposes therein
stated.

WITNESS my hand and notarial seal the day and year last written

Notary Public for Alaska Washington
My commission expires: August 6, 198_

**Exhibit 1**
**Page 9 of 9**