1

1              IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ALASKA

3

4    GREGG CONITZ,                    )
                                      )
5              Plaintiff,              )
                                      )
6    vs.                              )
                                      )
7    TECK COMINCO ALASKA, INC.,       )
                                      )
8              Defendant.             )
     _____)
9    Case No. 4:06-CV-00015 RRB

10

11
     _____
12

13              DEPOSITION OF TED ZIGARLICK

14   _____

15

16                    Pages 1 - 271
                  Wednesday, August 1, 2007
17                       8:30 A.M.

18

19

20            Taken by Counsel for Plaintiff
                           at
21            HARTIG RHODES HOGE & LEKISCH
                      717 K Street
22                 Anchorage, Alaska

23

24

25

         PACIFIC RIM REPORTING   907/272/4383

52

1      A.   No, I don't.
2      Q.   Okay.  All right.  And then if you go on to
3  the next page, under 10.1.2, it goes on to talk about
4  preferences concerning, let's see, no Natives of the
5  NANA region, and talks about residents of the region
6  for two years, residents of Northwest Alaska for two
7  years, resident of Alaska for two years, and any
8  other job applicant.
9           That seems to say that there is
10 additionally, under this employment goal and policy,
11 preferences based on those criteria as well.
12     A.   I guess that's what it says there, but
13 that's certainly not how we run our business that I'm
14 aware of.  We don't put restrictions on two-year
15 terms of anybody as to coming to work at Red Dog.
16     Q.   Okay.
17     A.   Like I say, I'm not very familiar with the
18 document, either the detail or the logic behind it.
19     Q.   Did you ever have a meeting with Mr. Conitz
20 and show him portions of this agreement?
21     A.   I believe I did, yes.
22     Q.   Okay.  Do you know what portions of the
23 agreement you showed to him?
24     A.   It would probably be this.
25     Q.   Okay.

167

```
 1    Aleuts and Eskimos have intermarried and settled
 2    (sic).  "The dominance of the single indigenous group
 3    has given the NANA region an usually high degree of
 4    unity."
 5              So that would seem to represent to us that
 6    indeed the region is Eskimo or largely Eskimo.
 7         A.   Um-hum.
 8         Q.   Okay.  Then if you go to page 59, the
 9    underscored section.  Up there at the upper left it
10    says, "An important provision in the agreement deals
11    with employment.  First preference on all Red Dog
12    jobs goes to qualified Natives in the NANA region."
13              I guess, first of all, would that appear to
14    be -- well, if you go back to 58, I'd suggest it
15    appears to be in reference to that 1982 agreement.
16    Do you have a dispute with that?
17         A.   I can only assume.  Like I say, I don't
18    know the agreement that well.
19         Q.   Okay.  Well, we looked at the 1982
20    agreement, and it had, if not identical language,
21    language that indicated that there was a preference
22    for shareholders, right?
23         A.   NANA shareholders, yes.
24         Q.   Okay.  All right.  And then this brochure
25    here, whether published by NANA or Cominco or both,
```

168

```
 1   reinforces that by saying first preference on all
 2   jobs goes to qualified Natives in the region, right?
 3        A.   Qualified shareholders, not Natives.  There
 4   is a difference.
 5        Q.   Okay.  Well, let's explore that.  But first
 6   of all, what it says on 59 is "Natives," right?
 7        A.   Yes.
 8        Q.   Okay.  All right.  Tell me what the
 9   difference is.
10        A.   Well, my -- this is my --
11        Q.   Sure.
12        A.   -- opinion or perception of Native.
13        Q.   Okay.
14        A.   Native is any indigenous culture.
15        Q.   Okay.
16        A.   Whether it's Eskimo or Indian, and NANA
17   shareholder is somebody that qualifies under the NANA
18   eligibility for shareholder or stockholder or
19   whatever you want to call it.
20        Q.   Okay.  All right.  And here on 59, I think
21   when they use the phrase Natives in -- well, this
22   says Natives in the NANA region.  If we go back to
23   the agreement, which I think was No. 10.  No, No. 4.
24   That 1.17, the second page, it says Natives of the
25   NANA region.
```

1    A.   Well, my understanding since I've been at
2    Red Dog, it's NANA shareholders, not Natives.
3    Q.   Okay.  Do you know if a NANA shareholder is
4    coextensive with being a Native of the NANA region?
5    A.   Coextensive?  What do you mean, sir?
6    Q.   In other words, if you're a Native in the
7    NANA region -- well, wait a minute.  If you're a
8    shareholder.  Okay.  And we were told yesterday that
9    there is a list of shareholders.  Do you understand
10   that to be the case?
11   A.   There is.  I wouldn't -- I've never seen
12   the list, but I believe there is a shareholder list
13   of NANA people.
14   Q.   Let me back up.  How do you know if
15   somebody is a shareholder?
16   A.   Me personally?
17   Q.   Yeah.
18   A.   I request that out of human resources.
19   That's part of their service that they're supposed to
20   provide to us.
21   Q.   Okay.  And they tell you?
22   A.   And they tell us.
23   Q.   Okay.  So assuming somebody is a -- you've
24   got them -- you know they're shareholders, and then
25   we're talking about a potential distinction between a

190

```
 1   that's a newspaper or a book.
 2        Q.   Okay.  All right.  Some kind of
 3   publication.  All right.  Let's go back to page 95
 4   there.  It's got the header Anchorage Daily News,
 5   December 24, '89.
 6        A.   Okay.
 7        Q.   And 97 says Anchorage Daily News on it, as
 8   well.
 9        A.   All right.
10        Q.   All right.  And if you turn to page 89
11   there, if you look at that --
12             MR. HALLORAN:  Eighty-nine?
13             MR. COVELL:  Yes.  I'm sorry.
14        Q.   The last two sentences say, "Another
15   important agreement deals with employment.  First
16   preference on all" -- and then I can't read that
17   word, but I assume it says jobs or employees or
18   something.  Or goes.  First preference on all
19   something, probably goes to qualified Natives in the
20   NANA region.  It is intended probably -- it is
21   intended something of operation to mine will be 100
22   percent Natives.
23             That's another reiteration of some other
24   statements we've seen about the mine in other
25   publications, including the 1982 agreement, right?
```

```
 1        A.   Other than what we've discussed already?
 2   It would be a reference to NANA shareholders.
 3        Q.   Okay.
 4        A.   Not Natives.
 5        Q.   Okay.  All right.  Thank you for
 6   straightening me out there.  All right.  All right.
 7   That's all I've got on that one.  Did you assist
 8   anybody in answering the EEOC complaint that
 9   Mr. Conitz filed?
10        A.   Did I assist anybody?
11        Q.   Yeah.  I mean, like Mr. Somers said
12   yesterday, "Well, I knew there was a lawsuit or a
13   complaint, and I was asked to go through files and
14   get papers," and things like that.  So I assume that
15   the attorney calls up the mine and says we need to
16   answer these questions, we need to prepare for this
17   administrative action or lawsuit, and do these things
18   for us.  And Mr. Somers told us he did things like
19   that.  Were you involved?
20        A.   The involvement I had is the questions that
21   Mr. Halloran requested of me.
22        Q.   Okay.  So a talk?
23        A.   No.  He asked me to --
24             MR. HALLORAN:  Don't discuss any questions
25   I may have asked you or any answers you may have
```

```
 1   applied to Red Dog mine.  In some of the questions
 2   that you were asked, the word Native was used
 3   interchangeably for shareholder.  Is there any sort
 4   of Native preference that you're aware of at Red Dog
 5   mine?
 6        A.   That's the end of the question?
 7        Q.   Yes.
 8        A.   No.
 9        Q.   You talked about having shown at least some
10   portion of the 1982 Development and Operating
11   Agreement between Teck Cominco America and NANA
12   Regional Corporation to Mr. Conitz.  Why did you show
13   any portion of that agreement to Mr. Conitz?
14        A.   If I did do that, it would have been upon
15   his request.  And if I did show it there, I would
16   have got access through human resources.  And
17   probably was dumb in the act of doing it because we
18   don't share that document with the general public.
19   It was responding to a request, I guess.
20        Q.   And do you recall what that request may
21   have been?
22        A.   Verbatim, no.
23        Q.   In general, do you recall?
24        A.   In general, he would have asked the
25   question:  I would like to see where there is a
```

1   preference for shareholder hire.
2       Q.   Would you have shown him any of that
3   agreement beyond the parts that are included in -- I
4   don't know.  What is it in?
5            MR. COVELL:  Four.  Right here.
6   BY MR. HALLORAN:
7       Q.   Beyond what's in Exhibit 4?
8       A.   No, sir, I wouldn't have done that.
9       Q.   You mentioned a minute ago that there needs
10  to be a clarification with regard to Teck Cominco
11  Alaska, Inc.  Teck Cominco Alaska is the operator of
12  Red Dog mine; is that correct?
13      A.   That's correct.
14      Q.   And Teck Cominco Alaska, is it the same or
15  a different corporation than Teck Cominco America?
16      A.   It's a different corporation.
17      Q.   Is it the same or a different corporation
18  than Teck Cominco, Ltd.
19      A.   It's a different corporation.
20      Q.   Teck Cominco Alaska used to be known by
21  another name, is that correct, prior to the merger
22  between Teck and Cominco?
23      A.   Prior to the merger it was Cominco Alaska.
24      Q.   Was Cominco Alaska, Inc., the same
25  corporation as Cominco American?

260

```
 1        A.   No.
 2        Q.   Was Cominco Alaska the same corporation as
 3   Cominco, Ltd.?
 4        A.   No.
 5        Q.   You talked a lot about things like seat
 6   time and other quantitative measures of Mr. Conitz's
 7   performance. Are you familiar with qualitative
 8   measures of Mr. Conitz's performance over the years,
 9   how well he does his job?
10        A.   I would give my view on it, yes.
11        Q.   What is your view on it?
12        A.   My view is that, as we stated earlier in
13   today's discussions, that Mr. Conitz became part of
14   the mine operating group in my absence of the
15   operation.  We tested him twice for his practical
16   knowledge, ability and experience.  At the time of
17   those tests, he was not suitable, nor was he a
18   candidate to meet the level that we were looking for.
19   We were looking for a level three or level four
20   operator.  He had indicated that he had had previous
21   time in -- I believe it was in Fairbanks.  Or not
22   Fairbanks.  Fairbanks Gold, Alaska Gold operation in
23   Nome was what it was.  That he had had previous
24   equipment experience.  We were asked to go and do
25   a field test, and if he was capable of the field
```