Sean Halloran
Hartig Rhodes Hoge & Lekisch, P.C.
717 K Street
Anchorage, Alaska  99501
Phone:  (907) 276-1592
Fax:     (907) 277-4352
mail@hartig.com


Attorneys for Teck Cominco Alaska Inc.


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE


| | |
|---|---|
| GREGG CONITZ,<br><br>          Plaintiffs,<br><br>vs.<br><br>TECK COMINCO ALASKA, INC.,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case: 4:06-CV-00015 RRB |

## OPPOSITION TO MOTION TO COMPEL

**A.      Teck Cominco Fully Answered All Of The April 12 Interrogatories.**

Mr. Conitz asks the court to compel Teck Cominco to answer the interrogatories that he dated April 12, 2007.  Mr. Conitz does not anywhere assert that Teck Cominco did not fully answer them, and even attaches a copy of Teck Cominco's answers as his Exhibit 2 .  To the extent that he moves to compel answers to these interrogatories, his motion is frivolous and should be denied.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

**B.    Mr. Conitz Had Propounded 23 Interrogatories Prior To His August Requests.**

According to Mr. Conitz, his April 12 Interrogatories were only a single question, such that he should be deemed to have asked only six interrogatories prior to his August requests, and not 23. He further asserts that his August interrogatories were only 21 in number, such that the totality of his discovery requests somehow came within the 25 interrogatory limit established by Civil Rule 33. Ignoring for a moment that Mr. Conitz exceeded the 25 interrogatory limit even by his own count, the law makes clear that Mr. Conitz is simply wrong when he asserts that all of his April interrogatories should be counted as only a single question due to their supposedly having "a common theme".

> Interrogatory subparts are to be counted as part of but one interrogatory, if they are logically or factually subsumed within and necessarily related to the primary question … The best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone? Is it independent of the first question?.[1]

If the subsequent questions are "independent of the first question", the subsequent questions should be treated as separate interrogatories.[2] Consequently, "once a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated."[3] Essentially, "if the first question can be

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

1    Kendall v. GES Exposition Servs., 174 F.R.D. 684, 685-86 (D. Nev. 1997).

2    Id. This standard is approved of in *Moore's Federal Practice* § 33.30[2] at 33-37 (3d ed. 2007), and has been widely applied in federal courts. See e.g., Nyfield v. Virgin Islands Telephone Corp., 200 F.R.D. 246, 247-48 (D.V.I. 2001); Safeco Insurance Co. of America v. Rawstron, 181 F.R.D. 441, 445 (D. Cal. 1998).

3    Willingham v. Ashcroft, 226 F.R.D. 57 (D. D.C. 2005); see also Banks v. Office of Senate Sergeant-at Arms, 222 F.R.D. 7, 10 (D.D.C. 2004) (courts should "look at the way lawyers draft interrogatories and see if their typical approaches threaten the

answered fully and completely without answering the second question, then the second question is totally independent of the first and not 'factually subsumed within and necessarily related to the primary question'."[4] On the other hand, "if a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory, no matter how it is designated."[5] Courts recognize, for example, that an interrogatory that first enquires about an employer's general hiring practices, then asks about the hiring of the specific person for the position, must be counted as two interrogatories.[6] Similarly, where an interrogatory asks about documents and also asks about a specific determination made as to an employee, the question must be recognized as incorporating multiple interrogatories.[7]

Mr. Conitz would have the court believe that he is only asking one question when he requests "the minimum mandatory qualifications" for the position of mobile equipment trainer, and the identities of "candidates who applied for" the position of mine shift supervisor.[8] Similarly, he asserts that the same interrogatory that asks for these two things can also permissibly demand the identification of documents reviewed in connection with determining whether the candidates for the supervisor position were qualified and the identity of the person who chose the successful candidate for the trainer position and still count as only one

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

purpose of the rule by putting together in a single question distinct areas of inquiry that should be kept separate."

4    Estate of Manship v. United States, 232 F.R.D. 552, 555 (M. D. La. 2005), *vacated in part on other grounds*, 237 F.R.D. 141 (M. D. La. 2006).
5    Miller v. Holzmann, 240 F.R.D. 1, 3 (D. D.C. 2006)
6    Banks v. Office of the Senate Sergeant-At-Arms & Doorkeeper, 22 F.R.D. 7, 10 (D.D.C. 2004).
7    Id.
8    Docket 66; see Docket 66-3.

interrogatory.[9]  As a matter of law, Mr. Conitz is wrong.[10]  His April discovery requests

included 9 separate questions about two different events, for a total of 18 questions.  Since he

had already propounded 5 interrogatories earlier, these 18 interrogatories brought the total

number he had asked to 23.[11]  Since he did not seek leave to exceed the 25 interrogatory limit

established by Rule 33, he had only 2 interrogatories left to ask when he propounded his

August requests.  Teck Cominco answered the next 2 questions that Mr. Conitz propounded,

and properly objected to the remainder as falling outside the 25 interrogatory limit.  His motion

to compel should be denied accordingly.


C.    **The August Interrogatories Are Otherwise Objectionable.**

Mr. Conits seeks to compel answers to such questions as the identity of "every

candidate for the position" that Ms. Greene may have referenced, despite the fact that Teck

Cominco has already told him that no position was referenced by her.[12]  He seeks to compel

Teck Cominco to tell him the percentage of "Northwestern Region Alaskan Natives" that are

shareholders of NANA Regional Corporation, without offering even the slightest hint

suggesting why Teck Cominco might be expected to have any idea at all as to what the answer

might be.[13]  He wants Teck Cominco to explain "why Mr. Zigarlick says he never had a file"

when in fact, Mr. Zigarlick has never said his file did not exist, but only that he didn't receive a

file from Human Resources and that he believes his own file included only a list of names and

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

9    Id.
10    Banks at 10.
11    Mr. Conitz falsely asserts that "one interrogatory became 23 by Teck's [sic] count".
[Docket 66 at 2.]  In making this assertion, he is ignoring the fact that he propounded, and Teck
Cominco answered, multiple sets of discovery requests including 5 interrogatories prior to the
April requests.  [See Docket 16-4.]
12    Docket 66-5 at 5.
13    Id at 10.

did not include all that counsel for Mr. Conitz thinks it should.[14]  If Mr. Conitz did not

understand Mr. Zigarlick's testimony, or wanted further clarification on this point, he should

have simply asked Mr. Zigarlick additional questions when he deposed him instead of asking

Teck Cominco to explain Mr. Zigarlick's state of mind regarding something that Mr. Zigarlick

never said.

Mr. Conitz's request for the identity and ethnicity of each of the many thousands of

persons who have worked at Red Dog Mine since 1992[15] is plainly overbroad and irrelevant in

the context of a case that examines only the reasons as to why Mr. Conitz was not promoted on

two specific occasions more than a decade after the start of the specified time period.  It is also

burdensome for Teck Cominco to see if such information is even available to produce, in light

of the fact that thousands of workers at Red Dog encompassed by this request have never been

employed by Teck Cominco.  Nor can Teck Cominco be expected to know which of these

thousands of individuals might own stock in one or more unspecified corporations.

Among the questions that Mr. Conitz seeks to compel an answer is a series of

interrogatories asking about one or more complaints he made to Teck Cominco about receiving

mail that appeared to have been previously opened.[16]  What he does not acknowledge to the

court, however, is that Mr. Conitz never made any such complaint as he is asking about.[17]

Moreover, if the questions relate to how Teck Cominco is responding to the allegations

contained in the Complaint filed in this case, his questions call for information protected by the

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

14      Id. at 11; see also Docket 16-4 at 2; Zigarlick depo. at 185-188.
15      Docket 66-5 at 12.
16      Id. at 14-15.
17      Conitz depo at 69, 70, 73.

work product doctrine, as does his question calling for Teck Cominco's legal theories as to why a shareholder preference is or is not based upon race or national origin.[18]

Not only has Mr. Conitz failed to show any basis to compel Teck Cominco to answer the questions at issue, the reality is that many of the questions are objectionable on other grounds or impossible for Teck Cominco to answer. The motion should be denied accordingly.

## D.    The Court Should Not Compel Answers To Unasked Questions.

In his motion to compel, Mr. Conitz asserts that the court should preclude any need for future discovery battles by ordering Teck Cominco to answer up to 50 additional interrogatories that have yet to be posed by Mr. Conitz. There is no basis under the Civil Rules for doing so.[19]

Even if the court were to ignore the fact that the request is presented as a motion to compel, and instead treated his request as a motion to exceed the Rule 33 limit of 25 interrogatories, the request should be denied in this instance. Most of the interrogatories that Mr. Conitz has propounded to date have only served to waste the time of Teck Cominco and its staff, since the discovery requests propounded to date, for the most part, have not sought information that has not already been produced. The April interrogatories, for example, overwhelmingly demanded that Teck Cominco reiterate the exact same information it had provided in its initial disclosures.[20] With respect to Teck Cominco's disclosure that "the hiring decision was made by Mr. Zigarlick, and not Mr. Kells or Mr. Scott", for example, Mr. Conitz

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

18    See Docket 66-5 at 16.
19    See Fed.R.Civ.P. 37.
20    See Docket 66-3.

even went so far as to ask "who made the decision".[21]  Similarly, he repeatedly has asked Teck Cominco to explain why it said things that Mr. Conitz very well knows Teck Cominco has never said.[22]

Expecially where Mr. Conitz has a proven track record of multiplying the number of interrogatories he asks well beyond the numbering system by which he denominates them, there is no basis for compelling Teck Cominco to answer 50 as yet unasked interrogatories in addition to all those that have been asked to date.


**E.      Plaintiff's Counsel Did Not Try To Resolve The Issues Prior To Filing His Motion.**

Mr. Conitz asserts that counsel for Teck Cominco "did not even provide the courtesy" of responding to his attorney's letter that demanded complete answers to the August interrogatories "by September 24th" -- the same day on which the letter was delivered. [Docket 66 at 3.]  Of course, if counsel for Mr. Conitz had made any attempt to call counsel for Teck Cominco before filing his motion, he would have learned that Teck Cominco's attorney was out of the office when his letter arrived, and did not have any opportunity to respond until after the instant motion had already been filed.  The fact is that Mr. Conitz is attempting to turn this case into a vitriolic attack upon Teck Cominco and its counsel.[23]  He did not meet his obligation to confer with Teck Cominco prior to bringing his motion, and there would have likely been no need for the motion if he had bothered to follow the court rules.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

21    Docket 66-3 at 2, 7.
22    See e.g. Docket 16-4.
23    See Docket 68 at 4.

**F. Mr. Knapp Is Willing To Have His Signature Notarized When A Notary Is Available.**

Mr. Conitz seeks to compel Mr. Knapp to notarize his signature verifying Teck Cominco's September discovery responses. If counsel for Mr. Conitz had bothered to ask, he would have been told that (as it states on the verification page) no notary was available at Red Dog Mine when Mr. Knapp signed the verification, and that Mr. Knapp is willing to sign again before a notary when one becomes available. There was no need for a motion to compel.

DATED at Anchorage, Alaska, this 22nd day of October, 2007.

HARTIG RHODES HOGE & LEKISCH
Attorneys for Defendant
Teck Cominco Alaska Incorporated.

By: _____
    Sean Halloran

CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of October, 2007
a true and correct copy of the foregoing was served
on Kenneth Covell & Thomas Daniel by electronic
means through the ECF system as indicated on
the Notice of Electronic Filing.

_____
Hartig Rhodes Hoge & Lekisch PC

F:\Docs\62880\198\PLEADINGS\OPPOSITION TO MOTION TO COMPEL.doc

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


GREGG CONITZ,                        )
                                     )
           Plaintiff,                )
                                     )
vs.                                  )
                                     )
TECK COMINCO ALASKA, INC.,           )
                                     )
           Defendant.                )
_____)

Case No. 4:06-CV-00015 RRB


_____


DEPOSITION OF GREGG CONITZ

_____


Pages 1 - 102
Thursday, August 2, 2007
8:30 A.M.



Taken by Counsel for Defendant
at
HARTIG RHODES HOGE & LEKISCH
717 K Street
Anchorage, Alaska

1   designated the decision-maker.

2   BY MR. HALLORAN:

3       Q.   You can answer the question.

4            MR. COVELL:   You can go ahead and answer.

5            THE WITNESS:   My perception of it is it is

6   somewhat of a group thing to where I think it would

7   be hard to define as ultimately one person's

8   decision.

9            I believe that Mr. Kells told me ultimately

10  that this was somewhat of a consensus reached by

11  three people, all of whom did not necessarily agree,

12  and that he was the minority one out of the three

13  that didn't agree with the decision, and --

14  BY MR. HALLORAN:

15      Q.   But that's talking about your specific

16  application for that particular position at that

17  particular time, right?

18      A.   Yes, right.

19      Q.   I'm saying in general, positions of this

20  level.   Normally Mr. Zigarlick would be the

21  decision-maker, wouldn't he?

22      A.   Well, as I said before, I don't really have

23  inside knowledge of how those decisions have been

24  made in other circumstances.

25      Q.   Okay.   You have an allegation in your

Page 68

1   complaint regarding mail that you received at the

2   mine.  Tell me about it.

3        A.   I received a letter that came from my

4   attorney, Ken Covell, that was mailed from his

5   Fairbanks office on his office stationery, letterhead

6   on the envelope.  It was mailed to my home address

7   here in Anchorage.  Due to the fact of being gone

8   from home for four weeks at a time, what I do is have

9   my mail forwarded.  It's forwarded through the

10  company, through the Anchorage office to the mine

11  site.

12            When I received the letter, it had been

13  opened, clearly, completely across the top of the

14  envelope, stapled shut.  The person at the mine site

15  who received the letter and distributes the letter

16  into the mail, Grace - I don't know her last name.

17  She works at the billeting office with NANA

18  Management Services - initialed the front of the

19  envelope and wrote on it that she had received it

20  opened and stapled shut.

21       Q.   What was that person's name?

22       A.   Grace is her first name.  I don't know her

23  last name.  She goes by Gracie.

24       Q.   Is she a Teck Cominco employee?

25       A.   No.  She's a NANA Management Services

1    employee.

2        Q.    NANA Management handles the mail at Red

3    Dog?

4        A.    They handle the mail when it gets to the

5    living facility.  Teck Cominco handles the mail that

6    comes into the warehouse, and then they take it over

7    to the living -- the pack, which is the living

8    facility, and then this NANA Management Services

9    person distributes it into the mailboxes which are in

10   the living facility.

11       Q.    Is it the billeting office that takes care

12   of that?

13       A.    Yes, it is.

14       Q.    Do you have a mailbox?  How do they

15   distribute the mail?

16       A.    Yeah.  You've got a little mailbox, kind of

17   like what they have at the post office, with a key

18   and a little box, and they put your mail in there.

19       Q.    And did you tell anyone or complain to

20   anyone about the fact that you had received the

21   letter that had been opened and stapled shut?

22       A.    I believe I asked Gracie about it.  She

23   told me that she had received it that way.  I can't

24   specifically remember whether I complained to Joanne

25   Bozek in the Anchorage office or not.  I don't

Page 70

1    remember whether I did or not.

2        Q.   And I'm assuming, then, if you don't

3    remember whether you complained, do you remember

4    whether anyone gave you any explanation for what

5    might have happened?

6        A.   No, I do not remember getting an

7    explanation from anybody.

8        Q.   And do you remember if you complained to

9    anyone at Red Dog?

10       A.   I don't remember for certain, but I don't

11   believe that I did.

12       Q.   Did anyone at Red Dog give you any sort of

13   explanation as to what might have happened?

14       A.   No.

15       Q.   Is there any other occasion when you've

16   received mail that's been opened?

17       A.   In the time that I've worked there, I

18   believe there have been three.  This was one of them.

19   Prior to that, the only other time that anything

20   happened was regarding a workman's comp issue, a

21   letter from workman's comp insurance company, and

22   that was opened.  And I believe I complained to the

23   Anchorage office about that.

24            And then the other time was another letter

25   from Mr. Covell that appeared to have been opened and

Page 71

 1    then taped shut.  It appeared to me that it was glued

 2    shut, and it was opened where the glue was and then

 3    taped back shut.

 4         Q.    There was tape on it?

 5         A.    Yes, there was tape on it.

 6         Q.    With regard to the workers' comp letter,

 7    when did that occur?

 8         A.    I don't remember exactly, but I believe it

 9    would have been in the neighborhood of three years

10    ago.

11         Q.    Three years ago from now?

12         A.    Yeah.

13         Q.    Do you recall what kind of injury you had

14    at that time?

15         A.    Yes.  I have a back problem.  It was with

16    regards to that.

17         Q.    Was that the only workers' comp injury

18    you've had?

19         A.    No.

20         Q.    Were there other workers' comp injuries

21    that were also back injuries?

22         A.    No.

23         Q.    So if I was to look up when you had a

24    workers' comp back injury, that would more or less

25    pinpoint for me the time at which you might be

Page 72

1    receiving letters regarding that injury?

2         A.    I believe it would, yes.

3         Q.    Okay.  And then when did the incident occur

4    with the stapled-shut envelope?

5         A.    That was around the time that we were

6    working on the EEOC complaint, I believe.  I don't

7    remember exactly if it was prior to or after.  It was

8    in that neighborhood somewhere.  I have the letter

9    and the envelope.

10        Q.    You still have it now?

11        A.    Yes, I do.

12        Q.    And then the third incident that you

13   mentioned, when someone had put tape on an envelope,

14   when did that occur?

15        A.    That was after the one that was stapled by

16   maybe a month or two.

17        Q.    And who was that letter from?

18        A.    Ken Covell.

19        Q.    Was that also addressed to you at your

20   home?

21        A.    Yes, I believe it was.

22        Q.    And forwarded to you by the Postal Service

23   directly?

24        A.    Yeah.  The Postal Service forwards it to

25   the Anchorage office, and then it's in the company's

Page 73

1    hands going from the Anchorage office to Red Dog.

2        Q.    Have you ever known anyone else at Red Dog

3    to receive mail that had been opened prior to the

4    time it was delivered?

5        A.    Not to my knowledge.

6        Q.    On the third incident that you mentioned

7    with the envelope that had tape on it, did you make

8    any complaints to anyone about that incident?

9        A.    I don't remember that I did.

10        Q.    And did anybody ever give you any

11    explanations as to what might have happened with

12    regard to that?

13        A.    Not that I recall.

14        Q.    And other than complaining, did you bring

15    it to anyone's attention either at Red Dog or in the

16    Anchorage office?

17        A.    Well, my wife knew about both of those

18    instances.  Possibly I would have mentioned it to

19    somebody that I work with, but not that I

20    specifically remember.

21        Q.    But no supervisors or --

22        A.    No.

23        Q.    You didn't call Joanne Bozek and let her

24    know or anything like that?

25        A.    No, not at that time.  I guess I just told

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


GREGG CONITZ,                         )
                                      )
            Plaintiff,                )
                                      )
vs.                                   )
                                      )
TECK COMINCO ALASKA, INC.,            )
                                      )
            Defendant.                )
_____)

Case No. 4:06-CV-00015 RRB


_____


DEPOSITION OF TED ZIGARLICK

_____


Pages 1 - 271
Wednesday, August 1, 2007
8:30 A.M.



Taken by Counsel for Plaintiff
at
HARTIG RHODES HOGE & LEKISCH
717 K Street
Anchorage, Alaska

Page 185

1          A.    He made his assessment, I made mine, and

2     then we jointly sat together.

3          Q.    Okay.  And did you make any notes or other

4     commemorations of your assessment?

5          A.    Any notes?

6          Q.    Yeah.

7          A.    Other than mental ones, no.

8          Q.    Okay.  All right.  And as far as materials

9     you used to make your assessments, did -- let me ask

10    you this question.  Did you get sent a paper file

11    from HR in regard to making this job selection?

12         A.    Did I receive anything?

13         Q.    Yeah.

14         A.    Not to my recollection, no.

15         Q.    Okay.  Did Mr. Kells, if you know?

16         A.    I don't know that.

17         Q.    Okay.  Is this the job that the file's gone

18    missing on?

19         A.    Is this the job that the file went missing

20    on?

21         Q.    Right.  Right.  What I understand is there

22    is some kind of selection file, and it was my

23    understanding that that file -- there was a file that

24    you had that you sent back to HR that HR says they

25    never got.

1        A.    The only file that I could think of is the

2    list of people that applied for the job, and that

3    would be the end of it.  There was -- I don't know

4    what else you're looking for.  We had candidates that

5    applied for the job as the supervisor.

6        Q.    Right.

7        A.    And I believe -- I still believe it was

8    Mr. Gibson, Mr. Sheldon, Mr. Conitz, Mr. Hanna and

9    Mr. Parillon.  Those are the five candidates that

10   requested the opportunity of a supervisor job.

11       Q.    Okay.  All right.  And so what you call the

12   file was a list of those candidates.  Is that

13   something you generated or HR generated or do you

14   know?

15       A.    I think it was just publicly known that

16   that's who the candidates of choice were through

17   Mr. Kells, and he shared that with myself, and he

18   probably would have shared that with HR.

19       Q.    Okay.  In regard to either this job or the

20   trainer job, did you ever have a file that was a

21   compilation of papers about making a selection for

22   the job?

23       A.    Not that I can recollect.  We had a formal

24   file that -- if you're looking for a matrix or

25   anything like that.  Is that what you're asking?

1          Q.    Well, I mean, what I envisioned is --
2     holding up a manila folder.  Something like this,
3     with 50 pages in it or so that had resumes and work
4     experience, evaluation sheets.
5          A.    Never seen such a file, sir.
6          Q.    All right.  Do you agree it would be
7     helpful to try to recreate the situation if we had
8     something like that?
9          A.    I will tell you that our selection of
10    interviewing people has improved much, not just for
11    Mr. Conitz or anybody else.  Over the last couple,
12    three years there is a more formal protocol of making
13    sure that there is resumes and question and answer is
14    done on a thing.
15               But prior to those days, my experience at
16    Red Dog, the people -- I know everybody in the mine
17    department, very well at that time.  My assessment
18    was through experience, observation and personal
19    knowledge of each individual, is how that came
20    about.
21         Q.    Okay.  And those answers as to files and
22    papers apply to both jobs, right?
23         A.    Yes.
24               MR. COVELL:  Go ahead and mark this
25    sequentially, please.

Page 188

1              (Exhibit 27 marked.)

2    BY MR. COVELL:

3        Q.    This No. 27 appears to be -- let's see.  A

4    Cominco publication -- no, no.  Do you know what this

5    is?  That would be the first question.

6        A.    To answer your question, no, I've never

7    seen it.

8        Q.    Okay.  All right.  Would it be fair to say

9    these seem to be some form of historical publications

10   that pertain to the Red Dog mine that were similar to

11   the previous exhibit we saw?

12       A.    Can only assume so there.  Doesn't show we

13   approved of that, but I would assume it has something

14   to do with it, yes.

15       Q.    All right.  If you turn to the second page,

16   at the bottom it says diversity initiatives.  There

17   it says, "As a corporation, we strive to employ a

18   diverse workplace but have no formal policies in

19   place other than at Red Dog."

20             Do you know if -- and I realize this could

21   be somewhat redundant for you, and I know you've

22   given me answers, but just to keep the record clear.

23   Are you aware of formal policies of diversity at Red

24   Dog?

25       A.    Formal policies of diversity at Red Dog.