Sean Halloran
Hartig Rhodes Hoge & Lekisch, P.C.
717 K Street
Anchorage, Alaska 99501
Phone: (907) 276-1592
Fax: (907) 277-4352
mail@hartig.com

Attorneys for Teck Cominco Alaska Incorporated

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| Gregg Conitz, )<br>)<br>          Plaintiff, )<br>)<br>vs. )<br>)<br>TECK COMINCO ALASKA, INC. and )<br>NANA REGIONAL CORPORATION, )<br>)<br>          Defendants. )<br>————————————————————— ) | Case: 4:06-CV-00015  RRB |

## TECK COMINCO'S MOTION FOR SUMMARY JUDGMENT

Defendant Teck Cominco Alaska Incorporated herein seeks summary

judgment as to all claims asserted by plaintiff Greg Conitz in this litigation, as

there are no material issues of fact to be tried.

## Background Facts

Defendant Teck Cominco Alaska Incorporated operates the Red Dog Mine. [Scott Affidavit; Zigarlick Declaration.] The mine is owned by defendant NANA Regional Corporation. [Id.] The relationship between NANA and Teck Cominco is a type of joint venture. Reich v. Cominco Alaska, 56 P.3d 18, 23 (2002); see Zigarlick Declaration. NANA contributes its ore bodies and surrounding land to the Red Dog Project, while Teck Cominco contributes the use of its capital, operational expertise, and operational abilities. [Zigarlick Declaration.] The Red Dog Project is governed by a management committee in which Teck Cominco and NANA have equal representation. [Id.; Pankowski v. Cominco Alaska, ASCHR C-91-093 (1993).[1]] Ultimately, the profits that the Project generates are apportioned between NANA and Teck Cominco. [Id.; Reich at 24.]

Mr. Gregg Conitz began employment with Teck Cominco at Red Dog in 1990 as an Oiler in the Mill Maintenance Department. [Zigarlick Declaration.] In 1995, he transferred to the Mine Operations department as an apprentice equipment operator. [Id.] It took Mr. Conitz five years to achieve journeyman, or "Level 6" status, and he continues to be employed as a Level 6 Operator today. [Id.] Mr. Conitz's performance is not above average with respect to any of the equipment he

---

[1]    For the convenience of the court, a true and correct copy of the Pankowski decision is included within Exhibit 1.

operates, and between 1995 and 2004, he averaged nearly three safety incidents/accidents per year. [Id.]

When one of Teck Cominco's mine shift supervisors drowned in a boating accident in June, 2004, it became necessary to hire a replacement. [Id.] From then until April 2005, Teck Cominco appointed several individuals, including each of the Teck Cominco employees who eventually applied for the job, to serve as Acting Supervisor in that position, in order to take advantage of the opportunity to observe the performance of each of the individuals and assess their suitability for the job. [Id.] Mr. Zigarlick, then superintendent of mine operations, ultimately determined that Mr. Larry Hanna was the best qualified applicant, and Mr. Hanna was promoted to fill the position. [Id.] In finding Mr. Hanna superior to all other applicants, including Mr. Conitz, Mr. Zigarlick recognized that he had experience working at the DMTS Port, experience working in Mill Operations, and experience working in Surface Operations, as well as experience serving as an acting supervisor in Surface and Mine Operations, and as an a trainer in Surface, Mine and Port Operations. [Id.; Zigarlick depo. at 256; see Hanna Declaration.] In total, Mr. Hanna's experience provided him with greater breadth and with more training and supervisory experience than any of the other candidates. [Zigarlick Declaration.]

An opening for a mine operations trainer was originally posted on December 2, 2004, and scheduled to close on December 22, 2004. [Id.] Because of operational

concerns driven by international metals prices, the targeted starting date was moved back from January 2005 to June 2005, and the application period was similarly extended. [Id.] At the same time, and as part of the overall evaluation of Red Dog operations, the name of the position was changed from "Mine Operations Trainer" to "Mobile Equipment Trainer". [Id.] By the time that applications were closed in May 2005, the applicant pool consisted of the four individuals that were unsuccessful applicants for the mine shift supervisor position. [Id.] As before, the selection of the successful candidate was made by Mr. Zigarlick. [Id.] His choice was Mr. Mike Baker, who was a former trainer for Teck Cominco Alaska seeking an opportunity to return to his former position. [Id.; see Baker Declaration.]

Mr. Baker was chosen as the successful candidate due to his exemplary safety record; his experience in Surface Operations, Materials Management and Mine Operations; and his qualifications and outstanding past performance as a trainer and a developer of training programs. [Id.] Mr. Conitz, on the other hand, had a poor record with respect to safe mobile equipment operating practices over many years of operations, had no prior experience as an equipment trainer, and had no formal training as a trainer. [Zigarlick Declaration.] In short, Mr. Zigarlick determined that Mr. Baker was well qualified for the position while Mr. Conitz was not qualified at all. [Id.]

Mr. John Kells, who was then a general foreman in mine operations but who is no longer a Teck Cominco employee, continued to use Mr. Conitz as an acting

supervisor from time to time. However, Mr. Kells' replacement, Warren Draper, chose to not use anyone with a poor safety record in that capacity. [Draper Declaration; see Zigarlick depo at 209-210 (Draper succeeded Kells).] Because Mr. Conitz had a particularly poor safety record, he was among those who were deemed by Mr. Draper to be unsuitable for advancement to a regular supervisory position. [Id.]

Mr. Conitz has now sued, claiming that Mr. Zigarlick's decision to promote Mr. Hanna instead of the plaintiff constitutes discrimination under Alaska law, and claiming that his decision to re-hire Mr. Baker instead of promoting Mr. Conitz constitutes discrimination under both state and federal law. [Docket 57.] Additionally, Mr. Conitz now claims that Mr. Draper's decision to use individuals other than Mr. Conitz whenever it becomes necessary to appoint a relief supervisor constitutes unlawful retaliation. [Id.] Mr. Conitz has brought other claims before the court as well, including allegations that his privacy has been invaded. [Id.] Teck Cominco herein moves for summary judgment as to all claims.

## Summary Judgment Standards

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where there is "no genuine issue as to material fact," and the moving party is "entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); In re: Apple Computer Securities Litigation, 866 F.2d 1109, 1112 (9th Cir. 1989).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Lujan v. National Wildlife Federation, 110 S.Ct. 3177, 3186 (1990).

A party seeking summary judgment need not disprove claims for which his opponent bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party "need provide nothing more than a reference to those materials on file in the case which support the movant's belief that there is an absence of any genuine issue of material fact." Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249; Bukoskey v. Walter W. Shuman, 666 F. Supp. 181, 185 (D. Alaska 1982).

## Argument

### A.     Teck Cominco Is Entitled To Judgment On The Federal and State Claims For National Origin Discrimination.

Mr. Conitz asserts in his Complaint that he is European, and that his national origin is therefore some undisclosed nation in Europe. [Docket 57 at ¶ 8.] The Complaint further alleges that the selection of Mr. Mike Baker, instead of Mr. Conitz, to fill the position of Mobile Equipment Trainer constitutes National Origin Discrimination under federal law. [Id. at ¶ 34.] He similarly asserts that the

selection of Mr. Lawrence Hanna, instead of the plaintiff, to fill the position of Mine

Operations Supervisor constitutes National Origin Discrimination under Alaska

State law.  [Id. at ¶ 47.]  In cases such as this one, where Mr. Conitz has no direct

evidence of discriminatory intent, both Alaska and federal law provide for use of a

three-part analysis known as the McDonnell Douglas test[2] to determine whether an

individual is the subject of unlawful discrimination.  Raad v. Alaska State Com'n

for Human Rights, 86 P.3d 899, 904 (Alaska 2004).  The McDonnell Douglas test

requires that "the complainant must show that (1) the complainant belongs to a

protected class; (2) the complainant applied for and was qualified for a job for which

the employer was seeking applications; (3) the complainant was rejected despite the

complainant's qualifications; and (4) after the complainant's rejection, the position

remained open and the employer continued seeking applications from persons with

the complainant's qualifications."  Id..  However, "if an employer has not left the

disputed position open, and  has instead hired someone else, the fourth element of

the prima facie case is the hiring of an individual not within the same protected

class as the complainant."  Id.

Here, it is undisputed that Mr. Conitz was not hired for the Mobile

Equipment Trainer position because Mr. Baker was selected over him, and he was

not hired into the Mine Operations Supervisor position because Mr. Hanna was

---

[2]        The McDonnell Douglas test is named after the United States Supreme Court case
in which it was first enunciated, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).
Alaska adopted the McDonnell Douglas test in Brown v. Wood, 575 P.2d 760 (Alaska 1978).

selected over him. [See Docket 57.] Accordingly, regardless of Mr. Conitz's

qualifications or lack thereof, his National Origin discrimination claim must fail

unless he can show that Mr. Baker and/or Mr. Hanna are not within the same

protected class as himself. Raad at 905.

Contrary to the assertion in his Complaint, Mr. Conitz is not from any

European country. [Conitz depo. at 11-13.] To the contrary, Mr. Conitz's national

origin is the United States. [Id.] Mr. Baker's national origin is also the United

States. [Baker Declaration.] As well, Mr. Hanna's national origin is the United

States. [Hanna Declaration.] As a matter of law, there can not have been any

discrimination on the basis of national origin where the successful and unsuccessful

candidates share the same national origin. Raad at 905.907. Mr. Conitz's claim is

frivolous, and Teck Cominco is entitled to summary judgment accordingly.


**B.    Teck Cominco Is Entitled To Judgment On The Invasion Of Privacy Claim.**

Mr. Conitz asserts that Teck Cominco twice invaded his privacy by opening

mail that he had forwarded to the company for delivery to him at Red Dog. On

April 6, 2006, he claims that he received an envelope that was stapled shut. [Conitz

depo. at 68; see Docket 57 at ¶ 29.] On another occasion within the two week period

beginning on that date, he asserts that he received another envelope that had tape

keeping the flap closed. [Conitz depo. at 70-71; see Docket 57 at ¶ 30.] He asserts

that Teck Cominco intentionally opened and re-sealed his mail on both occasions, and that it did so to invade his privacy. [Docket 57 at ¶¶ 29-30, 75.]

In Alaska, a person who "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person". <u>Greywolf v. Carroll</u>, 151 P.3d 1234, 1244-1245 (Alaska 2007); <u>Walmart v. Stewart</u>, 990 P.2d 626, 632 (Alaska 1999).

Mr. Conitz has no evidence to support his claim that anyone ever intentionally opened personal mail addressed to him. [<u>See</u> Conitz depo. at 68-74.] Mail addressed to Teck Cominco's Red Dog employees is from time to time opened accidentally, as a result of getting mixed in with the company's mail [Radakovich Affidavit; Holbrook Affidavit; McNeal Affidavit.] From time to time, mail is also received by the company from the Postal Service in envelopes that are not sealed. [<u>Id</u>.] It is apparent that on one of the occasions at issue, a letter addressed to Mr. Conitz was accidentally opened and then stapled shut so as to be forwarded to him, while on the second occasion about which he complains, Mr. Conitz's envelope was open when delivered by the Postal Service, and in accordance with standard procedures, was taped shut so as to be forwarded to him.[3] [<u>See Id</u>.; <u>see</u> Conitz depo.

---

[3]    Prior to the mail deliveries that he claims constitute retaliation, Mr. Conitz admits that he has received mail that had been accidently opened and re-sealed. [Conitz depo. at 70.] Such accidents may well happen again in the future. [<u>See</u> Radakovich Affidavit; Holbrook Affidavit; McNeal Affidavit.]

at 68-71.] What is clear and undisputed is that nobody at Teck Cominco ever intentionally opened any envelope that may have been addressed to Mr. Conitz, and nobody at Teck Cominco ever read any mail that may have been addressed to Mr. Conitz. [Radakovich Affidavit; Holbrook Affidavit; McNeal Affidavit; Outwater Declaration.] There are no facts to support Mr.Conitz's claimed invasion of privacy, and Teck Cominco is entitled to judgment accordingly.

C.    **Teck Cominco Is Entitled To Judgment On The State and Federal Claims For Retaliation.**

"To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000). With respect to claims of retaliation, Alaska law is in accord with federal law, and also requires that: "a complainant must establish that (1) the complainant engaged in a protected activity (e.g., opposed a discriminatory practice); (2) the complainant suffered an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action." Raad v. Alaska State Com'n for Human Rights, 86 P.3d 899, 905 (Alaska 2004). Here Mr. Conitz asserts that his receipt of mail that had previously been opened constituted retaliation, and that he was further retaliated against because he was not used as an acting supervisor

since some time after he filed an EEOC complaint. [Docket 57 at ¶ 57.] As a matter of law, his claims necessarily fail.

## 1.    There Was No Retaliation With Respect To Conitz's Mail.

The affidavits of the individuals who process mail for Teck Cominco make clear that nobody at Teck Cominco ever intentionally opened any envelope that may have been addressed to Mr. Conitz. [Radakovich Affidavit; Holbrook Affidavit; McNeal Affidavit; Outwater Declaration.] Moreover, none of the people working at Teck Cominco who could have opened the envelopes at issue had any knowledge of Mr. Conitz's EEOC Complaint. [Id.] It is therefore impossible for there to be a causal link between the filing of an EEOC Complaint by Mr. Conitz and the alleged opening of mail. Even if we assume that opening mail somehow constitutes an "adverse employment action" (which it does not), the lack of causation necessitates that Mr. Conitz's claim of retaliation must fail. Ray at 1240. Judgment should be entered in favor of Teck Cominco accordingly.

## 2.    There Was No Retaliation With Respect To Not Using Conitz As An Acting Supervisor.

The facts are clear in showing that the decision to use persons other than Mr. Conitz as relief supervisors had no connection to his EEOC Complaint. Teck Cominco hired Mr. Warren Draper out of retirement to serve as a Mine Foreman, and charged him with the task of selecting candidates who, with appropriate

training, might eventually succeed as supervisors in Red Dog's operations. [Draper Decl.] With input from others, he identified several individuals that possess the requisite attitude, knowledge of mining, and observation, evaluation and communication skills to eventually become a supervisor. [Id.] However, because of a need to improve safety at Red Dog, he felt that it was inappropriate for persons with poor safety records to be held up as an example for others to follow, and he refused to consider anyone that had a poor safety record as an appropriate candidate for supervisor. [Id.] Gregg Conitz has a dismal safety record, and like other individuals in his situation, was found by Mr. Draper to be unacceptable as a candidate for development into a supervisor. [Id.] Accordingly, Mr. Draper determined that he would not allow Mr. Conitz to serve as a relief supervisor. [Id.] The fact is that Mr. Draper made a justifiable business decision to not use Mr. Conitz and others similarly situated to him as relief supervisors, and that decision had nothing what so ever to do with Mr. Conitz having complained to the EEOC. [Id.] Mr. Conitz cannot establish causation, and summary judgment should be granted to Teck Cominco accordingly.

### D.    Teck Cominco Is Entitled To Judgment On The Claims For Racial Discrimination Relative To The Re-Hiring Of Mr. Baker.

Mike Baker worked for Teck Cominco as a mobile equipment trainer from 1997 to 1999, and served in other positions at Red Dog prior to that time. [Baker Declaration; Zigarlick Declaration.] He had an exemplary safety record. [Zigarlick

Declaration.] When an opening for a trainer position came available again in 2005, he asked to be re-hired into his old job. [Id.] Mr. Baker was fully qualified for the position, having performed the job exceptionally well when he previously held it. [Id.] More than just being qualified, however, Mr. Baker was better qualified than any other applicant. [Id. Zigarlick depo. at 262.] Mr. Conitz, on the other hand, was found to be entirely unqualified for that position, not only because of his dismal safety record, but also because of his relative lack of experience. [Id.] Race played no role in the decision to re-hire Mr. Baker.[4] [Id.]

As a matter of law, there is no basis for a claim of unlawful discrimination with respect to a hiring decision when the most qualified candidate is selected over an unqualified candidate. When a hiring or firing decision is based upon a "lack of proper qualifications", the decision is legitimate and non-discriminatory. Coleman v. Quaker Oats Co., 232 F.3d 1271 (9th Cir. 2000); Sakellar v. Lockheed Missiles & Space Co., 765 F.2d 1453 (9th Cir. 1985). Teck Cominco is entitled to judgment as a matter of law, and summary judgment should be granted accordingly.

**E.      Teck Cominco Is Entitled To Judgment On The Claim For Racial Discrimination Relative To The Promotion Of Mr. Hanna.**

Larry Hanna was a long time Teck Cominco employee when he was promoted to a supervisor position calling for him to oversee a shift crew in the mine

---

[4]      Because Mr. Baker was more qualified than any other candidate, shareholder preference was not a factor either. [Zigarlick Declaration; Zigarlick depo. at 263.]

department. As of the time he was promoted, Mr. Hanna had experience working at the DMTS Port and in the Mill Operations, Surface Operations, and Mine Operations departments. [Hanna Declaration; Zigarlick Declaration.] His experience included work as an operator, a mobile equipment trainer, and as a relief supervisor in multiple departments. [Id.] When making the decision as to who to promote, Mr. Zigarlick determined that Mr. Hanna was the best qualified of the applicants, because he had greater breadth and more training and supervisory experience than any of the other candidates. [Zigarlick Declaration; Zigarlick depo. at 87-88, 93, 148, 158.] Mr. Conitz, on the other hand, was found to be unsuited for the job, primarily because his poor safety record precludes the company from wanting to hold him out as an example for others to follow,[5] but also because he had substantially less experience serving in leadership roles. [Zigarlick depo. at 151 157, 202, 256, 262. ] The shareholder hire preference played no part in the decision to promote Mr. Hanna. [Zigarlick Declaration; Zigarlick depo. at 210-211.] As with other hiring decisions at Red Dog, race played no part in choosing the successful candidate either. [Zigarlick Declaration.] Where there was no discrimination on the basis of race, there is no basis for Mr. Conitz's claim of discrimination, and summary judgment should be entered accordingly.

---

[5]     It is worth noting that Teck Cominco has redoubled its efforts in the past few years to improve its safety record. [Zigarlick depo at 151, Draper Decl., Zigarlick Decl.]

1.    **Mr. Kells' Testimony Does Not Create A Material Issue Of Fact.**

Mr. John Kells previously served as a mine foreman at Red Dog. He asserts that he wanted the decision of who to hire as mine shift supervisor to be delegated to him by Mr. Zigarlick, and asserts that if Mr. Zigarlick had delegated it, he would have promoted Mr. Conitz instead of Mr. Hanna. [Kells depo. at 81-82.] This is despite the fact that Mr. Kells recognized that Mr. Hanna "does a lot better than me [Kells] or the other shifters". [Exhibit 2; see Kells depo. at 130, 126.] Although Mr. Kells was not given the responsibility of making the hiring decision, he now asserts that Mr. Zigarlick (who did make the decision) and Mr. Scott (who approved the decision but did not participate in making it) told him that a shareholder preference was applied in favor of Mr. Hanna.[6] [Kells depo. at 78-79, 134-138.] Even if Mr. Kells' assertion creates an issue of fact as to whether a hiring preference was actually applied in that instance [see Zigarlick Decl.], any such issue is immaterial and may not properly defeat summary judgment, since the application of a hiring preference in favor of NANA shareholders is not a race based preference as a matter of law, and since Teck Cominco is entitled as a matter of law to apply such a hiring preference when employing workers at Red Dog.[7]

---

[6]    There is no reference to such a conversation in the detailed diaries that Mr. Kells kept, and his current testimony conflicts with the version of facts that he earlier asserted.

[7]    When two job applicants are rated equally, Teck Cominco gives a preference to a NANA shareholder if one of the two qualifies as such. If the candidates are not rated equally, no preference is given to either candidate. [Somers depo. at 28-29; Zigarlick depo. at 38, 56, 176, 178, 255-257; Scott Affidavit; Zigarlick Declaration.]

a.   **NANA Shareholders Are Not A Race-Based Group As A Matter Of Law. Thus, A Preference For NANA Shareholders Is Not a Racial Preference.**

In 1971, Congress settled the aboriginal claims of Alaska's Indians, Aleuts and Eskimos. [Pub. L. No. 92-203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §§ 1601.] The Alaska Native Claims Settlement Act provided for the creation and operation of numerous village and regional corporations to effectuate the settlement and serve the settlement's beneficiaries. [Id.] NANA is one of the ANCSA Regional Corporations. The Ninth Circuit Court has recognized that the statutory organization of certain individuals into ANCSA corporations as shareholders, "though they utilize blood quantum criteria, are clearly political classifications based on the unique non-reservation and non-tribal situation of the Alaska Natives". Alaska Chapter, Associated General Contractors, Inc. v. Pierce, 694 F.2d 1162, 1169 n10 (9th Cir. 1982). Any preference for NANA shareholders is therefore a preference for the political grouping of persons enrolled by ANCSA as shareholders in NANA Corporation. As a matter of law, it is not a race based group, and any employment preference in favor of that group is not a race based preference. Morton v. Mancari, 417 U.S. 535 (1974)[8]; Doe v. Kamehameha

---

[8]       In Mancari, the Supreme Court determined that the BIA's employment preference for "Indians" was not an unconstitutional racial preference because it was not directed toward the racial group consisting of Indians, but rather was applicable only to the political group consisting of members of federally-recognized tribes, thus excluding some persons who were racially classified as Indians. Id. at 554 n.24. Here, the political group consisting of NANA shareholders similarly excludes most members of the much larger racial groups of Aleuts, Indians and Eskimos who qualify as Alaska Natives.

Schools/Bernice Pauahi, 470 F.3d 827, 849-856 (9th Cir. 2006)(W. Fletcher

concurring)[9].  Even if a preference in favor of NANA shareholders was applied in

favor of Mr. Hanna (and Teck Cominco continues to assert that it was not), where

such a preference does not amount to race based discrimination as a matter of law,

summary judgment must be entered in favor of the defendants.


b.     **Where Teck Cominco Contributes Its Employees To The Red Dog Project, Federal Law Permits The NANA Shareholder Hiring Preference.**


1.     **Teck Cominco And NANA Participate In A Joint Venture.**

A joint venture exists under Alaska law when you have "an association of two

or more persons to carry out a single business enterprise for profit, for which

purpose they combine their property, money, effects, skill, and knowledge."

Northern Lights Motel v. Sweaney, 561 P.2d 1176, 1187 (Alaska 1987). "The joint

venture may be established without any formal agreement between the parties; it

may be implied from the facts or circumstances of the case." Id. "Although each

venturer need not exercise actual physical control of the instrumentalities used in

the enterprise, each must have a legal right to some voice in the direction and

control of the enterprise." Id. Here, The Alaska Supreme Court has recognized that

the relationship between NANA and Teck Cominco is a type of joint venture. Reich

---

[9]     In Kamehameha Schools, the concurring opinion pointed out that a preference for any group that is political rather than racial in composition does not violate § 1981 as a matter of law.

v. Cominco Alaska, 56 P.3d 18, 23 (2002).[10] In this regard, the Red Dog Mine is a Project in which Teck Cominco has participated with NANA since March 1988. [Zigarlick Declaration.] NANA contributes the land and the mineral rights, while Teck Cominco contributes capital and its operational expertise and abilities. [Id.] They each contribute their efforts and knowledge through participation in the Project's management committee, which is composed of six NANA representatives and six Teck Cominco representatives. [Id.] For its contributions to the Project, NANA receives royalties and is paid 25-50% of the net proceeds in accordance with a regularly increasing schedule. [Id.] Because NANA's equity interest in the joint venture meets or exceeds the 25% threshold set forth in 43 U.S.C. §1626(g), federal law permits Teck Cominco and other participants in the Red Dog Project to discriminate in favor of NANA shareholders and/or Natives generally when hiring personnel to work at the mine.

## 2.    The Red Dog Project Is Exempt From Federal Anti-discrimination Laws.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate in hiring practices because of a person's race, color, religion, sex, or national origin. [42 U.S.C. §2000e-2(a).] However, the Civil Rights Act expressly exempted Indian tribes from the definition of employers, so as to permit them to

---

[10] Cominco Alaska Incorporated is the former name of defendant Teck Cominco Alaska Incorporated. [Zigarlick depo. at 259.]

favor Native Americans when hiring. [42 U.S. C. §2000e(b). ] In addition, the statute provides that certain non-Indian business entities are also exempt, so as to encourage them to provide preferential treatment to Natives under certain circumstances. [See 42 U.S.C. §2000e-2(i).] Congress extended the privilege for preferential treatment to Alaska Native corporations when amending the Alaska Native Claims Settlement Act in 1991 and again in 1992 under the Alaska Land Status Technical Corrections Act. These Acts resulted in the following statutory provision:

> a Native Corporation and corporations, partnerships, joint ventures, trusts, or affiliates in which the Native Corporation owns not less than 25 percentum of the equity shall be within the class of entities excluded from the definition of "employer" by section 701(b) (1) of Public Law 88-352 (78 Stat. 253), as amended, or successor statutes.

[43 U.S. C. §1626(g).]

In developing the legislation contained in ANCSA, Congress was sensitive to the impoverished condition of Natives and the lack of opportunities for Natives to improve their conditions. Hakala v. Atxam Corp., 753 P.2d 1144, 1147 (Alaska 1988). Section 1626(g) was intended to facilitate Alaska Native shareholder employment programs by resolving any uncertainty as to the applicability of the Civil Rights Act to certain business enterprises in which Native Corporations participate. [S. Rep. 201, 100th Cong., 1st Sess. at 26 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3269, 3290.] According to (then) Senator Frank Murkowski, the intent of Congress in adopting the ANCSA amendment was to ensure that Alaska

Native corporations and their affiliates were exempted along with Indian tribes from the anti-discrimination laws of § 2000e(b). [100th Cong. Rec. S3196 (March 28, 1988).] Accordingly, federal law serves to promote economic participation by Native corporations and the employment of Natives in enterprises in which those corporations participate. As one court noted, legislative history reveals that the exemption from Title VII was created for the affected Native peoples:

> in an effort to decrease unemployment and in order to integrate their people into the affairs of the national community, operate many economic enterprises, which are more or less supervised by the Indian tribes, the employees serving as apprentices in many instances, and as supervisors and regularly employed and paid employees in others.

Dille v. Council of Energy Resource Tribes, 801 F.2d 373, 375 (10th Cir. 1986), quoting 110 Cong. Rec. 13702. The exemption further allows affected Natives to control their own economic enterprises and develop their natural resources. Id.

The Red Dog Project is precisely the type of activity that Congress sought to encourage when it included Alaska Native corporations in the Title VII exemption, because the Project allows NANA the ability to effectively control certain employment aspects of the economic enterprise in which it participates and thereby allow its shareholders to obtain employment opportunities that otherwise might not be available.

NANA is charged by law with providing benefits to and promoting the health, education and welfare of both its shareholders and the family members of its shareholders who are not themselves shareholders. [43 USC § 1606(r).] Where

Congress provided NANA and other Native corporations with the ability to provide benefits to Natives and/or the corporations' shareholders and/or the families of their shareholders in the form of employment opportunities, Congress was merely enabling the Native corporations to fulfill their assigned role.

Because NANA receives at least 25% of the net profits of the Red Dog Project, that joint venture -- including Teck Cominco's contribution of personnel like Mr. Conitz and Mr. Hanna to that Project -- is exempt from the employment discrimination provisions that are otherwise applicable under federal law. [43 U.S.C.§ 1626(g).[11]] Teck Cominco's existing hiring preference in favor of NANA shareholders is permissible as a matter of law. Regardless of whether a hiring preference was applied in this instance, there was no unlawful discrimination, and summary judgment must be granted against Mr. Conitz.

---

[11]     The exemption is not limited to Title VII, but extends to § 1981 also. Courts recognize that "it would be wholly illogical to allow plaintiffs to circumvent the Title VII bar against race discrimination claims based on a tribe's Indian employment preference programs simply by allowing a plaintiff to style his claim as a § 1981 suit." Taylor v. Alabama Intertribal Council, 261 F.3d 1032, 1035 (11th Cir. 2001), cert. denied, 535 U.S. 1066 (2002). In this regard, "Given Congress's clear intent to exempt tribes from employment discrimination suits under the more specific later statute, Title VII, and the general rule that specific statutes prevail over general ones, courts have dismissed employment discrimination suits grounded in § 1981." Cohen, Cohen's Handbook of Federal Indian Law § 21.02. See e.g. Wardle v. Ute Indian Tribe, 623 F.2d 670, 673 (10th Cir. 1980); Yashenko v. Harrah's NC Casino Co., LLC, 352 F. Supp. 2d 653, 664 (W.D. N.C. 2005), aff'd, 446 F.3d 541 (4th Cir. 2006); see also Stroud v. Seminole Tribe of Florida, 606 F. Supp. 678, 680 (S.D. Fla. 1985).

c.   **Alaska's Human Rights Commission Has Determined That Teck Cominco's Preference For NANA Shareholders Is Lawful.**

The Alaska State Commission for Human Rights is charged with enforcing Alaska's anti-discrimination laws.  AS 18.80.060; 18.80.110 -.130.  It also acts on behalf of the U.S. Equal Employment Opportunity Commission to enforce federal anti-discrimination laws.  [E.g. Exhibit 1.]  In a case where the Human Rights Commission was acting with delegated authority on behalf of the EEOC, the Human Rights Commission determined that the hiring preference given by Teck Cominco to NANA shareholders at Red Dog does not constitute unlawful discrimination under either Alaska or federal law.  Pankowski v. Cominco Alaska, ASCHR C-91-093 (1993) [attached as Exhibit 1].

The decision of the Human Rights Commission is entitled to deference by this court.  See Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984).[12]  As did the Human Rights Commission, this court should recognize that a hiring preference at Red Dog for NANA shareholders is legally permissible.  As such, even if Mr. Kells' testimony creates an issue of fact as to whether such a preference was applied in the promotion of Mr. Hanna to the shift supervisor

---

[12]   Chevron directs that courts should determine whether an agency's interpretation of a statute is based on a permissible construction of that statute.  If the agency's interpretation is within its authority and not otherwise arbitrary or contrary to law, courts should defer to the agency.  See generally, I Kenneth Culp Davis and Richard J. Pierce, Jr., *Administrative Law*, §§ 3.1-3.6 at 107-31 (3d ed. 1994).

Teck Cominco Motion for Summary Judgment
*Conitz v. Teck Cominco*, 4:06-CV-00015 RRB

position, any such issue is immaterial and irrelevant to the resolution of Mr.

Conitz's claim. Summary judgment should be granted accordingly.

DATED this 14th day of January, 2008, at Anchorage, Alaska.

HARTIG RHODES HOGE & LEKISCH, PC
Counsel for Defendant
Teck Cominco Alaska Incorporated


By: _____
Sean Halloran


CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, 2008
a true and correct copy of the foregoing was served
on Kenneth Covell & Thomas Daniel by electronic
means through the ECF system as indicated on
the Notice of Electronic Filing.

_____
Hartig Rhodes Hoge & Lekisch PC