IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

GREGG CONITZ,                          )
                                       )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )
                                       )
TECK COMINCO ALASKA, INC., and         )
NANA REGIONAL CORPORATION,             )
                                       )
            Defendants.                )
_____)

Case No. 4:06-CV-00015 RRB

DEPOSITION OF JOHN R. KELLS
November 28, 2007

APPEARANCES:

    FOR THE PLAINTIFF:           MR. DONALD F. LOGAN
                                  Attorney at Law
                                  P.O. Box 73162
                                  Fairbanks, Alaska 99707
                                  (907) 590-4341

    CO-COUNSEL (Telephonic):     MR. KENNETH L. COVELL
                                  Attorney at Law
                                  Law Office of Kenneth Covell
                                  712 Eighth Avenue
                                  Fairbanks, Alaska 99701
                                  (907) 452-4377

    FOR THE DEFENDANT
    TECK COMINCO ALASKA INC.:    MR. SEAN HALLORAN
                                  Hartig, Rhodes, Hoge,
                                    & Lekisch
                                  Attorneys at Law
                                  717 K Street
                                  Anchorage, Alaska 99501
                                  (907) 276-1592

| | | |
|---|---|---|
| 1 | Q | When you say now that it's not legal in the United |
| 2 | | States, is that because you disbelieve Mr. Zigarlick or |
| 3 | | what? |
| 4 | A | No, I said that -- Ted Zigarlick told me it had been |
| 5 | | taken to court. I took him at his word. |
| 6 | Q | Okay. That's all we're trying to find out here. |
| 7 | A | And that was why I had no reservation when Gregg came |
| 8 | | to me and said what happened, is I said, well, it was a |
| 9 | | shareholder issue. I was assuming that they were able |
| 10 | | to defend that position. |
| 11 | Q | But the company never gave you any reason for not |
| 12 | | hiring him other than Mr. Hanna was more qualified. |
| 13 | | Isn't that true? |
| 14 | A | No, that is not. That..... |
| 15 | Q | Isn't that what you told me when we spoke on the phone |
| 16 | | a couple months ago? |
| 17 | A | I said that was a manufactured conclusion from the last |
| 18 | | meeting, and that was after Gregg had filed his |
| 19 | | grievance; that was after Larry had been promoted and, |
| 20 | | again, that was completely manufactured. |
| 21 | Q | But didn't you tell me that that was the only |
| 22 | | explanation that the company ever gave you? |
| 23 | A | No, I didn't say it was the only one they ever gave me. |
| 24 | | I mean, I -- I can't -- if I said that on the phone to |
| 25 | | you, that wasn't correct. What I -- what is true is |

```
 1         that was the last explanation they gave me.  At that
 2         first meeting, all I got out of that was, it was a
 3         shareholder hire issue and they were comfortable with
 4         defending themselves as it being a shareholder issue
 5         because it was legal.  That was what I got out of that
 6         first meeting.  And, again, I don't think we talked
 7         about qualifications.  And even in that last meeting,
 8         we didn't talk about qualifications.  It wasn't a
 9         discussion.  It was just this is the deal; we've
10         determined he's more qualified and that's the story and
11         that's the end of it.  By then.....
12    Q    So if Rob Scott testifies.....
13              MR. LOGAN:  Can he finish his question, please?
14    He was still talking.  Go ahead and finish.
15    Q    If Rob Scott testifies that he's never had a
16         conversation with you about promoting Mr. Hanna or
17         about filling that position, are you going to tell me
18         that Rob Scott is lying?
19    A    He's never had any conversation about that position?
20         That's what he's -- could you repeat the question?
21    Q    If Mr. Scott testifies that he has never had a
22         conversation with you about filling that position or
23         promoting Mr. Hanna, are you going to tell me that he's
24         lying?
25    A    I'm not going to tell you he's lying, but I'll tell you
```

```
 1   Q      And Mr. Zigarlick was your direct supervisor that
 2          entire time.  Right?
 3   A      Yeah.
 4   Q      In terms of what authority you had to do whatever was,
 5          you know, the scope of your work, it's essentially
 6          whatever Mr. Zigarlick delegated to you, right?
 7   A      Yeah.  Yeah, that's fair to say.
 8   Q      And if Mr. Zigarlick didn't want to give you some
 9          particular task and kept it for himself, then it's his
10          to do.  Is that correct?
11   A      Yeah.
12   Q      And with respect to the decision whether or not to
13          promote Mr. Conitz or whether or not to promote
14          Mr. Hanna, it was Mr. Zigarlick's decision to make if
15          Mr. Zigarlick wanted to make that decision.  Isn't that
16          correct?
17   A      Yes.
18               MR. LOGAN:  Objection to form because it's a
19   compound question.
20   A      Ted had the ability to affect that decision or just
21          completely control that decision all the way to the
22          end.  I talked to him in my office and I said I picked
23          Gregg Conitz.  He could have said, no, you didn't or
24          we're going to discuss this or I'm overriding you.  He
25          could have said anything other than, okay, I'll tell
```

```
 1          Rob.  And this whole thing would have ended right
 2          there.
 3    Q     You're saying he didn't just reject your.....
 4    A     No.  He -- if he didn't say, okay, I'll tell Rob, he
 5          said something real close to that.  But I had no
 6          indication that he was going to step into that
 7          decision.
 8    Q     Were you working at Red Dog when Mr. Conitz first got
 9          transferred from the oiler position to the equipment
10          operator position?
11    A     No.
12    Q     Did you ever have any discussions with Mr. Zigarlick
13          about that particular transfer?
14    A     Yes, I did.
15    Q     And tell me sort of the substance of any such
16          conversations you might have had with Mr. Zigarlick.
17    A     What I remember about it was Gregg was working -- I
18          thought he was working in the mill and he was trying to
19          get out of the mill to come into the mine and Ted, for
20          some reason, opposed that.  And Ted went on vacation
21          and whoever was in his place, Gregg went and worked a
22          deal with them.  When Ted came back from vacation,
23          Gregg was in the mine department.
24    Q     Did Ted indicate he was happy, unhappy, anything else
25          with that transfer?
```

1  BY MR. HALLORAN:

2  Q      You brought a number of exhibits last time.

3  A      Uh-huh.

4  Q      Did you bring all the same documents this time?

5  A      I didn't bring the e-mails, but I did bring this bag of
6         notebooks.

7  Q      Okay. Are there any other additional documents that
8         you brought this time that you did not bring last time?

9  A      I did. The subpoena -- I think this is a -- oh,
10        this -- these are the transcripts that Liz sent me.
11        This is a subpoena I was served at my house with the
12        check. And that's it.

13 Q      All right. With regard to the books that you have in
14        the bag, there's copies of them in the pile to your
15        left as well. Can you describe what these books are?

16 A      At the time I used a daytimer and I would try to keep
17        track of important things that were going on during the
18        day or sometimes not so important things. I believe I
19        keep track of the weather in them, also. I carry that
20        on to this day, but in a simpler format.

21 Q      And when you say that you kept track of the important
22        things, you pretty much wrote down everything that was
23        more or less important?

24 A      No, I -- I did the best I could. It wasn't something
25        that I really had a lot of use for, but it was

1    detail in the steno notebooks, I don't think I would
2    have been as likely to have put much detail in these
3    notebooks here.
4         I didn't have any reason to think that I would
5    not have those steno notebooks to refer back to and
6    that was, of course, while I was employed there.  And I
7    didn't know that I'd have any reason to look back on my
8    employment there after the fact.
9  Q When different people made known that they were
10   interested in the job, you made references in your
11   books to that.  Isn't that correct?
12 A I don't know.  I haven't read through these.  I've
13   skimmed through them just to see the -- that I'd
14   encaptured all the dates in it, where Leo had died, and
15   then where I left.
16 Q All right.
17 A But there could be something in there.
18 Q When you made notations in these books, is there any
19   reason why we should believe that anything you might
20   have written is not true?
21 A No.
22 Q So if you said, for example, one employee was better
23   than another employee, that would be an accurate
24   reflection of your opinion as of that time?
25 A Yeah.

1      detail, yes.
2  Q   Okay. Who is RLS?
3  A   Shields, the other shifter. Robert Shields. I don't
4      know what his -- what the L stood for.
5  Q   If you look at November 11th, 2004.....
6  A   Okay.
7  Q   .....it says you talked to RLS about Larry as shifter.
8      He said he didn't think he had any unusual conflict
9      with him.
10 A   Uh-huh.
11 Q   What is that entry telling us?
12 A   That he didn't have any conflicts that he was -- that
13     he brought up at that time.
14 Q   Well, I'm asking you, I guess, to explain what you mean
15     by conflicts.
16 A   Well, again, this is three years ago. I don't -- I
17     can't say anything specific. This was all just part of
18     the process of seeing how well the shifter candidates
19     fit into the operation. So I -- I can't elaborate on
20     that.
21 Q   Okay. Why don't you turn to the next page.
22            MR. LOGAN: Is that 11/12?
23            MR. HALLORAN: Yes.
24            MR. LOGAN: Thank you.
25 Q   It says you had a long talk with Ted Zigarlick, third

```
 1         entry down, after he talked with Rob.  Who is Rob?
 2    A    Rob Scott.
 3    Q    And that's about the shifter position.  Is that
 4         correct?
 5    A    Yep.
 6    Q    And it says they want to put Larry in as two by one?
 7    A    Two-and-one rotation.
 8    Q    Okay.  And use relief to fill in empty weeks.
 9    A    Yes.
10    Q    So this is indicating you had a talk with Ted
11         Zigarlick, but not Rob Scott.  Is that correct?
12    A    On that day, yeah.
13    Q    Was there another day where you had a conversation with
14         Rob Scott about Larry Hanna and the shifter position?
15    A    There were three separate days:  One, the day that I
16         talked to him; Ted had gone out, said he was going to
17         go talk to Rob; he had not.  I went and talked to Rob
18         about it.  The other one was when Ted, me, and Rob were
19         all together, the time when I said I don't think this
20         is legal.  And the last of the meetings, which was when
21         the -- it was put on me that this is a conclusion;
22         we've decided it this way and that's how it's going to
23         be represented.  The conclusion being that Larry was
24         the -- was not only appointed as a shifter, but he was
25         appointed as a shifter because he was the better
```

1       qualified.
2  Q    Now, when you and I talked on the phone a few months
3       ago now, you were pretty clear in telling me that the
4       only reason that anyone at Teck Cominco actually gave
5       you for hiring Mr. Hanna or for promoting Mr. Hanna was
6       that Mr. Hanna was better qualified.  And the last time
7       we were in Healy, you seemed to be deviating from that
8       position and suggesting that someone had actually told
9       you that he was being promoted because of shareholder
10      preference.
11 A    That's a fact and however you interpreted the phone
12      conversation, that is -- that was never my intent to
13      say that.  That was the initial reason for putting
14      Larry in there was because he -- of the shareholder
15      preference.  It was after Gregg Conitz filed his
16      grievance that the qualifications came up.
17              At that original meeting between me, Ted, and
18      Rob, qualifications were never discussed.  We talked
19      about the shareholder hire.  That was the reason I
20      said, I don't think this is legal in the United States,
21      and the reason that I was given the Nana agreement to
22      read.  We never talked about qualifications.
23              And, in fact, in the third meeting, when it
24      was decided that he was given the shifter position
25      because he was better qualified, we still didn't talk

```
 1         about qualifications, which I just took as the --
 2         rolled over the top of me and that was the way it went.
 3    Q    In the instance where you talked about shareholder hire
 4         being illegal or your perception that it was illegal,
 5         didn't that conversation not ever deal with Mr. Hanna?
 6    A    That was the only context that could have been in.
 7         Now, you had said that last time, and I can't imagine
 8         how that could have come up any other way.  There were
 9         I think only two meetings between me, Ted, and Rob in
10         the whole time I -- that the three of us were there and
11         it was about that issue.  It wasn't a common occurrence
12         that we would be meeting and this could have fallen
13         under some other topic.  So, no, that was about Larry
14         Hanna, specifically.
15    Q    And you mentioned the names Larry Hanna and that sort
16         of thing?
17    A    I -- I'm sure we did.
18    Q    Then how can you explain, then, that Mr. Scott and
19         Mr. Zigarlick believe that that conversation had
20         nothing to do with Larry Hanna?
21              MR. LOGAN:  Assumes facts not in evidence.  You
22    can answer if you wish.
23    A    I have no explanation for that.  I think you'd have to
24         ask them.
25    Q    Why don't you turn to November 16th.  The second entry
```

```
 1        down, you said you called Larry; he's interested in the
 2        position.  I told him his on -- his is on nights.
 3   A    Which would be his next.....
 4              MR. LOGAN:  Was that 9/16?  I'm sorry.
 5              MR. HALLORAN:  November 16th.
 6              MR. LOGAN:  November 16th.  Thank you.
 7   A    Which would mean his first rotation coming up.  Because
 8        the shifters rotated, he wouldn't be on nights
 9        permanently.
10   Q    So are you essentially informing him here that he's
11        getting promoted?  Is that what I should read into
12        this?
13   A    What I'm verifying here is that he's still interested
14        in the position because I was told obviously beforehand
15        that he was going to get the job.  I think that's what
16        we'd looked at from the 12th.  So I just wanted to make
17        sure that he was still interested in it and then that
18        would have been him getting the job.
19   Q    And then on the 19th, the second entry from the bottom,
20        it says you talked to Conitz about appointing Larry as
21        shifter.
22   A    That's when he came into my office - this is what I'm
23        going to have to assume here - and said he had heard
24        that I had been his -- that he had been my first choice
25        and I verified that.  And then he asked me what was the
```