Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

GREGG CONITZ,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
TECK COMINCO ALASKA, INC.,　　　　 )
　　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　　)
_____)
Case No. 4:06-CV-00015 RRB

---

DEPOSITION OF TED ZIGARLICK

---

Pages 1 - 271
Wednesday, August 1, 2007
8:30 A.M.

Taken by Counsel for Plaintiff
at
HARTIG RHODES HOGE & LEKISCH
717 K Street
Anchorage, Alaska

1   that they accept.
2       Q.  All right.  And as far as the environmental
3   thing, you've probably got spilled fuel or something,
4   you're doing remediation?
5       A.  We've had a contractor that has spilled,
6   concentrate trucks, over our history, and we were
7   required to reclaim that material.
8       Q.  Okay.  All right.  So -- because of the
9   metal content --
10      A.  That's correct.
11      Q.  -- potentially hazardous?  All right.  And
12  then you got to pick that up.  And is that put in one
13  big pile or is it something that's spread out over
14  the road the whole way?
15      A.  No.  Well, normally if a truck is having an
16  incident or accident, it's pretty well located in a
17  central area.  Environmental scans it with
18  spectrometer to make sure that we've collected the
19  mineral, and we bring it back to our mine site and
20  put it in our feed stockpiles in the pit and then it
21  ultimately goes through our process.
22      Q.  Okay.  All right.  So coming back to the
23  job now.  You've got to do an assessment of your
24  candidates for the job.  Tell me what happens in the
25  instance of this mine supervisor job.

1    A.   Well, we take a look at the candidates, see
2 what their skill sets have been, what they have done,
3 what their experience is, what their knowledge is, if
4 they have any past experiences that they can provide
5 or offer, and do an evaluation on that and make a
6 selection.
7    Q.   Okay. All right. And how did you -- did
8 you rank these guys, then, for this job?
9    A.   Did I rank them?
10   Q.   Yes.
11   A.   As in a --
12   Q.   One, two, three, four.
13   A.   Yes, I did.
14   Q.   How did you rank them?
15   A.   Mr. Hanna was No. 1. Mr. Parillon would be
16 No. 2.
17   Q.   Okay.
18   A.   I believe Mr. Gibson would be No. 3.
19   Q.   Okay.
20   A.   If I'm not mistaken, I think I ranked, out
21 of the group that we had, Mr. Conitz as the bottom
22 one in the pile.
23   Q.   Number 4 or --
24   A.   Well, it was four our five. Whatever. I
25 think we had five people, applicants.

1   know, or to whatever detail you can give me, that
2   Mr. Gibson had as an acting supervisor?
3       A.   Boy, off the top of my head, I don't know
4   what it is.  But he's done it lots.
5       Q.   Okay.  All right.  And what about
6   Mr. Parillon?  Did he have --
7       A.   He was an original operator that was hired,
8   as well, in 1989, and he's been used and filled in
9   quite often as a supervisor, as well.
10      Q.   Okay.
11      A.   Acting supervisor.
12      Q.   All right.  And what about Mr. Hanna?  What
13  experience did he have?
14      A.   Mr. Hanna is out of the whole works, and
15  that's why I selected him.  He's got the most
16  exposure to the whole Red Dog operation.  He worked
17  in the mill, he's worked on surface, he was a
18  trainer, he was an equipment operator, and he was
19  used as acting supervisor more than once.  In surface
20  operations quite a bit.
21      Q.   Okay.  What did he do in the mill?
22      A.   Well, he worked down at our port
23  operations, and he worked as a mill operator in the
24  mill.  I believe he worked in flotation.  He worked
25  in -- I'm not quite sure without looking at his bio

1  talking about, yes.  If we're talking about from
2  their start dates, no.
3      Q.   Okay.  Let's say we're talking about from
4  whenever the -- from whenever the mine supervisor
5  position came open.  That's in the last -- that was
6  in 2005 or six, right?
7      A.   Um-hum.
8      Q.   Okay.  So from that date forward?
9      A.   Well, the reason I made my selection is I
10 honestly believed I had the best candidate because of
11 their knowledge, their abilities, their leadership
12 qualities, their accident incident rate.  Took all of
13 that into consideration, and unfortunately at that
14 time Gregg was not at the top of the pile.
15     Q.   Okay.  And we'll get to that.  Okay?
16     A.   Okay.
17     Q.   But just talking about operating and
18 proficiency, I think was the word I was using.  We're
19 talking about a set of candidates here, and the
20 question is:  As of the date that mine supervisor
21 came open, did you view all the candidates as
22 proficient with the appropriate equipment?
23     A.   They're proficient and met the minimum
24 standard.
25     Q.   Okay.

1  the employees for supervisor?
2       A.   Well, one thing that's really important to
3  us is safety performance.  So the candidates that we
4  looked at, looked at all of them, their associated --
5  their incident and accidents and then severity,
6  frequency and all of that, and Gregg was the worst of
7  the works out of that group, and that is pretty
8  important in the leadership side of things and
9  supervision at the time of hire.
10      Q.   Okay.  Had Mr. Conitz ever been -- he was
11 working as an acting supervisor up until he made
12 his -- well, let me ask you this question.
13           He represents that he was working as acting
14 supervisor until he made his EEO complaint.  Do you
15 agree with that remark?
16      A.   I don't agree with that, no.
17      Q.   Okay.  Tell me what his history is as
18 acting supervisor.
19      A.   Tell what his history as acting supervisor
20 is.
21      Q.   Right.
22      A.   I'm not quite sure what your question is.
23      Q.   His representation -- and I think maybe
24 your counsel has represented, although I'm not going
25 to state that for the record, but that he worked as

1    A.   If you were looking on site for candidates,
2  yes.
3    Q.   Okay. All right. And is it your statement
4  to us that Mr. Conitz wasn't fit for the job based on
5  his history?
6    A.   I'm saying that he was the least qualified
7  of the group that we looked at.
8    Q.   Okay. And the reason you say that -- well,
9  let's go back. Is the reason you say that based
10 on -- and there are different sections we can look
11 at. But as far as operating equipment goes, is he
12 least fit in operating equipment or in the middle or
13 most fit, or where does he rank in that regard?
14   A.   At the time of selection?
15   Q.   Um-hum.
16   A.   He was selected -- my perception was least
17 fit.
18   Q.   Okay. All right. And then another --
19 what's another criteria you evaluated, then, for?
20   A.   We stated high urgency for safety and
21 communications with people, and reduction in injury
22 and accident.
23   Q.   Okay. So let's say safety. What do you
24 view his safety record to be in view to other
25 employees?

1   A.   Mr. Hanna at the time and Mr. Baker when he
2  came on for the other one had no incidents in their
3  work history or record.  And Gregg was averaging
4  around three per year of various size.  Some were
5  minor, some were major.
6   Q.   Okay.
7   A.   And continuous.  That's over a long period
8  of time.
9   Q.   Okay.  When you work in the mine, isn't it
10 part of the work that equipment to one degree or
11 another gets damaged?
12  A.   It's not supposed to.  It does get damaged,
13 yes.
14  Q.   Right.  I mean, this is why we have MSHA,
15 isn't it, because mines are particularly hazardous
16 environments, and there are accidents or incidents
17 and equipment gets damaged and people get hurt?
18  A.   That's a general public perception that
19 it's hazardous.  Everything is hazardous or it has
20 hazards to it.  It's not dangerous if you abide by
21 the rules and regulations and operate things in the
22 way they were meant to be.  Nothing is hazardous or
23 dangerous, but --
24  Q.   Okay.  When incidents get reported in the
25 mine, is there another MSHA form or how is that

1   promotion?  Either or both.
2       A.   From an operator to a trainer and
3   supervisor?
4       Q.   Yeah.
5       A.   And/or supervisor?
6       Q.   Yeah.
7       A.   That would be considered a promotion.
8       Q.   Okay.  All right.  And so you were
9   concerned about Mr. Conitz's safety record in
10  promoting him, right?
11      A.   That was one concern.
12      Q.   Okay.  All right.  Did you go look at any
13  records in that regard in making your assessment?
14      A.   Absolutely.
15      Q.   What did you look at?
16      A.   I looked at incident reports and the type
17  of incident of each and every individual.
18      Q.   Okay.  And what did you find?
19      A.   I found that Mr. Conitz had an average of
20  three-plus incidents a year for a period of about six
21  or seven years.  Mr. Hanna and Mr. Baker didn't have
22  any incidents reported, or I believe maybe one of
23  them had one.
24           MR. COVELL:  Okay.  All right. Let's go
25  ahead and mark these sequentially, please.

1  the right word, to it?
2      A.   Pretty small team.  I can't recollect if
3  there was anybody else involved in the supervisor
4  or -- there had to be somebody, but I don't remember
5  who that was right now.
6      Q.   Is my understanding correct or incorrect
7  that the mobile training or mine trainer, whatever
8  they were, at one point was a direct report to your
9  current position and is no longer direct report to
10 your position?
11     A.   That's correct.
12     Q.   When the mine trainer job was filled here
13 in '06, was it a direct report to your position at
14 that time?  If you know.
15     A.   I believe it was to the general foreman by
16 then.
17     Q.   Okay.  And when the mine trainer position
18 was filled, advertised and/or filled, who was the
19 general foreman, or if there were multiple ones
20 through that time frame?
21     A.   In 2006?
22     Q.   Right.
23     A.   That would be Mr. Warren Draper.  Butch
24 Draper he's known by.
25     Q.   Did Mr. Draper succeed Mr. Kells?

```
 1       A.    Yes, he did.
 2       Q.    Okay.  And do you know what year that was?
 3       A.    Without looking at a point of hire, I can't
 4   recall.  It's short.  A year and a half is my guess.
 5       Q.    Okay.  But seems that Mr. Kells was in that
 6   job for the supervisor position but not in that job
 7   for the trainer position; is that right?
 8       A.    Yes.
 9       Q.    Okay.  And since the trainer position was
10   Mr. Hanna's vacant position, it couldn't have been
11   too long from when you went from one to the other, so
12   to speak?
13       A.    Yes.
14       Q.    All right.  So you weren't sent any
15   paperwork from human resources.  You didn't consult
16   any paperwork other than looking at these safety --
17   or incident reports.  Those were the resources or
18   lack of resources, as the case may be, that you used,
19   other than what you knew in your head, in making both
20   these selection decisions; is that correct?
21       A.    Primarily it was the ability of each
22   individual based on my personal assessment.
23       Q.    Okay.  And were you ever told that rather
24   than hiring Mr. Conitz for the position, you had to
25   hire a shareholder for the position?
```

```
 1       A.    Absolutely not.
 2             MR. COVELL:  Let's go off record and get a
 3    stapler.
 4             (Off record.)
 5             (Exhibit 30 marked.)
 6    BY MR. COVELL:
 7       Q.    All right.  Mr. Zigarlick, you've been
 8    handed Exhibit 30, which is a portion of papers
 9    supplied to us in discovery, a letter from
10    Mr. Halloran to EEOC, and if you turn to -- with some
11    attachments.
12             If you turn to Defendant's 8 in the lower
13    right-hand side, that grid chart there.
14       A.    Eight you say?
15       Q.    Yeah.  This one here.
16       A.    Okay.
17       Q.    Is this something you used in doing these
18    assessments or not?  Or let me withdraw that
19    question.  You told me about doing the assessments,
20    and you listed some factors for me, right?  We
21    discussed that today?
22       A.    Yes.
23       Q.    All right.  Now -- okay.  Let me back up.
24    Are you familiar with this form?
25       A.    Very familiar with it, yes.
```

1     A.    To the best of my ability, we operate in
2  the fashion that best suits our operation.  If we
3  have qualified individuals, they will get the job if
4  they're a NANA shareholder.  If they're not equal, we
5  would hire who we need to get our job done.  I don't
6  know if that answers your question well enough or
7  not.
8           In the discussion of Mr. Conitz on both
9  supervisor position and the training position, he was
10 not the most qualified for either one of those
11 positions, and that's why he was not selected.
12    Q.    Okay.  And the reasons you say he was not
13 most qualified is based upon the criteria we spoke
14 about during the day?
15    A.    His safety performance, his training
16 expertise.  We didn't get into leadership.  I don't
17 know -- he had, to my awareness, no other formal
18 leadership other than the acting supervisory work
19 that we had on site.
20          His operator skills, if we were -- we had
21 mentioned earlier with regards to it's advantage to
22 have more seat time.  He had seat time but not
23 necessarily is he or was he the best candidate to
24 promote to the trainer or the supervisor at any time,
25 and I still believe that.  And it has nothing to do

Page 262

1  six operators; is that correct?
2      A.  Yes, sir.
3      Q.  How did Mr. Conitz's performance measure up
4  against the other level six operators who were
5  applicants for those jobs?
6      A.  My personal opinion and through my
7  expertise of operating equipment and training
8  equipment, he was the lesser of those individuals,
9  and that was one of the essences of the selection.
10 He was not the strongest, and he had -- has developed
11 quite well over the years, which is a credit to him,
12 but he's still not the best operator in our
13 operation today.
14          At the time of the selection for those
15 other individuals, they were, in my personal opinion,
16 better operators.  They had more experience, more
17 exposure to the two jobs that were fulfilled.  One of
18 them had already been a trainer and went back into a
19 training position.  The other one had been a
20 supervisor and had done training before, and to my
21 knowledge Gregg had not done anything other than fill
22 in active supervisors.  He had the least amount of
23 past practice in the Red Dog operation.
24      Q.  When Mr. Hanna was hired, was he given any
25 sort of shareholder preference?

1    A.   No.
2    Q.   Or actually I guess when he was promoted is
3 the right word.
4    A.   Promoted from operator?  No.
5    Q.   When Mr. Baker was rehired into the job
6 that he obtained, was he given any sort of
7 shareholder preference?
8    A.   No, sir.
9         MR. HALLORAN:  I have no other questions.
10                    FURTHER EXAMINATION
11 BY MR. COVELL:
12   Q.   In regard to the 1982 agreement, I asked
13 you if you had showed it to Mr. Conitz, and you said
14 yes.  I believe I asked you if you might have shown
15 him other sections of the agreement not there, and I
16 believe your answer at that time was you weren't
17 sure.  You didn't know.
18   A.   I don't believe so.  I wouldn't have done
19 that.  There would be no reason to do so.
20   Q.   Well, is your memory so good that you can
21 tell us that you didn't show him other portions of
22 the agreement?
23   A.   I would say my memory would be well enough
24 to remember if Mr. Conitz had privy to reading the
25 NANA agreement, and I know that he didn't have that.