# Employment Discrimination Law

Third Edition
Volume I

Barbara Lindemann
Paul Grossman

ABA
Section of
Labor and
Employment
Law

.akland, Calif., and
.ry and Patrick rep-
.iters. Also making
.ffrey Grube of Los
.. Garrison of New
.ployment Lawyers
.ho represents plain-
.ial chapters, princi-
.r Opportunity Law
dants. They are rec-

editorial team were
y objectives: (1) to
ts, and (2) to ensure
tioner, student, and

ssarily represent the
ction of Labor and
 are simply the col-
. of the authors and

;ALD P. MACDONALD
         Chair

STOPHER A. BARRECA
        Chair-Elect

ARLES A. POWELL III
        Past Chair

   Section of Labor
  d Employment Law
 can Bar Association

# FOREWORD TO THE SECOND EDITION

The Civil Rights Act of 1964 was the most important civil rights legislation of this century. Title VII of that Act, as this book demonstrates, has been its most important part. Both facts are laden with irony to one who knows the history of this legislation.

In the spring of 1963 I was serving as Assistant Attorney General in charge of the Justice Department's Office of Legal Counsel, having been appointed to that post by President Kennedy in 1962 to replace Nicholas Katzenbach (who in turn had moved up to replace Byron White). In that role I had had some exciting civil-rights assignments, but as yet none related to legislation. Indeed, there was no important legislation in prospect in the spring of 1963, the Administration's only legislative proposal being a rather feeble measure which sought to simplify voting-rights lawsuits brought by the Attorney General and to extend for five years the life of the Civil Rights Commission.

To me it was always clear that President Kennedy placed the highest value on enforcing and implementing the Constitution in the area of civil rights and was personally determined to do all that he could to advance the cause of civil rights. This was apparent in the case of James Meredith, for example, where the President gave the highest personal priority to overcoming the resistance by state officials to the court's decree ordering Meredith admitted to the University of Mississippi. During the long night of September 30, 1962, while Katzenbach and I and a force of federal marshals were surrounded by a mob in the teargas-filled administration building at Ole Miss, the President kept in touch moment by moment on an open telephone line. In the end, President Kennedy called out the armed forces of the United States to protect and enforce the rights of one individual. President Eisenhower's complete lack of involvement in the Authorine Lucy case of a few years before provides a dramatic contrast in Presidential attitudes toward enforcement of civil rights in such situations.

President Kennedy was, however, strongly opposed in early 1963 to the sponsorship by the Administration of major civil-rights legis-

xi

Exhibit 1 page 2 of 9

lation. It was clear to him that the temper of the country and of the Congress was such that significant civil-rights legislation was sure to be defeated. Indeed, the Administration had found earlier in the same Congress, in an all-important fight to enlarge the Rules Committee, that its margin in the House of Representatives, on the most basic and least controversial of questions, was exactly one vote. Even putting aside the filibuster problem in the Senate, therefore, it seemed apparent that there would be defections in the controversial area of civil rights, and that any major proposal would be defeated in both Houses. Meanwhile, Congress and the country would be distracted by this futile battle, and all other progressive legislation—indeed, the whole business of Congress—would be brought virtually to a standstill for approximately a full year. The President was particularly concerned about his tax-cut bill, which he believed would get the economy moving and by that means probably solve more problems for the minorities of the United States than any civil-rights legislation could do.

This situation changed suddenly and dramatically in May 1963, when trouble erupted in Birmingham, Ala. In the course of the interminable crisis in Birmingham, the people of the United States saw on their television screens night after night an unapologetic Eugene "Bull" Connor, Birmingham's police chief, and the seemingly senseless use by forces under his command of police dogs, firehoses and other undiscriminating weapons against apparently well-behaved demonstrators, many of them children, protesting discrimination. After three weeks of bombed homes, demonstrations, riots and outrageous official conduct by representatives of state and local government, the situation was finally stabilized with the aid of federal troops and infinitely patient work by Assistant Attorney General Burke Marshall.

The people of the United States went through a sea-change as a result of the events in Birmingham. At least, the President and the Attorney General thought so, and in retrospect it seems clear they were right. Somehow, Birmingham made clear to the American people that there was something radically wrong in their country; that an intolerable injustice existed about which something had to be done no matter what other business had to wait as a result. Suddenly, literally overnight, the time had come for consideration by the country and by Congress of major civil-rights legislation.

On a Saturday afternoon late in May, Attorney General Kennedy assembled a group consisting of his principal assistants, including Nick Katzenbach, Burke Marshall, Louis Oberdorfer, Ramsey Clark and me,

Exhibit 1 page 3 of 9

[left column, partially cut off:]

...ry and of the
... was sure to
... in the same
... Committee,
...ost basic and
... Even putting
...eemed appar-
... area of civil
... both Houses.
...d by this futile
...e whole busi-
...ndstill for ap-
...ncerned about
...omy moving
...the minorities
...ould do.
...in May 1963,
...se of the inter-
...ed States saw
...ogetic Eugene
...mingly sense-
...firehoses and
...behaved dem-
...on. After three
...utrageous offi-
...vernment, the
...troops and in-
...urke Marshall.
...ea-change as a
...sident and the
...clear they were
...can people that
...that an intoler-
...e done no mat-
..., literally over-
...ountry and by

...neral Kennedy
...including Nick
...Clark and me,

[main column:]

among others, and some representatives from various other agencies of the government. He explained that the President felt the time had come for presentation by the Administration to Congress of a major civil-rights bill. All afternoon we discussed the areas that would need to be covered by the proposed legislation, and what the substance of our proposals should be. At the end of the day, Robert Kennedy asked me to form a drafting group, utilizing one or more lawyers from the Civil Rights Division as well as from my own office, and to produce a draft bill if possible by the close of business on Monday, two days later.[1] We did so, and there began the long process of refining the bill's provisions and reviewing it with other agencies of government and, finally, the Congressional leadership of both parties. The process ended with President Kennedy's message to Congress of June 19, 1963, by which he transmitted the bill that became the Civil Rights Act of 1964.

In May and June of 1963, when the Administration's proposals were being formulated, the most immediate and pressing civil-rights problem before the country was the public-accommodations problem. It was that problem which had given rise to the "sit-ins" in the South, and it was the denial of rights in that area—in restaurants, hotels and other public places—that seemed least defensible and most outrageous not only to blacks but to most of the people in the nation. The subject of public accommodations was covered in Title II of the bill (Title I was the Administration's voting-rights proposal, which had already been submitted to Congress) and it was edited carefully to make possible reliance on the power of Congress to regulate interstate commerce as well as the power to implement the Fourteenth Amendment.[2]

---

[1] Harold Green, now a judge in the District of Columbia, was a valuable participant from the Civil Rights Division. Participants from the Office of Legal Counsel included Harold Reis, Leon Ulman, Richard Berg (later Acting General Counsel of the Equal Employment Opportunity Commission), Sol Lindenbaum and James Morrisson.

[2] At about the time the bill was introduced, a group of liberal Republicans, headed by Representative John Lindsay of New York, announced that they could not vote for any public-accommodations bill based on the Interstate Commerce Clause; they insisted that the bill be based exclusively on the Fourteenth Amendment. This theory, which made no sense at all from a legal standpoint, seemed to be an attempt to develop a rationale that would sound "liberal" and yet would enable these legislators to vote the same way as they expected their more conservative party colleagues to vote. At this stage, Representative Lindsay probably assumed that his vote would make no real difference because the bill would be defeated anyway, like all previous important civil-rights proposals. After the bill gained significant Republican support, nothing more was heard of the idea that the bill was unacceptable to liberals because of its partial reliance on the Commerce Clause as a source of legislative power.

Exhibit 1 page 4 of 9

There was a brief flurry of concern behind the scenes that because of its emphasis on the "interstate commerce" aspects of the public accommodations problem, the bill would be assigned to the House Committee on Interstate and Foreign Commerce, chaired by Oren Harris of Arkansas, who seemed less friendly to civil rights than Judiciary Committee Chairman Emanuel Celler of New York. Since under Speaker McCormack the committee-assignment process relied heavily on the wording of the bill's preamble, I rewrote the preamble of our bill so as to include as many terms as possible suggestive of the idea that the bill would fall within the Judiciary Committee's territory. It is somewhat amusing today to read the preamble's description of the proposed legislation as "A BILL ... to confer jurisdiction on the District Courts of the United States to provide injunctive relief ... to authorize the Attorney General to institute suits ..." and so on.

Title VII of the Administration's bill dealt with discrimination in employment, but it bore no resemblance to Title VII as ultimately enacted. The Administration proposed that Congress provide statutory authority for the program, long since established under the authority of the Executive, to eliminate discrimination in employment under government contracts. An affirmative reason for including this proposal was that it was known to be wanted by Vice President Johnson, who had been asked by President Kennedy to take charge of the program and was embarrassed by the absence of any legislative basis for it.

The bill was limited to this modest objective because the President was concerned that the Administration might "break its pick" on the explosive issue of employment discrimination—then often referred to as the "FEPC" issue, referring to President Truman's proposal of a Fair Employment Practices Commission—and as a result get no legislation at all. He explained to a group of us one day that he thought President Truman had unintentionally done great harm to the cause of civil rights in employment by proposing FEP legislation before the country was ready for it; the proposal had been defeated ignominiously (along with many of its proponents), and as a result was regarded by many legislators as something extreme, to which they could not give serious consideration without risking defeat at the polls. President Kennedy said he personally thought a prohibition against discrimination in employment was far less of an encroachment on business than a great many laws already on the books. Both minimum-wage and collective-bargaining laws, he said, were more invasive

Exhibit 1 page 5 of 9

of business freedom than a law requiring that people be hired on their merits rather than on the basis of race or religion. Moreover, civil rights laws in other areas were in reality more sensitive: schools, for example, were obviously more emotion-charged than factories. Nevertheless, he believed, for historical reasons employment was the most sensitive area of all so far as Congress was concerned, and it behooved us for the time being to stake out a modest objective in this area so as not to endanger the bill as a whole.

During the period when the bill was being cleared with congressional leaders, two of the men who became giant figures in its history began their participation. One, Senator Everett Dirksen of Illinois, then the Minority Leader of the Senate, had previously been known to me only by reputation. On the basis of that reputation I assumed he would be unfriendly both to the bill itself and to us as proponents of this and other Administration legislation. To my surprise, he turned out to be a man of great wit and charm, in whose presence one could not help but feel welcome, and in fact entertained. Even more surprising, in private he was from the outset seemingly friendly to the bill and its purposes. I had the impression, indeed, that he committed himself to work with us to get the bill enacted in as favorable a form as possible. Although he proceeded to denounce the bill in his public statements as unconstitutional and generally the work of the devil, I felt certain he would help us and would vote for the bill in the end—as of course he did.³

Vice President Johnson was included from the outset in briefings of legislative leaders. He listened quietly for a time, then one day in June commented to a White House aide that he had some thoughts which he preferred not to express in a group because the comments might unduly pressure the President. Because it was understood that his comments were substantive, relating to the terms and scope of the bill, I was dispatched to collect them. As it turned out, the Vice President wanted to talk about how the bill should be presented to Congress and the country.

"I'd take the bill to Dick Russell [the senior Senator from Georgia] and ask him to analyze it," he said. "He'll be against it, but he'll

---

³Parenthetically, on one occasion in reviewing a draft of the bill Senator Dirksen gave a demonstration of speed reading that was awe-inspiring. Having been handed a thoroughly redrafted version of the bill, he paged through it about as rapidly as the pages could be turned—noting and commenting as he did so on *every* change that had been made.

Exhibit 1 page 6 of 9

tell you what he thinks and it will help you because you'll know all the arguments you'll have to meet. Some of the arguments may be so good you'll want to change the bill before it's introduced so it won't make as good a target."

As for presenting the bill to the country, Vice President Johnson believed it was essential to go straight to the source of strongest opposition to the bill—the South—and present the bill as a question of simple morality. "He should go to Mississippi or Alabama," the Vice President said. "Those people are against this bill now but they're not bad people and they know that what they're doing isn't right." Reaching out and grasping the flag that stood beside his desk in the Capitol Hill office, as if to demonstrate how the President should do it, the Vice President said the President ought to talk about God, and patriotism, so people could not escape the moral issue. "It's just not right," he said, "for a man to come back from risking his life for his country in Vietnam or somewhere and then find he can't buy a cup of coffee in a roadside restaurant. Nobody can deny that, in the South or anywhere else, and the President ought to say it."

Vice President Johnson's comments, duly reported to the Attorney General and President Kennedy, undoubtedly played a role both in the President's decision to make a television address to the nation about the proposed legislation, and in the content of the address. Previously, President Kennedy's references to civil-rights subjects had usually been cool and dispassionate; presumably he felt that emotional talk on these subjects would appeal only to those who were already persuaded. In that speech of June 11, 1963, however, speaking part of the time extemporaneously, the President made a moral issue of the need for civil-rights legislation and declared simply and stirringly his own feelings about the injustices which made such legislation necessary.

In the proceedings of the House Judiciary Committee, it rapidly became apparent that the Administration had aimed too low in the area of discrimination in employment. Initially, liberals and arch-conservatives voted together to substitute for the Administration's mild Title VII the provisions of a much more ambitious bill which had been introduced and advocated over many sessions of Congress by Representative James Roosevelt. The conservatives, of course, thought that by this move they would ensure the bill's defeat. In a stormy session at the White House during this period, President Kennedy persuaded Minority Leader Charles Halleck not to follow this disruptive strategy, and the

Exhibit 1 page 7 of 9

[left column, partially cut off:]

...you'll know all
...ments may be so
...duced so it won't

...resident Johnson
... of strongest op-
... as a question of
...abama," the Vice
...w but they're not
...t right." Reaching
...n the Capitol Hill
...ld do it, the Vice
..., and patriotism,
...ust not right," he
...or his country in
...a cup of coffee in
...outh or anywhere

...orted to the Attor-
...layed a role both
...dress to the nation
...f the address. Pre-
...ghts subjects had
...he felt that emo-
...o those who were
..., however, speak-
...ent made a moral
...clared simply and
...ch made such leg-

...mmittee, it rapidly
...too low in the area
...nd arch-conserva-
...on's mild Title VII
...ch had been intro-
...ess by Representa-
...hought that by this
...rmy session at the
...ersuaded Minority
...e strategy, and the

[main column:]

result in the House was a Title VII which, although stronger than the Administration's original proposal, was less likely than the Roosevelt bill to attract a decisive amount of opposition. Essentially, the Roosevelt bill would have created an administrative agency like the National Labor Relations Board, with power to issue cease and desist orders. The Title VII which passed the House, like Title VII as ultimately enacted, left enforcement to lawsuits brought in the courts.

On the House floor, Title VII was amended *by its enemies* to add sex as a prohibited basis of discrimination. The amendment, offered by Judge Howard Smith of Virginia, then Chairman of the Rules Committee, was adopted by a majority most of whose members voted against the legislation as a whole. The fact that the prohibition of discrimination based on sex has probably had a greater impact than anything else in the legislation illustrates the hazards of the strategy followed by the bill's Southern opponents in the House.

Title VII took its final shape in the Senate. There it was subjected to innumerable amendments offered by Senator Dirksen, some important but most seemingly designed mainly to get the idea across to the country that the bill was being subjected to exhaustive review in order to minimize its impact on business. When this exercise was completed Senator Dirksen blandly reversed his public position, announced that the bill was "an idea whose time had come," and cast his vote in its favor. What he seemed to me to have done was to oppose the bill until he had all of the opposition troops firmly lined up behind him, then march them off in the opposite direction.

Less than halfway through the legislative consideration of the bill, on November 22, 1963, President Kennedy was assassinated. Most of us who worked on the bill from start to finish are of the view, I believe, that the bill would have passed if the President had remained alive—that it was truly an idea whose time had come. However, there can be no doubt that the President's death gave added impetus to the drive for the bill, and it is in an important sense a legislative monument to him.

Subsequently, in the election of 1964, I believe it is fair to say that the people of the United States expressed their ringing approval of what the President and Congress had done to make the bill a part of the law of the land on July 2, 1964. President Johnson had never faltered in his support of the bill. His opponent, Senator Goldwater, was opposed to it and argued that it was an unconstitutional invasion of states' rights. There can be no doubt who the country thought was right.

Exhibit __1__ page __8__ of __9__

Today, many then-controversial provisions of the Civil Rights Act of 1964—those relating to public accommodations, for example—are observed so universally that they are ancient history, of no concern to anyone in the workaday world. Title VII, in contrast, is a mighty engine that is gradually forcing the alteration of the employment practices of a nation in innumerable ways. Sooner or later, as this book graphically illustrates, Title VII will affect the life of nearly every American alive today, in ways that—it is to be hoped—will be just and humane as well as efficient, but for better or worse in ways that were undreamed of when the legislation was first proposed. Title VII is, for better or for worse, an illustration of how constitutional democracy works. It is my conviction that with all its imperfections—and there are many—Title VII illustrates the ultimate superiority of democracy and law as institutions by which to seek the resolution of human problems and to provide a standard of justice under which human energy and talent can find a constructive outlet. I hope its provisions will be wisely administered, not only by judges and public officials but by the thousands upon thousands of business people, labor leaders, lawyers and others whose actions and decisions determine what the law means in practice. The authors of this book have helped them all to bring the day closer when Title VII will no longer be important because it is no longer needed to coerce the elimination of discrimination based on irrelevant personal characteristics from the industrial life of our country.

NORBERT A. SCHLEI

Los Angeles, Calif.
November 1982

Exhibit 1 page 9 of 9