definitely has an advantage over you and that's even if he doesn't have the experience in the position. But, the phrase "can be trained in a reasonable time" is pretty vague. I mean, what's reasonable and how do you know if you can train somebody until you train them?

Q Okay. I've got some questions that I've sort of dug out of all these papers. If you don't know the answer, just tell us you don't know. Please don't guess.

A Uh-huh.

Q Okay. We'll just go forward from there. [illegible] day-to-day contact did Mr. [illegible] have with these applicants?

A [illegible] and [illegible] were on alternate shifts so that he was [illegible] a week when I was there and we each worked our respective jobs, and then he was gone for either my first or second week when I was there, so I would do his job and my job. And when I was gone, he would be doing both the jobs. [illegible] we were both there, I -- I don't remember him having a lot of contact [illegible] the mine. I can't say for when I wasn't there and he was doing my job, also.

Q Okay. Thank you. [illegible] [illegible] day-to-day contact with the co-workers?

A No. I don't ever remember Sommers being involved in this [illegible]. [illegible] with Jim Sommers on a couple other

|   |   |   |
|---|---|---|
| 1 |   | was my impression of it. And that was kind of verified |
| 2 |   | with the conversations I had with the Noorvik guys. |
| 3 |   | Martin was a real good-natured guy. He was real hard |
| 4 |   | to understand. He had a real thick Virgin Islands |
| 5 |   | accent; that's where he was from. So he was pretty |
| 6 |   | reserved. |
| 7 | Q | Virgin accents? Or like Rasta? |
| 8 | A | Yeah, I don't -- I don't really know how to describe |
| 9 |   | it, but..... |
| 10 | Q | Yeah. |
| 11 | A | .....yeah, it was a thick accent. |
| 12 | Q | Okay. Had you heard of many problems between Gregg and |
| 13 |   | some of the other people as far as..... |
| 14 | A | I can't remember anything. |
| 15 | Q | Okay. Again, once again, if you don't know the answer, |
| 16 |   | please tell me so. But did Conitz have the skill to be |
| 17 |   | a trainer? |
| 18 | A | Yeah, I would think he was -- he would be good at it |
| 19 |   | and a lot with the trainer position, I put more weight |
| 20 |   | on how he can relate to people. It takes a certain |
| 21 |   | amount of patience. It -- the guy doesn't have to be |
| 22 |   | your best operator to be your best trainer. And I |
| 23 |   | would think his disposition was real well-suited to a |
| 24 |   | trainer. |
| 25 | Q | You say that Mr. Hanna was able to pretty much dictate |

Exhibit 4 page 26 of 36

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

| | |
|---|---|
| 1 | making some changes in the scheduling. Would anybody |
| 2 | have been able to do that or was it just Mr. Hanna |
| 3 | seemed to be able to? |
| 4  A | He was the only one that did it. I know Leo changed |
| 5 | his schedule when he came on as shifter. Whether |
| 6 | anyone else could have done it, I don't know. |
| 7  Q | Do you have any idea why Mr. Hanna would be able to do |
| 8 | that? |
| 9  A | Not really. Just he asked for that and he was able to |
| 10 | get it. |
| 11  Q | It wouldn't have anything to do with being a |
| 12 | shareholder? |
| 13  A | I couldn't say that. I don't know. |
| 14  Q | Okay. That's fine. If you don't know, please say so. |
| 15 | So, actually, being able to operate the equipment well |
| 16 | doesn't really tie into being a trainer? |
| 17  A | You have to know all the safety features in the |
| 18 | equipment, all the walk-around procedures. As far as |
| 19 | actually making it produce, that's sort of secondary. |
| 20 | That is up to the operator. He's the one who has to |
| 21 | develop the skills to do it, but the trainer does have |
| 22 | to know everything about the piece of equipment and |
| 23 | certainly all the safety features, the -- all the |
| 24 | operating systems on it. They're actually pretty |
| 25 | complicated, the mining machines. |

Exhibit 4 page 27 of 36

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

1  Q   How about Mr. Goodwin?
2  A   You know, I can't remember his level. I think he
3      probably could have got up to 4. He might not have
4      gotten past 4.
5  Q   Okay. And then Mr. Conitz was a level 6. Is that
6      correct?
7  A   I think so.
8  Q   Do you recall whether any other level 6's besides
9      Mr. Perione, Marvin Jack- -- or, yeah, Mr. Jackson, and
10     Mr. Conitz?
11 A   No, I can't say for sure. I was more familiar with the
12     drill blast because I was the one promoting or holding
13     their promotions and the shifters were in charge of
14     their crews as far as promotions. I would see them and
15     I would sign them, but it wasn't something I was
16     involved in the -- I wasn't the guy making the decision
17     and then looking at the paperwork that controlled that,
18     so.....
19 Q   Okay. And then how many mobile equipment trainers were
20     there?
21     MR. LOGAN: I'm sorry, I didn't hear the
22     question.
23 Q   How many mobile equipment trainers were there?
24     MR. LOGAN: Thank you.
25 A   In the end, there was just one when it -- after Ted

Exhibit 4 page 28 of 36

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

```
 1         supervisor to be on that radio all the time.
 2              When you get out of your truck, you turn on
 3         your handheld.  Anybody -- any one of your operators
 4         should be able to contact you at a moment's notice.
 5         And I did talk to Martin about that.  He said, oh, he
 6         thought the pumps were making too much noise or
 7         something and he didn't hear the radio.  But he was a
 8         little indecisive and he was a little passive.  I could
 9         foresee Martin seeing a potentially dangerous situation
10         and waiting too long to correct it.
11              And, again, I'm not a timid person and I'm not,
12         on a personal level, overly cautious, but with respect
13         to mining, I am.
14    Q    And how did you feel that Mr. Hanna performed as a
15         supervisor?
16    A    I thought he did most of the stuff real well.  I --
17         and, again, he could be brought up to speed with all
18         the intricacies of the mine operations.  I didn't see
19         that he could never be a supervisor.  It was just,
20         between the two of them, between Gregg and Larry, that
21         I preferred Gregg.  Had it been Larry and Martin, I
22         would have taken Larry.  So I didn't see that he was
23         a -- you know, he couldn't do the job.  I
24         preferred Gregg's approach to it because I always
25         prefer somebody who is working from
```

1  people don't complain, I don't know what they're
2  thinking. So I don't have a problem with people
3  complaining. I liked Steve Sampson coming around and
4  crabbing at me about what he thought were problems in
5  the mine. Otherwise, I don't know what -- what the
6  problems are. I have several of complainers on my crew
7  now and I value them, and I'll listen to their
8  complaints and I'll answer them, and some things do
9  need correcting. I mean, those are the guys that are
10 going to alert you to them.
11      MR. HALLORAN: I'm assuming we have to get out
12 of this room now.
13      MR. LOGAN: Well, we have a few more minutes.
14 Afterwards, my suggestion, that we move to a hotel -- I think
15 we can do that today.
16 Q  You indicated before that you, Mr. Zigarlick, and
17    Mr. Scott, essentially acted as a committee to pick
18    this job. Is that correct?
19 A  After the fact.
20 Q  What do you mean by after the fact?
21 A  After I had made my decision, independent, and I had
22    never had an agenda or kept anything secret. I had
23    told everybody this right from the start and never kept
24    anything from Scott. I told him, and he was the first one I
25    talked to. I said I had picked Greg Conitz. After

Exhibit 4 page 30 of 36

```
 1   that, after -- then I had talked to the shifter and I
 2   talked to Larry Hanna and I talked to Rob Scott; then,
 3   it became a committee decision. But up until that
 4   point, I was never given any reason to think it wasn't
 5   my decision alone.
 6 Q And how was it a committee decision as opposed to them
 7   rejecting your recommendation?
 8 A Well, in fact, it was not a committee decision; it was
 9   their decision and they just rolled right over the top
10   of me. And that was something they could have done at
11   any time. I didn't have any objection to that. If
12   they had come in on day 1 and said Larry Hanna is your
13   supervisor, I would have said okay. And up to that
14   last day, when I talked to Ted, if he said Larry is
15   your supervisor, I would have said okay and that would
16   have been the end of it. That was where this whole
17   thing could have been stopped, or any time before that.
18 Q On the e-mails that are in exhibit 11, prior to the
19   first of the e-mails that you have in here from
20   Mr. Conitz, did you ever communicate in any way with
21   Mr. Conitz after the time that you left Red Dog?
22 A No.
23          MR. HALLORAN: Mr. Logan has left the room
24   again.
25 Q You mention in one of these e-mails, and I'm not going
```

Exhibit 4, page 31 of 36

```
 1              to take the time to pull it out unless you want me to,
 2              that you think it would be better for the Nana
 3              shareholders if there was no preference for Nana
 4              shareholders.
 5    A         Uh-huh.
 6    Q         Why is that?
 7    A         Well, what I say specifically is Nana shareholders in
 8              general, because there has got to be thousands of
 9              shareholders. If -- so the vast majority of them,
10              their benefit from that corporation is the profits of
11              that corporation. If this preference is used to put
12              people in -- what I'm saying is that this -- this
13              preference can be used to put in lesser qualified
14              people in the positions, then you're benefitting one
15              shareholder, but the rest of them don't get the benefit
16              from that. There's only, what, 300 people working at
17              Red Dog. There's got to be thousands out there that
18              are looking for the dividend or -- and the increased
19              value of the -- their corporation.
20                       So, yeah, I think in general what they want and
21              what my position was all along was bring the most
22              qualified guy on board, whether he's a shareholder,
23              nonshareholder, from the Virgin Islands, or wherever,
24              and that would maximize the benefit to the
25              shareholders.
```

Exhibit 4 page 32 of 36

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

100

1  Q  Who is Jim Sommers?
2  A  He was the Teck human resources manager or whatever
3     they're called.
4  Q  Superintendent?
5  A  Superintendent.
6  Q  If I was to tell you that both Mr. Sommers and
7     Mr. Zigarlick have testified that the way a shareholder
8     hire preference works at Red Dog is that only when you
9     have two equally qualified people and one is a
10    shareholder and one is not, and the shareholder
11    preference is used to tip the scales in favor of the
12    shareholder, would you agree with that or would you
13    disagree with that?
14 A  I may agree that they said that. I don't know what
15    they said, but that gra- -- that paragraph that I read
16    in the agreement said that if the shareholder could be
17    trained within a reasonable amount of time, that he was
18    given preference. So that, to me, is an approval that
19    you could take someone less qualified, put them in that
20    position and say, well, I can train them up to that
21    qualification.
22 Q  But if they.....
23 A  And, again.....
24 Q  If they're testifying that they don't follow that
25    agreement and what they do in practice at Red Dog is,

Exhibit 4 page 33 of 36

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

101

```
 1         when you have two equally qualified people, one is a
 2         shareholder, one is not, they give the job to the
 3         shareholder." In your experience, would that be a
 4         correct statement or an incorrect statement?
 5    A    Well, my judgment in the Conitz and Hanna decision is,
 6         no, that's not what they followed because I thought
 7         Gregg was more qualified. You know, of course, they
 8         have their own perspective and they could say, no, gee,
 9         Larry was more qualified. I think I was in the best
10         position to know who was better qualified, but
11         everybody's got their opinion. They didn't qualify
12         that when they showed me the Nana/Cominco agreement. I
13         read it just the way it was typed out there and nobody
14         ever said, but this part omit.
15    Q    Did you read the other portions of the preferences that
16         are in that agreement?
17    A    It seems to me like I read one paragraph that had been
18         either outlined in highlighter or had been highlighted
19         all the way across and it was, you know, 10 lines long
20         or 8 lines long.
21    Q    Do you recall that it provides for provisions -- or it
22         provides for preferences to be given to people who live
23         in Northwest Alaska and people who live in Alaska and
24         people.....
25    A    There was a hierarchy and it started with Kivalina and
```

Exhibit 4 page 34 of 36

```
 1  UNITED STATES OF AMERICA        )
                                    ) ss
 2  STATE OF ALASKA                 )

 3          I, John R. Kells, have read the foregoing Deposition

 4  and have_____/ have not_____ made corrections thereto. Any and

 5  all changes, explanations, and/or corrections to my testimony

 6  may be found on the correction sheet(s) enclosed with this

 7  transcript.

 8

 9                                  _____
                                    JOHN R. KELLS
10
                                    DATE:_____
11

12

13                            *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25                                          Exhibit  4  page 35 of 36
```

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

121

# CERTIFICATE

1
2  UNITED STATES OF AMERICA  )
                              ) ss.
3  STATE OF ALASKA            )

4      I, Elizabeth D'Amour, Notary Public in and for the State of Alaska, residing at Fairbanks, Alaska, and electronic reporter for Liz D'Amour & Associates, Inc., do hereby certify:

6      That the annexed and foregoing Deposition of JOHN R. KELLS was taken before me on the 28th day of November, 2007 beginning at the hour of 1:00 o'clock p.m., at the District Court, Healy, Alaska, pursuant to Notice to take the deposition of said witness on behalf of Plaintiff;

9      That the above-named witness, before examination, was duly sworn to testify to the truth, the whole truth, and nothing but the truth;

11     That this deposition, as heretofore annexed, is a true and correct transcription of the testimony of said witness, taken by me and thereafter transcribed by me;

13     That the original of this deposition has been lodged in a sealed envelope with the attorney requesting transcription of same, as required by Civil Rule 30(f)(1) amended, that being MR. KENNETH L. COVELL, Attorney at Law, Law Office of Kenneth Covell, 712 Eighth Avenue, Fairbanks, Alaska 99701.

16     That I am not a relative or employee or attorney or counsel of any of the parties, nor am I financially interested in this action.

18     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this 10th day of December, 2007.

_Elizabeth D'Amour_
Elizabeth D'Amour
Notary Public in and for Alaska
My Commission Expires: 12/28/2010

SEAL

Exhibit 4 page 36 of 36

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678