```
                              John Kells Dep Vol II.txt
00122
   1              IN THE UNITED STATES DISTRICT COURT
   2                  FOR THE DISTRICT OF ALASKA
   3   GREGG CONITZ,                  )
                                      )
   4                                  )
                 Plaintiff,            )
   5                                  )
       vs.                            )
   6                                  )
       TECK COMINCO ALASKA, INC., and )
   7   NANA REGIONAL CORPORATION,     )
                                      )
   8              Defendants.          )
       _____)
   9   Case No. 4:06-CV-00015 RRB
  10                        VOLUME II
                    DEPOSITION OF JOHN R. KELLS
  11                     December 28, 2007
  12   APPEARANCES:
  13        FOR THE PLAINTIFF:      MR. DONALD F. LOGAN
                                    Attorney at Law
  14                                P.O. Box 73162
                                    Fairbanks, Alaska 99707
  15                                (907) 590-4341
  16        CO-COUNSEL (Telephonic): MR. KENNETH L. COVELL
                                    Attorney at Law
  17                                Law Office of Kenneth Covell
                                    712 Eighth Avenue
  18                                Fairbanks, Alaska 99701
                                    (907) 452-4377
  19
            FOR THE DEFENDANT
  20        TECK COMINCO ALASKA INC.: MR. SEAN HALLORAN
                                    Hartig, Rhodes, Hoge,
  21                                  & Lekisch
                                    Attorneys at Law
  22                                717 K Street
                                    Anchorage, Alaska 99501
  23                                (907)  276-1592
  24
  25
00123
   1   APPEARANCES (Continued):
   2        FOR THE DEFENDANT
            NANA REGIONAL CORPORATION: MR. JACOB B. NIST
   3                                Perkins Coie, LLP
                                    Attorneys at Law
   4                                1029 West Third Avenue
                                      Suite 300
   5                                Anchorage, Alaska 99501
                                    (907)  279-8561
   6
            FOR THE WITNESS:        MR. JASON BEATTY
   7                                Attorney at Law
                                    Post Office Box 70301
   8                                Fairbanks, Alaska 99707
                                    (907) 978-4274
   9
                              * * * *
  10
  11
  12
                                Page 1
```

```
                                  John Kells Dep Vol II.txt
13
14
15
16
17
18
19
20
21
22
23
24
25
00124
 1            PURSUANT TO NOTICE, the Deposition of JOHN R. KELLS,
 2   Volume II, was taken on behalf of Plaintiff, before Elizabeth
 3   D'Amour, Notary Public in and for the State of Alaska, and
 4   Reporter for Liz D'Amour & Associates, Inc., at the offices of
 5   Liz D'Amour & Associates, Inc., 330 Wendell Street, Suite A,
 6   Fairbanks, Alaska, on the 28th day of December, 2007,
 7   commencing at the hour of 10:30 o'clock a.m.
 8                           * * * *
 9                       TABLE OF CONTENTS
10        Cross Examination, continued, by Mr. Halloran . . . 125
          Cross Examination by Mr. Nist . . . . . . . . . . 150
11        Redirect Examination by Mr. Logan . . . . . . . . 163
12        EXHIBITS:
13        #12  (e-mail of November 29, 2007)  . . . . . . . 145
          #13  (Declaration of John Kells)  . . . . . . . . 148
14
                                 * * * *
15
16
17
18
19
20
21
22
23
24
25
00125
 1                       P R O C E E D I N G S
 2                (On record)
 3                COURT REPORTER:   We're on record.  Mr. Kells,
 4   would you raise your right hand?
 5                (Oath administered)
 6                MR. KELLS:  I do.
 7                COURT REPORTER:  Thank you.
 8                        JOHN R. KELLS
 9   testified as follows on:
10                  CROSS EXAMINATION, CONTINUED
11                COURT REPORTER:  Would you state your full name
12   for the record, spelling your first and last names, please.
13   A      John Kells, J-o-h-n K-e-l-l-s.
14                COURT REPORTER:  Is your address from the
15   previous deposition, and phone number, the same?
16   A      PO Box 61268.
17                COURT REPORTER:  And that's Fairbanks?
18   A      Yes.
19                COURT REPORTER:  9970.....
20   A      6.
                                    Page 2
```

```
                           John Kells Dep Vol II.txt
 21                 COURT REPORTER:  Phone number?
 22      A          479-3269.  I probably gave you my cell phone number
 23                 last time because we were in Healy.
 24                 COURT REPORTER:  Yes.  Okay.  All right.  You
 25      may proceed, counselor.
00126
  1      BY MR. HALLORAN:
  2      Q          You brought a number of exhibits last time.
  3      A          Uh-huh.
  4      Q          Did you bring all the same documents this time?
  5      A          I didn't bring the e-mails, but I did bring this bag of
  6                 notebooks.
  7      Q          Okay.  Are there any other additional documents that
  8                 you brought this time that you did not bring last time?
  9      A          I did.  The subpoena -- I think this is a -- oh,
 10                 this -- these are the transcripts that Liz sent me.
 11                 This is a subpoena I was served at my house with the
 12                 check.  And that's it.
 13      Q          All right.  With regard to the books that you have in
 14                 the bag, there's copies of them in the pile to your
 15                 left as well.  Can you describe what these books are?
 16      A          At the time I used a daytimer and I would try to keep
 17                 track of important things that were going on during the
 18                 day or sometimes not so important things.  I believe I
 19                 keep track of the weather in them, also.  I carry that
 20                 on to this day, but in a simpler format.
 21      Q          And when you say that you kept track of the important
 22                 things, you pretty much wrote down everything that was
 23                 more or less important?
 24      A          No, I -- I did the best I could.  It wasn't something
 25                 that I really had a lot of use for, but it was
00127
  1                 something that could be useful, looking back in the
  2                 past on different events because your memory sometimes
  3                 isn't as good as you think.
  4      Q          So if the books were to conflict with your current
  5                 memory, would you say that the book is more likely to
  6                 be accurate than your current memory?
  7      A          If it was very specific, then, yeah, I would say it is.
  8      Q          When you had meetings with Ted Zigarlick, you'd make
  9                 notes of them in these books.  Is that correct?
 10      A          There are some notes in there.  Again, the more
 11                 complete notes would have been in those steno notebooks
 12                 that I kept at the mine.
 13      Q          But there's -- still, there's a reference in here that
 14                 you met with Ted or you talked with Ted or.....
 15      A          I believe there are, yeah.
 16      Q          .....something even if the details of the conversation
 17                 aren't in here.  Right?
 18      A          Uh-huh.
 19      Q          And uh-huh means yes?
 20      A          Yes.
 21      Q          Okay.  You need to answer all the questions yes or no
 22                 because it's tough for her to write down uh-huhs and
 23                 unh-unhs.  Okay?
 24      A          (Nods)
 25      Q          When you would refer to Mr. Zigarlick, writing down in
00128
  1                 these books, was there a particular way that you
  2                 referred to him?
  3      A          Typically, TEZ.
  4      Q          All right.
  5      A          Those are his initials.
                                    Page 3
```

```
                           John Kells Dep Vol II.txt
 6   Q     And if you referred to Rob Scott, was there a
 7         particular way that you would refer to him?
 8   A     Probably Rob, I would think.  I don't -- I don't
 9         remember calling him Scott.  I think a lot of people
10         did call him Scott, but I think I always called him
11         Rob.
12   Q     Okay.  Any other way that you might have referred to
13         him?
14   A     Not that I can think of.
15   Q     Do you know what his initials are?
16   A     No, I don't.  I don't know what is middle initial was.
17         That was typical in the e-mails or in memos or
18         something where your three-letter initials would be --
19         would represent the person.
20   Q     Okay.  With respect to the hiring of the shifter, the
21         interactions that you had with different people,
22         whether they be the people who were applying for the
23         job or Ted Zigarlick or Rob Scott or anyone else, with
24         respect to that hiring those decision, those are things
25         that generally made it into your notebook here.  Is
00129
 1         that correct?
 2   A     It doesn't seem to be, no.  Again, the more -- the --
 3         the steno notebooks at work were specific to work.  If
 4         you read through these, you'll see there are a lot of
 5         things in my personal life in there.  So there's kind
 6         of a real general snapshot of what was going on at work
 7         in these books.  It was more specific in the stenos and
 8         I would suspect that had I covered something in detail
 9         in the steno notebooks, it probably didn't make much
10         note in here just because I'd already noted it down.
11         And I had no reason to think that those stenos
12         were.....
13              MS. LYNCH:  Excuse me, Ken Covell is on the
14   line.
15              MR. HALLORAN:  Okay.
16   A     Were something that I wouldn't have access to.  I mean,
17         certainly all the time I worked.....
18   Q     Why don't you wait till she can type again.
19              MR. LOGAN:  Hold on a minute.
20              (Off record)
21              (Mr. Covell joins deposition, telephonically)
22              (On record)
23              COURT REPORTER:  Back on record.
24   Q     You were saying something?
25   A     Yeah, I said that the -- if I had covered something in
00130
 1         detail in the steno notebooks, I don't think I would
 2         have been as likely to have put much detail in these
 3         notebooks here.
 4              I didn't have any reason to think that I would
 5         not have those steno notebooks to refer back to and
 6         that was, of course, while I was employed there.  And I
 7         didn't know that I'd have any reason to look back on my
 8         employment there after the fact.
 9   Q     When different people made known that they were
10         interested in the job, you made references in your
11         books to that.  Isn't that correct?
12   A     I don't know.  I haven't read through these.  I've
13         skimmed through them just to see the -- that I'd
14         encaptured all the dates in it, where Leo had died, and
15         then where I left.
16   Q     All right.
                                 Page 4
```

```
                           John Kells Dep Vol II.txt
17    A      But there could be something in there.
18    Q      When you made notations in these books, is there any
19           reason why we should believe that anything you might
20           have written is not true?
21    A      No.
22    Q      So if you said, for example, one employee was better
23           than another employee, that would be an accurate
24           reflection of your opinion as of that time?
25    A      Yeah.
00131
 1    Q      Can you turn to July 19th, 2004.
 2    A      Okay.
 3    Q      And if we look at the second entry down, it says that
 4           you talked with Larry.  Larry would be Larry Hanna.  Is
 5           that correct?
 6    A      Yep.
 7    Q      About the shifter position.  I mean, essentially, this
 8           is a reference that Mr. Hanna at least had made you
 9           aware by that time that he was interested in the job,
10           right?
11    A      Yep.
12    Q      And if you flip back to July 11th of the same year and
13           same book.....
14    A      Okay.
15    Q      .....at the bottom of the page, you have a notation
16           that you talked with Martin P.
17    A      Uh-huh.
18    Q      That'd be Mr. Perione.  Is that correct?
19    A      Yep.
20    Q      About shifting, if he's interested.  You told him it
21           was a two-man race as of that time.
22    A      Yep.
23    Q      The other person would have been Mr. Conitz at that
24           point.  Is that correct?
25    A      Yes.
00132
 1    Q      And I don't have it marked, but if I was to represent
 2           to you that you have an entry in here of when
 3           Mr. Conitz indicated that he was interested in the job,
 4           your recording of that in the book would be
 5           approximately accurate with respect to the date and
 6           time of the conversation?
 7    A      Yeah, if that was in there.  Again, the process started
 8           with just using the existing relief shifters, of which
 9           we had three: Martin, Gregg, and Jerry Gibson.  And
10           Jerry wasn't interested in it.  So that was where we
11           started out.  I don't know that Gregg came to me and
12           said that.
13                  I may have asked all the individuals whether
14           they were interested in being included in it.  But that
15           was how I started out, was just with the three relief
16           shifters that we had.
17    Q      Okay.  Can you turn to August 31st, 2004.
18    A      31st?
19    Q      Uh-huh.
20    A      Okay.
21    Q      Third entry down, it says you talked to Larry H.  That
22           would be Larry Hanna?
23    A      Yep.
24    Q      About shifter job and trainer.  J. Baldwin is
25           interested and willing to commit to five years.  What
00133
 1           does that sentence mean?
                                  Page 5
```

```
                         John Kells Dep Vol II.txt
 2    A      That's a good question.  Jimmy Baldwin had worked as a
 3           trainer there and I'm not sure if he was filling in as
 4           trainer at the time and -- I don't know.
 5    Q      And turn to October 25th.
 6    A      Okay.
 7    Q      Third entry from the bottom.  You said, I had a long
 8           talk with TEZ.  That'd be Ted Zigarlick?
 9    A      Yep.
10    Q      You say he's still reluctant to interact.  What does
11           that mean?
12    A      Ted -- I really can't explain it, but Ted didn't deal
13           with me very much.  He -- again, I can't explain it,
14           but I thought as superintendent and my direct superior,
15           that he would be more involved with what I was doing.
16           And he was not.
17                  So this was an unusual occurrence that we had
18           a long talk.  Typically, we'd interact at the morning
19           meeting and at the planning meeting later in the week,
20           but in between those, there was very little
21           interaction.
22    Q      So it's fairly unusual for you to have conversations
23           with Mr. Zigarlick about things while you were working
24           there?
25    A      To have a long conversation or a conversation in
00134
 1           detail, yes.
 2    Q      Okay.  Who is RLS?
 3    A      Shields, the other shifter.  Robert Shields.  I don't
 4           know what his -- what the L stood for.
 5    Q      If you look at November 11th, 2004.....
 6    A      Okay.
 7    Q      .....it says you talked to RLS about Larry as shifter.
 8           He said he didn't think he had any unusual conflict
 9           with him.
10    A      Uh-huh.
11    Q      What is that entry telling us?
12    A      That he didn't have any conflicts that he was -- that
13           he brought up at that time.
14    Q      Well, I'm asking you, I guess, to explain what you mean
15           by conflicts.
16    A      Well, again, this is three years ago.  I don't -- I
17           can't say anything specific.  This was all just part of
18           the process of seeing how well the shifter candidates
19           fit into the operation.  So I -- I can't elaborate on
20           that.
21    Q      Okay.  Why don't you turn to the next page.
22                  MR. LOGAN:  Is that 11/12?
23                  MR. HALLORAN:  Yes.
24                  MR. LOGAN:  Thank you.
25    Q      It says you had a long talk with Ted Zigarlick, third
00135
 1           entry down, after he talked with Rob.  Who is Rob?
 2    A      Rob Scott.
 3    Q      And that's about the shifter position.  Is that
 4           correct?
 5    A      Yep.
 6    Q      And it says they want to put Larry in as two by one?
 7    A      Two-and-one rotation.
 8    Q      Okay.  And use relief to fill in empty weeks.
 9    A      Yes.
10    Q      So this is indicating you had a talk with Ted
11           Zigarlick, but not Rob Scott.  Is that correct?
12    A      On that day, yeah.
                                   Page 6
```

```
                              John Kells Dep Vol II.txt
13    Q     Was there another day where you had a conversation with
14          Rob Scott about Larry Hanna and the shifter position?
15    A     There were three separate days:  One, the day that I
16          talked to him; Ted had gone out, said he was going to
17          go talk to Rob; he had not.  I went and talked to Rob
18          about it.  The other one was when Ted, me, and Rob were
19          all together, the time when I said I don't think this
20          is legal.  And the last of the meetings, which was when
21          the -- it was put on me that this is a conclusion;
22          we've decided it this way and that's how it's going to
23          be represented.  The conclusion being that Larry was
24          the -- was not only appointed as a shifter, but he was
25          appointed as a shifter because he was the better
00136
 1          qualified.
 2    Q     Now, when you and I talked on the phone a few months
 3          ago now, you were pretty clear in telling me that the
 4          only reason that anyone at Teck Cominco actually gave
 5          you for hiring Mr. Hanna or for promoting Mr. Hanna was
 6          that Mr. Hanna was better qualified.  And the last time
 7          we were in Healy, you seemed to be deviating from that
 8          position and suggesting that someone had actually told
 9          you that he was being promoted because of shareholder
10          preference.
11    A     That's a fact and however you interpreted the phone
12          conversation, that is -- that was never my intent to
13          say that.  That was the initial reason for putting
14          Larry in there was because he -- of the shareholder
15          preference.  It was after Gregg Conitz filed his
16          grievance that the qualifications came up.
17                At that original meeting between me, Ted, and
18          Rob, qualifications were never discussed.  We talked
19          about the shareholder hire.  That was the reason I
20          said, I don't think this is legal in the United States,
21          and the reason that I was given the Nana agreement to
22          read.  We never talked about qualifications.
23                And, in fact, in the third meeting, when it
24          was decided that he was given the shifter position
25          because he was better qualified, we still didn't talk
00137
 1          about qualifications, which I just took as the --
 2          rolled over the top of me and that was the way it went.
 3    Q     In the instance where you talked about shareholder hire
 4          being illegal or your perception that it was illegal,
 5          didn't that conversation not ever deal with Mr. Hanna?
 6    A     That was the only context that could have been in.
 7          Now, you had said that last time, and I can't imagine
 8          how that could have come up any other way.  There were
 9          I think only two meetings between me, Ted, and Rob in
10          the whole time I -- that the three of us were there and
11          it was about that issue.  It wasn't a common occurrence
12          that we would be meeting and this could have fallen
13          under some other topic.  So, no, that was about Larry
14          Hanna, specifically.
15    Q     And you mentioned the names Larry Hanna and that sort
16          of thing?
17    A     I -- I'm sure we did.
18    Q     Then how can you explain, then, that Mr. Scott and
19          Mr. Zigarlick believe that that conversation had
20          nothing to do with Larry Hanna?
21                MR. LOGAN:  Assumes facts not in evidence.  You
22    can answer if you wish.
23    A     I have no explanation for that.  I think you'd have to
                                    Page 7
```

```
                         John Kells Dep Vol II.txt
 24            ask them.
 25    Q       Why don't you turn to November 16th.  The second entry
00138
  1            down, you said you called Larry; he's interested in the
  2            position.  I told him his on -- his is on nights.
  3    A       Which would be his next.....
  4                   MR. LOGAN:  Was that 9/16?  I'm sorry.
  5                   MR. HALLORAN:  November 16th.
  6                   MR. LOGAN:  November 16th.  Thank you.
  7    A       Which would mean his first rotation coming up.  Because
  8            the shifters rotated, he wouldn't be on nights
  9            permanently.
 10    Q       So are you essentially informing him here that he's
 11            getting promoted?  Is that what I should read into
 12            this?
 13    A       What I'm verifying here is that he's still interested
 14            in the position because I was told obviously beforehand
 15            that he was going to get the job.  I think that's what
 16            we'd looked at from the 12th.  So I just wanted to make
 17            sure that he was still interested in it and then that
 18            would have been him getting the job.
 19    Q       And then on the 19th, the second entry from the bottom,
 20            it says you talked to Conitz about appointing Larry as
 21            shifter.
 22    A       That's when he came into my office - this is what I'm
 23            going to have to assume here - and said he had heard
 24            that I had been his -- that he had been my first choice
 25            and I verified that.  And then he asked me what was the
00139
  1            reason and I told him what the reason was.
  2    Q       If you only ever had two meetings with Rob Scott and
  3            Ted Zigarlick, those meeting should have been pretty
  4            significant, shouldn't they?
  5    A       Yeah, sure.
  6    Q       Why wouldn't there be any reference to them in these
  7            books?
  8    A       Well, again, I probably would have detailed them in the
  9            steno notebook and after I'd done that, that would seem
 10            redundant to put them in this notebook because I
 11            already had a record of what had happened.
 12    Q       When you have meetings with Ted Zigarlick, there are
 13            notations in here for a pretty fair number of meetings
 14            with Mr. Zigarlick, right?
 15    A       Yeah.  Well, I don't know how many, but, yeah, which to
 16            me would indicate that those weren't detailed in the
 17            steno notebooks.
 18    Q       You may recall last time when we were in Healy, you
 19            indicated that a particular truck accident was the
 20            result of faulty training and you indicated that after
 21            the accident, the brakes were in fairly good shape.  Do
 22            you recall that?
 23    A       Yep.
 24    Q       How is it that you would know what kind of shape the
 25            brakes were in?
00140
  1    A       As I said then, we started the truck up.  It was at
  2            least a week, and it may have been two weeks later,
  3            drove the truck away; it still had air and the brakes
  4            worked perfectly.
  5    Q       And who is we?
  6    A       The -- I don't even know who was driving it, but all
  7            the people from Caterpillar were there.  They sent a
  8            whole team up to look at this.  This was a pretty
                                 Page 8
```

```
                         John Kells Dep Vol II.txt
  9                 serious event.
 10    Q            Did you personally inspect the brakes or do.....
 11    A            No.
 12    Q            .....work to find out.....
 13    A            I took the word for whoever had done it.
 14    Q            Okay.  So that would be someone from Caterpillar?  You
 15                 took their word for it?
 16    A            Would have been someone from Caterpillar and probably
 17                 somebody from the shop along with them.
 18    Q            Do you know who from the shop?
 19    A            No.
 20    Q            Do you know if, in fact, there was anyone from the
 21                 shop?
 22    A            I -- I'm going to assume that.  I wouldn't think that
 23                 they would just let Caterpillar go down there and deal
 24                 with that and then say the brakes were fine.  Does that
 25                 make sense to you?
00141
  1    Q            When you say the shop, are you referring to Teck
  2                 Cominco employees.....
  3    A            Yeah.
  4    Q            .....in maintenance -- vehicle equipment maintenance,
  5                 right?
  6    A            Yeah.
  7    Q            If you were to learn that there have been a number of
  8                 similar accidents in Arctic climates with drivers
  9                 saying brakes didn't work in vehicles just like that
 10                 one, and in each instance Caterpillar said the brakes
 11                 were fine, would that cause you to change your opinion
 12                 in any way as to whether or not there might have been a
 13                 problem with the brakes?
 14    A            No.  No.  We didn't have that issue -- after this
 15                 incident, we put a sign up at the top of this grade.
 16                 It was a 9 percent downgrade with a really sharp turn
 17                 halfway through it.  We put a sign up at the top saying
 18                 9 percent downgrade; use fifth gear or lower.  Meaning
 19                 if the traction was worse, then go into a lower gear
 20                 and that would keep your engine RPMs up and enable the
 21                 retarder to work on the trucks.
 22                      And I've worked in the Arctic for a long time
 23                 and I've not heard many complaints about brakes, other
 24                 than that one with Art Ballot (ph) and then again later
 25                 with Bubba Adams on the coffer dam.  But they were both
00142
  1                 identical; just too low of RPMs to use the retarder.
  2                      And then the training part of it is that they
  3                 didn't -- they didn't remember that there is a service
  4                 brake, a brake on the floor that you can apply.  And
  5                 that was the brake that worked when Caterpillar drove
  6                 the truck away.  It has a separate air supply for it.
  7                      So there are at least two other braking systems
  8                 that you can use besides your retarder.  And that was
  9                 where we did an intensive training to make sure that
 10                 everybody understood that; that there were other
 11                 braking systems.  So if your retarder isn't slowing you
 12                 down, try something else.
 13    Q            And when you say we did extensive training, who do you
 14                 mean by we?
 15    A            There was -- the only two trainers I can remember being
 16                 Cominco trainers in it were Martin and Larry, but it
 17                 was at the -- it was in conjunction with the
 18                 Caterpillar people and I don't even remember who they
 19                 were or what they were, if they were mechanics or they
                                    Page 9
```

```
                             John Kells Dep Vol II.txt
   20            were engineers.  I think we had both of them there at
   21            the time.
   22     Q      But Caterpillar provided people to do training?
   23     A      I'm not sure that they did the training of the
   24            operators, but they did do the training of the trainers
   25            so that they were -- so it was real clear that -- how
00143
    1            the systems worked and how to train the operators to
    2            use the brakes.
    3     Q      And was that after the accident that we were just
    4            talking about?
    5     A      Yes.
    6     Q      How long after?
    7     A      Again, it took Caterpillar a long time to get there,
    8            and it could have been two weeks later.  And then I
    9            don't remember how long they stayed, but there was a
   10            lot of activity on this.  They did a presentation where
   11            they did explain all the brake systems and I think they
   12            did that with the crews.  I don't think it was just
   13            with the staff.
   14     Q      Did you attend that training session?
   15     A      Yes.
   16     Q      Were other supervisory or managerial-level people
   17            attending that training session?
   18     A      Again, I don't remember if it was just staff or just
   19            crews.  So I remember that the sessions happened and
   20            that there were people there.  I can't say who.
   21     Q      And were those sessions led by Teck Cominco trainers or
   22            were they led by Caterpillar people?
   23     A      Caterpillar.
   24     Q      But, again, just to be clear, with respect to your
   25            statement that the brakes were in working order, you're
00144
    1            essentially taking Caterpillar's word for that.  Is
    2            that correct?
    3     A      No.  I think it would have been the shop's word.
    4     Q      But you don't know who in the shop?
    5     A      No.
    6     Q      Between the time that we were all together in Healy and
    7            today, have you had any conversations with Mr. Logan?
    8     A      I did see him at the post office and again somewhere
    9            else, but I -- it was Fred Meyer's or something.  Just
   10            said hi and merry Christmas.
   11     Q      Did you have any conversations about this case?
   12     A      No.  The e-mail that I forwarded to you, that was the
   13            only thing specific to this case that we've talked
   14            about.
   15     Q      And that was on the night of the deposition?
   16     A      I don't know if it was then.  It was shortly
   17            thereafter.  It was the e-mail that he said it wasn't
   18            his position to advise me on how to deal with phone
   19            calls or anything, but that his recommendation, I
   20            think, was to have him included in the phone call -- in
   21            the phone conversation, which I think it makes sense.
   22            Although, the conference calls are kind of clumsy.  I
   23            think the e-mail would have been a better -- a better
   24            method on that.
   25                  MR. HALLORAN:  Can you mark that.  Sorry, I
00145
    1     don't have copies for you folks.
    2                                       (Deposition Exhibit 12 marked)
    3     Q      I'm handing you exhibit 12.  Is this the e-mail that
    4            you were just talking about?
                                    Page 10
```

```
                       John Kells Dep Vol II.txt
 5                 MR. LOGAN:  Do you think we might be able to
 6     see it over on this side of the table as well, please?
 7                 MR. HALLORAN:  Uh-huh.
 8                 MR. LOGAN:  Thank you.
 9     A      Yeah, that's it.
10     Q      All right.  Between the time we were all in Healy and
11            today, have you had any conversations with Mr. Covell?
12     A      I said hi to him at his office.  That was it.
13     Q      When were you at his office?
14     A      I was there to talk with Jason about getting the
15            deposition postponed so I could do it on my time off
16            versus taking time off.
17     Q      And what is the connection between Jason and
18            Mr. Covell's office?
19     A      I think he's interning as a lawyer.  I don't think he's
20            working for Ken Covell.  He's just looking to get some
21            experience in doing what lawyers do and this is -- he's
22            just recently out of law school or the bar exam or.....
23     Q      Have you ever employed Mr. Beatty before this
24            deposition?
25     A      No.
00146
 1     Q      What made you choose Mr. Beatty to become your
 2            attorney?
 3     A      That, I think was recommended by Don Logan.
 4     Q      And when did Don Logan recommend Mr. Beatty?
 5     A      It must have been after I got the deposition.  When you
 6            e-mailed me the deposition, I believe it was that day,
 7            so there is a phone call in there.  And what I remember
 8            about it was Don said if this is something that you
 9            don't want, there is an attorney that we can hook you
10            up with who can help get this waived.
11     Q      So you did actually have a conversation with Mr. Logan
12            then.....
13     A      Yes, I did.
14     Q      .....between the time we were in Healy and now?
15     A      Yeah.
16     Q      And it was about this case?
17     A      Yeah.
18     Q      Did Mr. Logan make any representations to you about
19            what you would be charged or how you would be charged
20            by Mr. Beatty?
21                 MR. COVELL:  Object to relevance.
22     Q      You can answer the question.
23     A      I'm not sure.  I know when I talked to Jason, he said
24            he'd do it for a dollar.
25     Q      Uh.....
00147
 1     A      But as far as what Don said, I can't remember.
 2                 MR. BEATTY:  Objection; that's attorney/client
 3     privilege, also.
 4     Q      How many times have you ever met with Mr. Covell?
 5     A      I met with him two summers ago in his office and I --
 6            again, I saw him the other day at his office.  He just
 7            stopped in and said hi.
 8     Q      When you saw him, that would have been in August two
 9            summers ago?
10     A      It could have been.  It was in the summer and I think
11            that's in these notebooks somewhere.  And it's -- also,
12            the dates are implied in those e-mails between me and
13            Gregg Conitz, because he e-mails me on one day and
14            says, thanks for talking to my lawyer yesterday.
15     Q      That actually would have been about a year and a half
                                 Page 11
```

```
                             John Kells Dep Vol II.txt
  16              ago, then, right?
  17    A         Sure.
  18    Q         I mean, if it was in the summer, it's a half year one
  19              way or the other.  It's two and a half or one and a
  20              half and.....
  21    A         That's fine with me.
  22    Q         .....in this case it'd be one and a half, right?
  23    A         Sure.
  24    Q         The lawsuit had already been filed by the time you met
  25              with Mr. Covell, do you know?
00148
   1    A         I would think so, but -- yeah, I would think so.
   2    Q         All right.
   3    A         Uh-huh.
   4    Q         What do you remember of the conversation that you had
   5              with Mr. Covell on that occasion?
   6    A         I just went in and told him pretty much the same thing
   7              I've been saying; just what happened or my recollection
   8              of what happened and that was that.
   9    Q         You met with him for about an hour and a quarter.  Is
  10              that correct?
  11    A         Could be.
  12    Q         How clear were you when you spoke with Mr. Covell about
  13              the chronology of events that you would have spoken
  14              with him about?
  15    A         I don't remember the conversation.  I didn't take
  16              notes.  I basically have just the one story, so I'm
  17              sure there's things that get distorted depending on
  18              when I'm telling it, but basically the story is the
  19              same; it's how I remember things.
  20                      MR. HALLORAN:  Can you mark this.
  21                                      (Deposition Exhibit 13 marked)
  22    Q         I'm handing you exhibit 13.  Have you ever seen that
  23              document before?
  24    A         I have.
  25    Q         Did you sign that document?
00149
   1    A         Yes.
   2    Q         When did you sign that document?
   3    A         Oh, I don't know when.  I don't remember the date.
   4              That would have been -- wait a minute, it was --
   5              because I was here in town on Friday.  I was getting
   6              some dental work done, so I was in town on Friday.  It
   7              was not today.  A week ago?
   8                      MR. BEATTY:  It was the day that this says.
   9    A         It was either a week ago or it was two weeks ago.
  10    Q         And do you know which, one week or two weeks?
  11    A         It would have been two weeks.
  12    Q         Okay.  Did you read that document before you signed it?
  13    A         Yes.
  14    Q         What, if anything, did you do to verify the accuracy of
  15              the statements that are in there?
  16    A         To verify -- I -- I don't know what you mean.  What
  17              would I -- what are my options on this?
  18    Q         Did you do anything to check to make sure that the
  19              statements in there are correct?
  20    A         I read them.  They're correct.
  21    Q         Well, it says you were deposed once on November 21st,
  22              2007.  The date of your -- the start of this deposition
  23              was not November 21st, was it?
  24    A         Oh, I don't know.  I gloss over dates like that.
  25              Maybe -- is it possible that that was not the date?
00150
                                    Page 12
```

```
                       John Kells Dep Vol II.txt
 1    Q         Do you gloss over other things besides dates?
 2    A         Sometimes, sure.
 3    Q         What kinds of things do you gloss over besides dates?
 4    A         I don't know.  What -- there's a whole universe out
 5              there.  If you're specific about something, I can
 6              answer a question.  But.....
 7    Q         Give me examples of things that you would gloss over.
 8    A         That doesn't even make any sense.  If I'm glossing over
 9              it, then how would I know what they were?
10    Q         So you're saying you don't know what it is you gloss
11              over?
12    A         I would think things that I -- no, I don't know.
13              That's the simplest way to answer that.
14    Q         I'm not looking for the simplest way, sir; I'm looking
15              for the truth.
16    A         And I'm telling you that there -- the question doesn't
17              have an answer.
18                   MR. HALLORAN:  I have no other questions, then.
19                   MR. NIST:  I'd like to take five minutes to get
20    my notes together before I.....
21                   MR. LOGAN:  Sure.
22                   COURT REPORTER:  Off record.
23              (Off record)
24              (On record)
25                        JOHN R. KELLS
00151
 1    testified as follows on:
 2                        CROSS EXAMINATION
 3    BY MR. NIST:
 4    Q         Mr. Kells, my name is Jacob Nist.  I represent Nana.
 5              Just a few questions for you.  You mentioned that you
 6              and Mr. Zigarlick -- first of all, just so I'm clear,
 7              he's your direct supervisor.  Is that correct?
 8    A         Correct.
 9    Q         Okay.  And you mentioned that there wasn't a lot of
10              interaction; that you would see him once or twice
11              over -- or speak with him once or twice a week about
12              issues.  Is that correct?
13    A         We would interact at the morning meeting which happened
14              every single morning.
15    Q         Okay.
16    A         And then again at the weekly planning meeting, but not
17              that often in between.
18    Q         And how long did the morning meetings usually last?
19    A         Oh, 20 minutes.
20    Q         Was it just you two?
21    A         No.  It was all the shifters, geology, shop.  I want to
22              say shop manager, but it wasn't necessarily a manager.
23              Whoever was overseeing the shop.  The shop foreman.
24              And the engineers and surveyors.
25    Q         And did Mr. Zigarlick supervise all these people?
00152
 1    A         He was -- yeah, he was in charge of all of them.
 2    Q         Okay.  And how about the weekly planning meeting?  How
 3              often or -- this probably happened weekly.  How long
 4              was that -- did those -- when you had a weekly planning
 5              meeting, how long did it run?
 6    A         That, I think we'd schedule it for half an hour.  It
 7              could go beyond that.
 8    Q         Did it usually?
 9    A         I would think it didn't, but there wasn't really a
10              restriction on it because it happened in the middle of
11              a shift, where that morning meeting happened right as
                               Page 13
```

```
                          John Kells Dep Vol II.txt
12              the day shift was starting.  The day shifter would send
13              the crew out, he would come into the meeting, and he
14              had to get back in the field pretty quick.  So.....
15    Q         You'd try to.....
16    A         .....15, 20 minutes would be pretty good on that one.
17              And if you went beyond a half an hour, then he would be
18              leaving the meeting.
19    Q         Okay.  And the weekly planning meeting, would that also
20              include all shifters, geology, shop foreman,
21              supervisor, and engineers?
22    A         The shop wasn't there, I don't think.  It was pretty
23              much the same cast of characters, though.
24    Q         Okay.  And I don't have a firm grasp -- about how many
25              people are we talking about here?
00153
 1    A         Fifteen.
 2    Q         Okay.
 3    A         And that's just a guess; it could have been 10.
 4    Q         And about the same at the weekly planning meeting?
 5    A         Yeah.
 6    Q         Okay.  So in the morning meeting, is that how you would
 7              receive your -- most of your tasks from Mr. Zigarlick?
 8    A         No.  That was where I got a report from the shifter
 9              from the night shift as to what happened last night and
10              we would ask the day shifter what he was going to be
11              doing that day and if we needed to make any changes at
12              that point, that would be where we'd throw it in.
13    Q         Okay.
14    A         And we'd get everybody's input if, say, something was
15              not going right with the chemistry of the ore, the
16              geologist might want to change where we were mining at
17              for that day.
18    Q         Okay.
19    A         The chemistry at Red Dog was real complicated.
20    Q         And so when you would be tasked with responsibilities
21              from Mr. Zigarlick, how would that usually occur?
22              Would he send you an e-mail?  Would he just -- would he
23              talk about those mostly during the weekly planning
24              meetings?
25    A         I don't remember anything specific on that.  Would have
00154
 1              just been through conversation and it could have been
 2              after the meeting.  That wouldn't have been part of the
 3              weekly planning meeting and it wouldn't have been part
 4              of the daily planning meeting as a general rule.  You
 5              might want to throw in there that the mill was also
 6              represented at both these meetings.
 7    Q         Okay.  You mentioned that you didn't think
 8              Mr. Zigarlick was, what were his word -- your words,
 9              interactive or.....
10    A         I didn't think he was comfortable interacting with me.
11    Q         Why is that?
12    A         Why was he -- why did I think that or.....
13    Q         Yeah.  Why did you think that?
14    A         Because he didn't do it.
15    Q         Okay.
16    A         And as somebody who was my direct superior, I thought
17              that would -- that he would have had more interaction.
18    Q         Okay.  Do you feel the same way?  Were you comfortable
19              interacting with Mr. Zigarlick?
20    A         Yeah, I was okay with it.
21    Q         Did you ever ask Mr. Zigarlick why he didn't interact
22              with you?
```

```
                        John Kells Dep Vol II.txt
 23    A       No.  No, I was pretty comfortable with the arrangement.
 24            I had quite a bit of autonomy with respect to the mine
 25            and if you're going to be responsible for something,
00155
  1            it's good to be in charge of it, also.  If you have
  2            somebody pulling strings on you, then you're not really
  3            in charge of it and if you're responsible for it and
  4            you're not in charge of it, that's kind of a crummy
  5            situation.
  6    Q       Would Mr. Zigarlick -- he would from time to time weigh
  7            in on things with you?
  8    A       Uh-huh.
  9    Q       Offer his opinion?
 10    A       Yeah.
 11    Q       Tell you the way it's going to be?
 12    A       Yeah.
 13    Q       I take it from your previous testimony there wasn't a
 14            lot of interaction -- that there wasn't a lot of
 15            interaction; that occasionally Mr. Zigarlick would make
 16            decisions and you don't know entirely what all went
 17            into those decisions.
 18    A       With respect to the mine?
 19    Q       With respect to the mine.
 20    A       I guess that's fair to say, you know.
 21    Q       Okay.  Did you ever see Mr. Zigarlick outside of work?
 22    A       No.
 23    Q       Did you ever invite him to your home?  Did he ever
 24            invite you to yours [sic]?
 25    A       No.  He lived in Anchorage; I lived in Fairbanks.
00156
  1    Q       Okay.  What about Mr. Conitz?  Did you ever see him
  2            outside of work?
  3    A       I saw him in Anchorage one time at a play, that it was
  4            just a coincidence we had both gone to the same play.
  5    Q       And that's while you guys were both working at Red Dog?
  6    A       Yes.
  7    Q       Okay.  Never here in Fairbanks?
  8    A       I don't think so.
  9    Q       Mr. Conitz ever been to your home?
 10    A       No.
 11    Q       Have you ever been to his?
 12    A       No.
 13    Q       What was the typical -- or what was your typical
 14            workday like at the mine?  I mean, would you wake up at
 15            a certain time and.....
 16    A       (Nods)
 17    Q       What time was that?
 18    A       Well, now I can't remember, but it -- you get
 19            institutionalized in a camp and everything happens at
 20            the same time.  You eat lunch at the same time, you eat
 21            dinner at the same time, and every Thursday it's the
 22            same dinner and every Friday it's the same soup.
 23                    I don't recall what time it was, but it was
 24            whatever it took to go downstairs, have breakfast, and
 25            then walk over and be at work at whatever time we
00157
  1            started there.
  2    Q       Okay.  Do you remember about what time breakfasttime
  3            was?
  4    A       Oh, I'll just say 6:00.  It's somewhere around there.
  5    Q       And.....
  6    A       It seems to me like the crews would start at 7:00, so
  7            the other crew would be coming in at 6:30 or getting
                                Page 15
```

John Kells Dep Vol II.txt

```
 8              over there right about the same time the other crew was
 9              coming in would have been a good idea.
10    Q         And I've never been to Red Dog, but is it -- I assume
11              it has some kind of a cafeteria-type set-up.  Is that
12              correct?
13    A         Yeah.
14    Q         Okay.  And so there'd be long tables and people would
15              sit together and eat together?
16    A         Yep.
17    Q         Did you make it your practice to have your meals or sit
18              with guys on your crew?
19    A         The operators didn't eat in the dining hall too much.
20              They would get styrofoam containers and they would take
21              it back to their room.  There were some of them there.
22              It seemed like typically eating breakfast, the
23              geologists would be there and maybe some of the
24              engineers.  Now, I did eat lunch in the lunch room that
25              was over in the -- by the mine offices and that was
00158
 1              with all the operators.
 2    Q         Okay.  So you guys would get together at that time?
 3    A         Uh-huh.
 4    Q         All right.  And.....
 5    A         I was more closely.....
 6    Q         .....again for the court reporter, you've got to say
 7              yes or no; otherwise, it.....
 8    A         Sure.  Yes.  I was more closely associated with the
 9              drill blast crew than any others, so if I was eating
10              lunch with someone, it would probably have been them.
11    Q         Okay.  Did you make a lot of close friendships while
12              you were working at Red Dog?
13    A         Probably as close as I make at any point.  I'm kind of
14              beyond having -- you know, I'm at an age where I don't
15              have bands of friends or -- there were lots of people I
16              liked and lots of people I enjoyed working with.
17    Q         Sure.
18    A         But, yeah, I.....
19    Q         Can you identify anybody as your best friend out at Red
20              Dog?
21    A         Oh, again, it would have been on the drill blast crew
22              and just about any of them.  All of the Martins.  There
23              was Don, Chris, and Ray.  Charlie Gray.  Charlie Gray
24              lives here in Fairbanks.  We've actually been fishing
25              together outside of work.  Norm Paley (ph), he was an
00159
 1              engineer.  I really enjoyed working with him.  Jim
 2              Swenside (ph), who was also an engineer.
 3    Q         What about as far as the operators go?  Who do you
 4              think you were closest with on the operator's side?
 5    A         Bill Cress.
 6    Q         Bill Cress?
 7    A         Bill Cress, yeah.  When we'd get weathered out in
 8              Anchorage, he lived out in Wasilla and if he was
 9              weathered out at the same time, I'd go over to his
10              house and stay versus renting a hotel room.
11    Q         Okay.  Do you still keep in touch with Bill?
12    A         No.
13    Q         Do you know if he still works for Teck Cominco?
14    A         I don't.
15    Q         What about Larry Hanna?  How would you describe your
16              relationship with Mr. Hanna?
17    A         I thought we had a good working relationship.  He's an
18              easy guy to get along with.
```

```
                          John Kells Dep Vol II.txt
  19    Q       Would you say your relationship was better than with
  20            Mr. Conitz or your relationship was worse with
  21            Mr. Hanna than Mr. Conitz?
  22    A       I'd say about the same.
  23    Q       I'd like to turn your attention back to that part of
  24            your daytimer on November 12th there.
  25    A       12th?
00160
   1    Q       Yes.  November 12th, 2004.
   2    A       Okay.
   3    Q       And you said you had a long talk with T-E-Z, which is
   4            Mr. Zigarlick.  Is that correct?
   5    A       Yep.
   6    Q       When you say here it's a long talk, I'm trying to get a
   7            sense of how long of a talk it was?
   8    A       Half hour maybe.  That would have been an exceptional
   9            conversation with Ted.
  10    Q       By exceptional, you mean that would be a much longer
  11            conversation than you would typically have with him?
  12    A       Correct.
  13    Q       Okay.  And this half hour long conversation, was
  14            this -- were you guys discussing Larry in particular or
  15            were you guys -- and when we're talking about Larry,
  16            we're talking about Larry Hanna.  Is that correct?
  17    A       Yes.
  18    Q       Okay.  And were you guys discussing Mr. Hanna in
  19            particular or were you guys more talking about the
  20            schedule, or do you remember?
  21    A       It looks like we're discussing Larry Hanna and the --
  22            how to fit his two-and-one schedule into the existing
  23            schedule of shifters because that was a mismatch.
  24    Q       Okay.
  25    A       We -- every six weeks, we would have one week where
00161
   1            there was only one shifter for both shifts, so we would
   2            need a relief shifter.  And then there would also be
   3            one week where there were three shifters on site and
   4            only two shifts.
   5    Q       Okay.
   6    A       So we were trying to justify how we could make that
   7            work out or try to put it together how we were going to
   8            do it.
   9    Q       Is this something you have an independent recollection
  10            of or is this just how you're interpreting your notes?
  11    A       No, that is -- I have a recollection of the -- how the
  12            two-and-one fit in there and the justification that we
  13            used for having -- not putting somebody else on a
  14            different schedule.
  15                    When Leo Thomas moved into the shifter
  16            position, he took the four-and-two position that was
  17            open.  When Larry came in, he wanted to keep his the
  18            same schedule he was on and make everything else fit
  19            into it.
  20    Q       I see.  And this November 12th entry, this is before
  21            Mr. Hanna had learned that he was going to be a
  22            shifter.  Is that correct?
  23    A       Yeah, I think he said it was the 14th or something
  24            that, I don't know, where I at some point asked Larry
  25            if he wanted the job.  I thought that was after that,
00162
   1            but I don't see it here.  Oh, here we go, on the 16th.
   2            And here it looks like I called him, so he wasn't on
   3            site at the time.
```

John Kells Dep Vol II.txt

```
  4    Q         You said -- I believe you previously testified about a
  5              year and a half ago, you had a meeting with Mr. Covell
  6              for about an hour and a quarter or so?
  7    A         I had a meeting with him, yeah.
  8    Q         Who all was at that meeting?
  9    A         It was just me and him.  Gregg may have been on the
 10              phone for the whole thing or he may have been on the
 11              phone afterwards.  I don't -- I don't remember.
 12    Q         And when you say Gregg, do you mean Gregg Conitz?
 13    A         Gregg Conitz, yeah.
 14    Q         Okay.  Were you -- was there a tape recorder running
 15              while this went on?
 16    A         I don't remember one.  There could have been, but.....
 17    Q         Okay.
 18    A         .....I don't know.
 19    Q         Was Mr. Covell taking notes?
 20    A         I'm sure.
 21    Q         Do you remember that or.....
 22    A         I.....
 23    Q         .....that's what you're assuming?
 24    A         I'm just assuming that, yeah.
 25    Q         Okay.
00163
  1                        MR. NIST:  I believe that's all the questions I
  2    have.
  3                              JOHN R. KELLS
  4    testified as follows on:
  5                           REDIRECT EXAMINATION
  6    BY MR. LOGAN:
  7    Q         I'm going to ask just one very short piece here.  Leo
  8              Thomas came up.  Who is Leo Thomas?
  9    A         Leo Thomas was the shifter that was in the position
 10              that became vacant when he died.
 11    Q         That's the position we're talking about?
 12    A         Yes.
 13    Q         Okay.  You had the opportunity to work with him?
 14    A         Yeah.
 15    Q         Okay.  Can you tell us what kind of quality of work he
 16              put out?
 17    A         Leo was a really hard worker.  He was a really good
 18              operator.  Wasn't used to being a supervisor, but he
 19              did real well at it.
 20    Q         Okay.  How much time had he spent on the equipment?
 21    A         As a supervisor?
 22    Q         As an operator?
 23    A         Oh, he -- he was there when I got there.  So he had
 24              been there, whatever, seven, eight years.
 25    Q         There's different rating systems, I guess.  Is 6 the
00164
  1              highest or.....
  2    A         Yes.
  3    Q         Okay.  Do you know if he was rated 6?  5?  Whatever.
  4    A         I'm pretty sure he was.
  5    Q         Okay.  Do you have any idea what his incident rate was?
  6    A         He did have one of the higher incident rates, but what
  7              I said last time was that that was directly
  8              proportional to the skill of the operator because you
  9              would send your skilled operators into the trickier
 10              situations.
 11    Q         Can you explain that just a little bit more?
 12    A         If you had a situation where the operator or the
 13              equipment was at risk, you wouldn't send an
 14              inexperienced operator in; you would send in your level
```

```
                          John Kells Dep Vol II.txt
15         6 operators.
16              And, conversely, if you had a real safe
17         operation like pushing the dump, you would send in --
18         that was where your inexperienced operators got their
19         training.
20   Q     So if I understand what you're saying, is that the
21         experienced operators, would you expect them to have a
22         higher number of incidents?
23   A     I would, unless there was an inexperienced operator
24         that was -- didn't belong on equipment at all.
25   Q     Okay.
00165
 1              MR. LOGAN:  Thank you.  I have nothing further.
 2              MR. HALLORAN:  We're done.
 3              COURT REPORTER:  Okay.  That concludes the
 4   deposition and we're off record.
 5              (Off record)
 6              (END OF PROCEEDINGS)
 7                   * * * *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00166
 1   UNITED STATES OF AMERICA    )
                                 ) ss
 2   STATE OF ALASKA             )
 3        I, John R. Kells, have read the foregoing Deposition
 4   (Volume II) and have_____/ have not_____ made corrections
 5   thereto.  Any and all changes, explanations, and/or corrections
 6   to my testimony may be found on the correction sheet(s)
 7   enclosed with this transcript.
 8
 9                                _____
                                  JOHN R. KELLS
10
11                                DATE:_____
12
13              * * * *
14
15
16
17
18
19
20
21
22
```

```
                               John Kells Dep Vol II.txt
 23
 24
 25
00167
  1                          C E R T I F I C A T E
  2    UNITED STATES OF AMERICA       )
                                      ) ss.
  3    STATE OF ALASKA                )
  4            I, Elizabeth D'Amour, Notary Public in and for the
       State of Alaska, residing at Fairbanks, Alaska, and electronic
  5    reporter for Liz D'Amour & Associates, Inc., do hereby certify:
  6            That the annexed and foregoing Deposition of JOHN R.
       KELLS, Volume II, was taken before me on the 28th day of
  7    December, 2007 beginning at the hour of 10:30 o'clock a.m., at
       the offices of Liz D'Amour & Associates, Inc., 330 Wendell
  8    Street, Suite A, Fairbanks, Alaska, pursuant to Notice to take
       the deposition of said witness on behalf of Plaintiff;
  9
               That the above-named witness, before examination, was
 10    duly sworn to testify to the truth, the whole truth, and
       nothing but the truth;
 11
               That this deposition, as heretofore annexed, is a true
 12    and correct transcription of the testimony of said witness,
       taken by me and thereafter transcribed by me;
 13
               That the original of this deposition has been lodged in
 14    a sealed envelope with the attorney requesting transcription of
       same, as required by Civil Rule 30(f)(1) amended, that being
 15    MR. KENNETH L. COVELL, Attorney at Law, Law Office of Kenneth
       Covell, 712 Eighth Avenue, Fairbanks, Alaska 99701.
 16
               That I am not a relative or employee or attorney or
 17    counsel of any of the parties, nor am I financially interested
       in this action.
 18
               IN WITNESS WHEREOF, I have hereunto set my hand and
 19    affixed my seal this 7th day of January, 2008.
 20                            _____

 21                            Elizabeth D'Amour
                               Notary Public in and for Alaska
 22                            My Commission Expires: 12/28/2010
 23    S E A L
 24
 25
```