Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3

 4   GREGG CONITZ,                    )
                                      )
 5           Plaintiff,               )
                                      )
 6   vs.                              )
                                      )
 7   TECK COMINCO ALASKA, INC.,       )
                                      )
 8           Defendant.               )
     _____)
 9   Case No. 4:06-CV-00015 RRB

10

11

     _____

12

13              DEPOSITION OF GREGG CONITZ

14   _____

15

16                    Pages 1 - 102

                  Thursday, August 2, 2007

17                     8:30 A.M.

18

19

20          Taken by Counsel for Defendant

                         at

21          HARTIG RHODES HOGE & LEKISCH

                    717 K Street

22               Anchorage, Alaska

23

24

25
```

```
 1                    A-P-P-E-A-R-A-N-C-E-S
 2
     For the Plaintiff:
 3   Kenneth L. Covell
     LAW OFFICES OF KENNETH L. COVELL
 4   712 Eighth Avenue
     Fairbanks, Alaska  99701
 5   (452-4377)
 6
     For the Defendant:
 7   Sean Halloran
     HARTIG RHODES HOGE & LEKISCH
 8   717 K Street
     Anchorage, Alaska  99501
 9   (276-1592)
10
     For NANA:
11   Kyan Olanna
     PERKINS COIE
12   1029 West Third Avenue, Suite 300
     Anchorage, Alaska  99501
13   (279-8561)
14
     Court Reporter:
15   Diane M. Bondeson
     PACIFIC RIM REPORTING
16   711 M Street, Suite 4
     Anchorage, Alaska  99501
17
18
19
20
21
22
23
24
25
```

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                                 8/2/2007

                                                              Page 3

 1                        I N D E X

 2

     EXAMINATION BY:                                  Page

 3

     Mr. Halloran                                        4

 4

 5

 6

     EXHIBITS

 7

      34    November 26, 2004 Problem/Dispute (1 pg)    36

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONITZ v. TECK COMINCO                                      GREGG CONITZ
                                                              8/2/2007

Page 4

1          ANCHORAGE, ALASKA; THURSDAY, AUGUST 2, 2007

2                         8:35 A.M.

3                          -o0o-

4                     GREGG CONITZ,

5       deponent herein, being sworn on oath, was

6            examined and testified as follows:

7                      EXAMINATION

8    BY MR. HALLORAN:

9       Q.   You want to go ahead and state your name

10   and spell your last name.

11      A.   Gregg Conitz, spelled C-O-N-I-T-Z.

12      Q.   Have you ever been deposed before?

13      A.   No.

14      Q.   But you've sat through depositions; is that

15   right?

16      A.   No, I don't believe so.  Well, yes, the two

17   previous days to today, yes.  Other than that, no.

18      Q.   You generally understand the procedure,

19   what we're about to do here?

20      A.   Yes.

21      Q.   All right.  I'm going to ask that anytime

22   I'm asking questions, a question, wait for me to

23   finish asking the question before you start

24   answering, because if both of us are talking at the

25   same time it becomes very difficult for the court

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

                                                          Page 5
1   reporter to write down what we're each saying.  And
2   if I ask you a question, I need to get a verbal
3   response back.  Shaking your head up or down or side
4   to side doesn't work because she can only type up
5   what it is you say, and uh-huhs and uh-uhs don't work
6   very well.  They're very difficult to put into the
7   transcript and -- you know, just like you're doing
8   now.  Shaking your head doesn't work.  Okay?
9        A.   Yes, I understand, but I didn't want to
10   interrupt.
11        Q.   You're the plaintiff in this lawsuit; is
12   that correct?
13        A.   Yes, that's correct.
14        Q.   Why don't you just tell us briefly why it
15   is you're suing Teck Cominco Alaska, Inc.
16        A.   It is because I was turned down for a
17   promotion to a mine supervisor position that occurred
18   in November of 2004.  I felt I was more qualified
19   than the candidate who received the job, and I
20   believe that he was given a preference based on
21   Cominco's NANA shareholder hiring preference.
22              And then subsequently I was turned down for
23   a mine operations trainer position, and there again,
24   the person that received the job I felt was less
25   qualified for it than I was.  And there again, I felt

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 6

1    that he received a preference based on Teck Cominco's

2    NANA shareholder hiring preference.

3         Q.    Now, you're currently still working for

4    Teck Cominco Alaska?

5         A.    Yes, I am.

6         Q.    And what is your position right now?

7         A.    I'm a mine operations operator, level six.

8         Q.    And is there a particular department you

9    work in?

10        A.    Yes.  It's mine operations.

11        Q.    And what rotation are you on?

12        A.    I'm on a four and two schedule, four weeks

13   on, two weeks off.

14        Q.    And are your coworkers all on a four and

15   two rotation?

16        A.    No.  Most of my coworkers are on a two and

17   one rotation.  There is, I believe, throughout the

18   three crews -- there are kind of two positions on

19   each crew, and each crew is roughly a 12-man crew,

20   and out of that 12-man crew there is two people that

21   are on four and two, and the rest are on two and one.

22        Q.    And with the four and two, does it work out

23   that you end up on the same crew each rotation you're

24   at the mine or do you end up being multiple -- do you

25   work with multiple crews because your rotation is

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 7

1   different than a lot of other people's?

2        A.   Yes, I do work with multiple different

3   crews.  It's not a regular thing that I always work

4   with the same crew, whereas the -- the crews are

5   based on that two and one schedule.  At this point in

6   time, although, one supervisor is on a four and two,

7   so he doesn't always work with his crew.  But yeah, I

8   work with different crews.

9        Q.   You have multiple supervisors as a result

10  of that, as well; is that correct?

11       A.   Yes.  There is one that, you know, is

12  designated the supervisor on the crew I'm supposed to

13  be on, but I don't work with him all the time.

14       Q.   Who is that designated supervisor?

15       A.   At this time it's Bob Shields.

16       Q.   How long has Bob Shields been your

17  supervisor?

18       A.   In terms of specifically on the crew that

19  I'm on --

20       Q.   Um-hum.

21       A.   -- or as a whole, you know, as part-time

22  thing?

23       Q.   Take them one at a time and answer both.

24       A.   Okay.  I believe that for the time that

25  I've been on his designated rotation, which is B

CONITZ v. TECK COMINCO                                                    GREGG CONITZ
                                                                          8/2/2007

1    crew -- say there is A, B and C crew, and he's the B

2    crew.  I would believe that's been in the

3    neighborhood of two years at this point in time.  And

4    as to working for him, you know, at times during my

5    rotation with him, not necessarily being my full-time

6    supervisor, that's been the entire length of time

7    I've been in the mine department.

8         Q.   Okay.  And then presumably you have two

9    other supervisors because you work two other crews;

10   is that right?

11        A.   Yes.

12        Q.   So who would be your supervisor when you're

13   with the A crew?

14        A.   With A crew is Larry Hanna at this point in

15   time.

16        Q.   And who would be your supervisor when

17   you're with the C crew?

18        A.   Be Steve Lozano, although Steve is

19   permanently at the port this summer.  So right now

20   it's a relief supervisor.

21        Q.   Okay.  And who is the relief supervisor for

22   that crew at this point?

23        A.   Currently they're using Chuck Barger.

24   Yeah, Chuck.  Chuck would be the guy that's on C crew

25   that would formally do that.

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 9

1    Q.    All right.  Are you a level six operator?

2    A.    Yes, I am.

3    Q.    How long have you been a level six

4  operator?

5    A.    I believe in the neighborhood of seven

6  years, six to seven years.

7    Q.    How long have you been in the department

8  that you're in now?

9    A.    Approximately 12 years.

10    Q.    How long have you worked for Teck Cominco

11  Alaska?

12    A.    A little over 17 years.  I hired on April

13  9th of 1990.

14    Q.    And what was the position you hired into

15  originally?

16    A.    With mill maintenance as a level four

17  oiler.

18    Q.    How long were you working as an oiler?

19    A.    I was promoted, or possibly you could say

20  reevaluated for -- well, they evaluated my

21  qualifications after I'd been working there for three

22  or four months, and there was an opening for what

23  they call a PMN, which is also an oiler to some

24  degree but has other duties associated with it, and

25  there was an opening for that job, and they promoted

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                              8/2/2007

                                                           Page 10
1   me to that job after I'd been in the department three

2   or four months, and I was a level six position.

3        Q.   And how long did you last in that position?

4        A.   For the remainder of the five years that I

5   was there before I transferred to the mine

6   department.

7        Q.   Okay.  And when you transferred to the mine

8   department, what level did you start off as an

9   operator?

10       A.   It was level -- I'm not sure if it was

11  three or four.  I believe it was level three.  Yeah,

12  it was level three.

13       Q.   And how long did it take you to progress

14  from level three to level six?

15       A.   That occurred over the next five years

16  roughly.

17       Q.   Okay.  When was it that you first applied

18  for a supervisor position?

19       A.   Full-time supervisor position?

20       Q.   Um-hum.

21       A.   After Leo Thomas died in -- I believe his

22  death was around June 1st of 2004.  And I was on R

23  and R at the time that that happened, and when I got

24  back to work, I was relief supervisor supervising,

25  and Mr. Kells, who was the mine foreman at the time,

Page 11

1    told me that there was a vacancy there, obviously due

2    to the fact that Leo died, and asked me if I was

3    interested in the position.  I told him yes, I was.

4        Q.   Mr. Thomas hadn't had that job very long

5    before he died, had he?

6        A.   No.  It had been in the neighborhood of a

7    year and a half, to my recollection.

8        Q.   And did you apply for the job at the time

9    that he was hired into that job?

10       A.   I was interested in it, but, to my

11   knowledge, it was never posted, and it was -- there

12   was no expression that there was an opening there,

13   that I was aware of.  And I think that the management

14   of the department knew that I was interested in

15   supervision, but I was not aware that there was any

16   effort to encourage applicants for the position.

17       Q.   Where were you born?

18       A.   Moscow, Idaho.

19       Q.   Have you always lived in the United States?

20       A.   No.  My parents spent some time overseas,

21   and I spent some time there with them.

22       Q.   Were your parents military or --

23       A.   No.

24       Q.   Why is it that you lived overseas?

25       A.   My father, the first time that they moved

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 12

1  overseas, was a college professor at the University

2  of Idaho, and he did I believe what was called a

3  sabbatical.  It was an exchange program where he

4  exchanged with a professor at the University of

5  Nairobi in Kenya, and he went there to do that job

6  kind of on a temporary basis for about a year and a

7  half, and we moved there.

8      Q.   How old were you at that time?

9      A.   I had just started first grade.  I believe

10  I turned six after we moved there.

11      Q.   And was there any subsequent time you lived

12  overseas?

13      A.   Yes.  I spent roughly five or six months

14  with my parents there shortly after I graduated from

15  high school, in the winter of '77-78.  After I

16  graduated from high school, my dad got another job

17  overseas, and again in Nairobi, Kenya, and he went

18  there for that, and that was with the government.

19  USAID.  And the government has a dependent -- since I

20  was a dependent of my parents, at that point in time

21  they paid for me to go over, and I spent four, five

22  months there with them at that time and then came

23  back.

24      Q.   Any other times you've ever lived overseas?

25      A.   No.

1      Q.    Are you a U.S. citizen?

2      A.    Yes, I am.

3      Q.    So you've never lived in northern Europe?

4      A.    No.

5      Q.    All right.  What is your race?

6      A.    Caucasian.

7      Q.    When you transferred to the department that

8  you're in now, was that the first time that you had

9  ever sought to get a transfer to that department?

10     A.    No, it was not.

11     Q.    How many times had you sought a transfer

12  unsuccessfully?

13     A.    A number of times.  I had -- I had wanted

14  to work in the mine department before I came to Red

15  Dog.  I had applied for a position in the mine

16  department before I received the position in the

17  mill.  So when I got to Red Dog, there is -- the

18  company policy states that you have to, as a new

19  employee, work for the company for one year before

20  you're eligible for transfer.  If you've been an

21  existing employee and, say, you've transferred to a

22  department, then it's six months.  If you've been in

23  one department six months but your total service is

24  more than a year, then you're eligible for transfer.

25  So as of the point that I'd been there for one year,

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 14

1   I felt I was eligible for a transfer and expressed

2   that interest to Mr. Zigarlick, and which was not

3   necessarily at the time of any posted opening.

4         And I discussed my interest with him to

5   move to the mine department a number of times after

6   that, some in relation to specifically posted

7   openings, and sometimes in general when there wasn't

8   necessarily a posted opening.

9   Q.   Were there times where they gave you field

10  tests to try you out?

11  A.   Yes, there were.

12  Q.   To check your skills?

13  A.   Yes.

14  Q.   Did they inform you of the results of those

15  tests?

16  A.   Yes.

17  Q.   What was it that they informed you with

18  respect to the results of those tests?

19  A.   Ted on the -- well, there was two

20  occasions.  One was strictly with Bob Shields.  He

21  told me personally that as a result of that test, he

22  thought I did just fine and that he thought that I

23  had good -- that was -- that test was strictly on a

24  loader, a 992 C model.  He told me that he felt I'd

25  done fine on that and that I had demonstrated

Page 15

1  potential and that he thought that he could make a

2  loader operator out of me and that I would be

3  potentially an asset to the department.

4          Subsequently I had a test with Ted

5  Zigarlick and Steve Lozano.  Steve never really gave

6  me any feedback from that.  Ted -- and that involved

7  three pieces of equipment.  That involved a D9 end

8  dozer, a backhoe that was a Cat 235, I believe, and a

9  992 C model loader.  And Ted was only there for the

10  dozer portion of it.  Steve was there not for the

11  dozer but for the backhoe and the loader portion of

12  it.

13          Like I say, he never gave me any feedback

14  from the -- Steve Lozano never gave me any feedback.

15  Ted told me two or three days after the test that he

16  didn't feel that I met the standards of what they

17  were looking for.  He said that obviously you have

18  experience as a -- you've been on a dozer before.

19  You have some experience.  You can handle the

20  machinery but not quite to the standards,

21  qualifications, what we are looking for.

22      Q.   Okay.  And what was Mr. Lozano's position

23  at the time of that test?

24      A.   Mine shift supervisor.

25      Q.   And what was Mr. Shields' position at the

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                           8/2/2007

Page 16

1    time of that test?

2         A.    Mine shift supervisor.

3         Q.    How far apart --

4         A.    In operations.

5         Q.    -- were the -- you said mine operations?

6         A.    Mine operations supervisor.

7         Q.    How far apart in time was the test with

8    Mr. Shields and the test with Mr. Lozano and

9    Mr. Zigarlick?

10        A.    I can't tell you exactly off the top of my

11   head.  I do believe -- I think I have that in notes.

12   I could give you specifics.  But it was roughly three

13   months.

14        Q.    Okay.

15        A.    I would guess.

16        Q.    And were those tests all in relationship to

17   a single opening or were they in relationship to two

18   different openings?

19        A.    I can't say that my memory is clear on

20   that.  I don't know for sure whether there even was

21   an opening at that point in time.  There may have

22   been.  I don't remember that there -- whether there

23   was or wasn't.

24        Q.    When you say "at that point in time,"

25   you're talking about for each of the two tests that

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 17

1    you were given?

2         A.    Yes.

3         Q.    Okay.  Who's Bill Haney?

4         A.    Bill Haney was an employee of Teck Cominco

5    Alaska.  He started as a driller, I believe.  I

6    worked with the drill and blast crew, and he worked

7    his way up through various positions.  He was a drill

8    blast supervisor, he was a mine operations

9    supervisor, and he ultimately became the mine

10   foreman.

11        I couldn't exactly tell you his years of

12   service, but it was, to my recollection, in the

13   neighborhood of from '93 or '94 until his death,

14   which was in 2000, maybe.

15        Q.    Okay.  When did you first become -- or when

16   were you first used as a relief supervisor?

17        A.    There again, I can't tell you exactly off

18   the top of my head.  I believe I have notes to that

19   effect.  To my memory, it was possibly late '99 or --

20   I mean '98 or sometime in '99.  It was, as I recall,

21   when I first got into that was about the time when

22   Ted had -- Ted Zigarlick had transferred to the mill

23   department.

24        And there was a Keith Malone who briefly

25   took over the position of mine superintendent, and

CONITZ v. TECK COMINCO                                     GREGG CONITZ
                                                          8/2/2007

Page 18

1    when he started there, he said that there was a need

2    for relief supervisors within the department and

3    asked people to tell him if they were interested in

4    doing that or not.

5            And there was a number of us that did, and

6    there was somewhat of an application process.  Bill

7    Haney was the mine foreman, I believe, at that time,

8    and I kind of went through that application process

9    through him.  And Bill told me after that that I was

10   the best candidate and applicant for -- of the group

11   that was interested as relief supervisor.  And so it

12   was sometime subsequent to that that I started doing

13   it.

14       Q.   All right.  In your Complaint, I'll

15   represent to you that it says on August 10th, 1999,

16   is when Mr. Haney said that he thought you would be a

17   good applicant for working as a relief supervisor.

18   Assuming that to be true, that would mean that you

19   would have first worked as a relief supervisor

20   sometime after August of 1999; is that correct?

21       A.   That sounds correct, yes.

22       Q.   Was Bill Haney still alive when you first

23   worked as a relief supervisor?

24       A.   Yes, I believe he was.

25       Q.   Okay.  And when you worked as a relief

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 19

1   supervisor initially, was Bill Haney a supervisor of

2   yours or how did that work?  Did he have any

3   interaction with your work as a relief supervisor

4   when you first worked as a relief supervisor?

5        A.   My memory is not entirely clear on that,

6   but I believe, like I said, that he was the mine

7   foreman when I started relief supervising.  He had --

8   previous to him becoming the mine foreman, he had

9   been my supervisor, my shift supervisor, and I'm not

10  entirely clear whether -- in my memory whether when I

11  started relief supervising he was a supervisor or if

12  he'd gone to the foreman job yet, but it was at least

13  one of those two.  I'm not clear on which.

14       Q.   Okay.  When you first worked as a relief

15  supervisor, was it in the mine department?

16       A.   Yes, it was.

17       Q.   You listened to Mr. Zigarlick's testimony

18  yesterday; is that correct?

19       A.   Yes, it is.

20       Q.   You recall him saying that within the past

21  year you have performed relief supervisor duties?

22       A.   Yes, I do.

23       Q.   Is that true?

24       A.   No, that is not true.

25       Q.   What is not true about that?

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 20

1        A.    I have not performed relief supervisor

2    duties.  I've not been asked on the basis -- normally

3    what occurs with the relief supervisor duties is that

4    if there is a -- one of the regular supervisors is

5    not -- is scheduled to be off-site for a week, a

6    period of time, then they designate a person as a

7    relief supervisor to fill in for that week.

8             I have not been asked to do that within the

9    period of the past since I've filed my complaint with

10   the EEOC, and also I have not only not been asked to

11   fill in on rotation when -- there is a situation that

12   occurs at Red Dog due to the rotation schedule

13   that -- say you're on day shift.  The day shift

14   supervisor is scheduled to go out on R and R.

15   Sometimes the entire crew's going out.  Sometimes the

16   crew's not going out.  Sometimes there is a few

17   people that stay that are, say, they're on four and

18   two.  Maybe the -- maybe B crew is -- that's B crew's

19   day to go out.  B crew supervisor, B crew all goes

20   out.  There is two guys left that are on four and

21   two.

22             And there is, to some degree, a need for

23   supervision in that interim, and I have not only not

24   been asked to perform any relief supervision during

25   that time, there has been what I've seen as

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 21

1   deliberate efforts to make arrangements for someone

2   else to perform those duties rather than me.

3          For example, at one point in time Steve

4   Lozano was brought up from the port site for the

5   afternoon to fill in for that, and I was -- I was

6   maybe one of the two other people there after the

7   crew went out.

8   Q.   Yesterday Mr. Zigarlick made a remark that

9   anytime you pick up the radio you're acting as a

10  relief supervisor.  What does that mean?

11  A.   Well, there are times in mine operations

12  that the supervisor is either busy with something

13  else or absent, and it's been an informal policy.

14  It's never been very clear-cut, I don't think, but to

15  some degree there is one person on a designated crew

16  that may be the potential relief supervisor for that

17  crew.

18         Say Steve Lozano is there with C crew and

19  Chuck Barger is the guy that would be the relief

20  supervisor if he wasn't there.  Then if Steve knew,

21  say, for example, that he was going to a meeting for

22  two hours, he might tell Chuck on the radio, "I'm

23  going to be in a meeting for two hours.  Would you

24  answer the radio for me?"  Which means would you take

25  the responsibility for anything that comes up that

Page 22

```
 1   needs to be dealt with in my absence.  To some

 2   degree, that's -- sometimes that's formalized and a

 3   specific person is designated for that.  Other times

 4   it's pretty vague, and the supervisor leaves or is

 5   gone and nobody knows why.

 6           And radio communication isn't perfect.  Not

 7   everybody can hear everything everywhere, depending

 8   on where you're at.  So it's not always a clear-cut

 9   situation that if the supervisor is not there, this

10   guy is answering the radio.  And there is times when

11   anybody on the crew might answer the radio.  If

12   somebody calls in and asks for the supervisor and

13   they can't get ahold of him, somebody might say,

14   well, he's not here right now, can we take a message,

15   or what do you need, or something like that.

16           So it may be that I've answered the radio,

17   but being that I have been excluded from relief

18   supervision, I haven't really made the effort to step

19   forward in that responsibility.

20       Q.   You indicated on one time they brought

21   Mr. Lozano up from port to act as a relief

22   supervisor.  Do you know whether or not Mr. Lozano

23   had any other business at the mine or mill on that

24   occasion that he may have been up there for some

25   other reason?
```

CONITZ v. TECK COMINCO                                           GREGG CONITZ
                                                                   8/2/2007

Page 23

1      A.   I do not know that.  That's possible.  I

2 can give you another example of being excluded in

3 that situation if you'd like.

4      Q.   Sure.

5      A.   There was a time that Chuck Barger was

6 relief supervising.  Bob Shield was filling in as

7 foreman, and Ted Zigarlick was on site.  I was

8 staying, Chuck Barger was going out, Bob Shield was

9 going out.  I was the only person left on the mine

10 operating crew, to my knowledge, at least as an

11 operator.  There may have been a crusher operator or

12 somebody there.

13      Chuck told me, "Take care of the China

14 hat," which is feeding the mill, which when it boils

15 down to everybody being gone, that's the one

16 essential task that remains that you need somebody to

17 deal with, is making sure that the feed goes into the

18 mill.

19      At that time one of the things that we do,

20 have been doing, is we haul crushed material out of

21 that building, which is done currently by contractor,

22 AIC.  Have a loader in the building, load their R 35

23 Euclid trucks, haul the material out, stockpile it so

24 that when we have to shut down the gyratory crusher

25 for necessary routine maintenance, that we can use

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 24

1  that feed, feed it back through the older jaw

2  crusher, which the mill doesn't like the feed from

3  the jaw crusher due to the different way that it kind

4  of shapes the rocks.  So the company has decided that

5  it's more productive, more cost-effective to use the

6  rock crushed from the gyro rather than the jaw.  So

7  we haul this material out, stockpile it, run it back

8  through the jaw.

9          So anyway, I was tasked with being in the,

10  quote, China hat, and I was not told that AIC was

11  going to come up there and haul material.  Chuck had

12  neglected to crush after lunch, which to me he should

13  have.  If he knew that they were going to haul

14  material out of the China hat, he could have crushed

15  from after lunch at one o'clock till when everybody

16  left at 2:30 and got another 3,000 tons in there,

17  which would have helped a lot.

18          I got in there.  There was a minimal amount

19  of feed there.  AIC shows up and says we're going to

20  start hauling out of here and as -- if I could back

21  up for a second.

22          When Chuck left, he told me to take care of

23  the China hat.  When Bob left, he got on the radio,

24  and I very specifically remember this because it

25  offended me.  He called me on the radio and told me,

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 25

1    "There are no shift supervisors on site.  If you have

2    any problems, need anything, get ahold of Ted."

3            So there was a bit of a conflict there that

4    these people had showed up to haul material, but

5    there wasn't quite enough material to haul out of

6    there, which possibly could have run us short on

7    material to feed the mill, which is our main purpose,

8    is to keep the mill going, keep feed there all the

9    time.

10           So if I would have been a supervisor, I

11   would have felt free to make the decision based on my

12   knowledge of whether they could or couldn't haul out

13   of there.  I felt, because I was told that there was

14   no supervisors there, which I was there, so that

15   inferred to me that I was not a supervisor, I needed

16   to get ahold of Ted and let him make the call.

17           Got ahold of him on the radio, and he asked

18   me what I thought I ought to do, and I said, "Well,

19   you know, we can make it till the end of shift if you

20   want to.  It will be close, but we can do it."

21      Q.   And you were the only person on your crew

22   working at that time; is that right?

23      A.   As I recall, yes.

24      Q.   So if they had made you a supervisor, there

25   would have been no one for you supervise; is that

1   correct?

2       A.   Yeah, just myself, you know.  Like I say,

3   there may have been one other person there that was

4   more of a laborer and not an operator, say cleaning

5   up in the crusher, something like that.  I don't

6   recall whether there was or wasn't.

7       Q.   And when they needed to know what should be

8   done, they turned to you to ask you; isn't that

9   correct?

10      A.   Based on my operator experience, yes.

11      Q.   You mentioned an EEOC complaint.  What was

12  that all about?

13      A.   That was after the decisions had been made

14  with regards to placement of Larry Hanna in the

15  supervisor position and Mike Baker in the trainer

16  position, which I felt was unfair.  I consulted my

17  lawyer and was thinking about -- after I felt I had

18  exhausted any possibility that I had of contesting

19  that issue within the company, then I went to my

20  lawyer and looked into taking legal action on the

21  matter.  He advised me that the first thing that we

22  would need to do is make an EEOC complaint, and

23  that's what we did through him.

24      Q.   You currently live in Anchorage; is that

25  correct?

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                               8/2/2007

Page 27

```
1       A.    That's correct.

2       Q.    How long have you lived in Anchorage?

3       A.    For about 15 years.

4       Q.    Where did you live prior to that?

5       A.    Nome, Alaska.

6       Q.    And how long were you in Nome?

7       A.    I was in Nome for a period of about ten

8    years.  I first started working there in the spring

9    of 1982, and for the first three years that I worked

10   in Nome I wasn't -- I still claimed residence in the

11   state of Idaho.  So I was a full-time resident of

12   Nome, and in '85 I moved to Nome permanently and

13   lived there permanently from '85 to '92, at which

14   time I moved to Anchorage.

15      Q.    What kind of work did you do in Nome?

16      A.    Mining.  I worked for the Alaska Gold

17   Company there.

18      Q.    And what did you do for Alaska Gold?

19      A.    I started in a laborer position as a thaw

20   field laborer.  Had the opportunity to work my way up

21   fairly quickly within the company.  The next job I

22   had was an equipment operator for the thaw field, and

23   there was opening as -- what was called shoreman on

24   dredge five.  That's a mobile equipment operator that

25   worked in support of the dredge operation.  I held
```

Page 28

1    that job until in 1984.  We operated through the end

2    of the season.  In the spring of 1985 I got a pink

3    slip basically that said the company was not going to

4    operate dredge five for the '85 season, so I, in

5    effect, lost my job there.  Did construction work for

6    that year.

7              In '86 dredge five was still not operating.

8    I got back on with Alaska Gold on the other dredge,

9    dredge six.  Worked as a deckhand, which is kind of

10   an entry-level labor position on that dredge.  And

11   then in '87 they started dredge five back up.  I went

12   back to my shoreman job on dredge five.  Did that

13   until through the end of the 1988 season, and in 1989

14   I became winchman, which is the operator of the

15   dredge.

16        Q.   And when you were a shoreman on dredge

17   five, what kind of equipment did you operate?

18        A.   I operated dozer, loader, backhoe, small

19   cranes, forklifts, trucks.

20        Q.   And you indicated that you did some

21   construction work when you got laid off.  What kind

22   of construction work?

23        A.   Road construction.  I worked for a small

24   contractor that did roads, driveways, you know,

25   gravel pit hauling, building roads, and then I also

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 29

1    worked for AIC on a road construction project from --
2    between Nome and Cape Nome.
3        Q.   And when you worked in construction, what
4    exactly was the work that you were performing?
5        A.   Dozer operator, truck driver primarily.
6    Sometimes loader operator.
7        Q.   And was that in Nome?
8        A.   Yes, it was.  There was times, say, for
9    example, for a small contractor that you would get on
10   a loader, load your truck, drive the truck to the
11   fill, dump, get off and get on the dozer.  So you're
12   running three pieces of equipment at the same time.
13       Q.   And after you worked for Alaska Gold, did
14   you go directly to Teck Cominco Alaska or did you
15   have other employment in between?
16       A.   I was -- at the time that I worked in
17   Alaska Gold, the nature of their operation was
18   somewhat seasonal.  There was a production season
19   that's from roughly May to November, and there is
20   other work that occurs kind of in the off season
21   during the winter, which they've always -- they were
22   always in the past pretty flexible about allowing
23   employees to either work or not work as they chose,
24   meaning that there was work there if you wanted to do
25   it.  You could -- it might not be your regular job,

CONITZ v. TECK COMINCO                                      GREGG CONITZ
                                                           8/2/2007

Page 30

1    but you could go work in the thaw field, say, while

2    they're drilling holes and putting in a new thaw

3    field in the winter.

4          Alaska Gold contracted, at that point in

5    time, some work out to local contractors.  They

6    stripped off roughly 25 feet of overburden before

7    they put in the thaw field to thaw and then

8    ultimately dredged the ground.

9          So I at times worked for those contractors

10   in the winter, and that's stripping work, which

11   mostly what I did then was running a dozer, ripping

12   and pushing.  And that was the job that I left to go

13   to Red Dog in the spring of 1990, which I -- you

14   know, I would have gone to my -- I was still working

15   for Alaska Gold.  I would have gone back to winchman,

16   you know, at the beginning of the operating season in

17   the spring, but I got on at Red Dog so I didn't.

18   Q.    What were your duties as a winchman?

19   A.    Winchman is responsible for the operation

20   of the dredge.  I guess it's named winchman because

21   there is a number of winches on the dredge that are

22   involved.  And it's a pretty large, complex piece of

23   machinery and there is winches involved, and maybe

24   that's the origin of the name.

25         But you're basically responsible for the

CONITZ v. TECK COMINCO                                                GREGG CONITZ
                                                                     8/2/2007

Page 31

1    production with that piece of machinery, and it's

2    both an excavation and a processing piece of

3    machinery.  You dig up the ground, and it has

4    processing machinery inside that separates the gold

5    from the gravel as you're -- as you're working, and

6    there is a four-man crew that takes care of

7    everything else on the dredge.  So as winchman,

8    you're nominally in charge of your crew that's

9    working with you on that shift.

10           There is -- there was what was called a

11   dredge master, which is ultimately the supervisor of

12   the whole operation, but there is three rotating

13   shifts, and he was only there during day shifts.  So

14   if you're on swing shift or night shift, you're in

15   charge of the operation.

16       Q.    And did you work swing shift or night shift

17   or did you work the day shift?

18       A.    When I was shoreman, I always worked day

19   shift.  When I became winchman, I worked the rotating

20   shift, and we worked two weeks of each shift and then

21   moved to the next shift.

22       Q.    Okay.  When you worked as a winchman, was

23   there a cab that you worked in or were their dredge

24   such that you had to walk from one set of controls to

25   another to operate the machinery?

Page 32

1    A.    There was what's called a winch room, which

2    essentially you could say was the cab.  It's roughly

3    the size of this room here probably, 25 by 35 feet

4    maybe.  And all of the controls for immediate

5    operation of the dredge as far as digging with it are

6    located in that room, and so you basically can either

7    stand or sit in, for the most part, one position and

8    operate the dredge.

9         And then there is -- the other people that

10   are working on the dredge are in control of things

11   like pumps and the trammel screen and the conveyer

12   belts, which are a part of the process.

13   Q.    And those four individuals all worked in

14   the same room as you?

15   A.    No.  They would work throughout the dredge.

16   The winch room was kind of used as a break room,

17   informal break room and lunchroom and meeting place,

18   you know.  So that was kind of where everybody went

19   at the beginning of the shift and at lunchtime.  And

20   so people that worked, you know, the other people on

21   the crew, may have been in and out of the winch room

22   at times during the shift.  And you had means of

23   communicating with the crew through bells and

24   telephones.

25   Q.    Prior to working for Alaska Gold, you said

CONITZ v. TECK COMINCO                                            GREGG CONITZ
                                                                     8/2/2007

Page 33

1    you worked in Idaho; is that correct?

2          A.    Yes, that's correct.

3          Q.    What kind of work did you do in Idaho?

4          A.    I worked for a very small underground

5    mining and milling operation.  I started in the mill

6    doing the assisting with mechanical maintenance work.

7    It was an operation that had been shut down for a

8    long time that had -- it had operated in I believe

9    the '40s and '50s.  I don't know when it shut down,

10   but it hadn't operated for quite some time, and they

11   decided to start it back up.

12          So they started -- started in the mill and

13   did a lot of mechanical work, got it going.  There

14   was a crew that -- contractor that worked in the mine

15   that started - it was an underground mine - drilling,

16   shooting, tunneling and started hauling ore out,

17   stockpiling it for the mill.

18          Then we started up the mills.  I worked,

19   you know, in operations in the mill and also worked

20   in the -- in their shop doing mechanical work on

21   equipment, trucks and equipment, and then eventually

22   I went into the mine and worked underground.

23          Q.    Who was your employer all that time?

24          A.    Ernie Oberbillig was the name of the guy

25   that owned the mine, and he was the one that I worked

CONITZ v. TECK COMINCO                                     GREGG CONITZ
                                                          8/2/2007

Page 34

1    for, and then there was a subcontractor that ran the

2    mine underground, and I worked for him when I went

3    there.

4         Q.   Do you know the name of that subcontractor?

5         A.   Gary Peck I believe was his name.

6         Q.   Did the mine have a name?

7         A.   Yeah.  It was Golden Gate mine.  There was

8    actually two mines there.  There was Golden Gate and

9    there was Antimony, but they didn't start up the

10   Antimony, and I believe that they just went by the

11   name Golden Gate.

12        Q.   Prior to working at Golden Gate, did you

13   ever have any employment?

14        A.   Yes.

15        Q.   What other employment did you have prior to

16   Golden Gate?

17        A.   I worked for the Forest Service for two

18   years.

19        Q.   What did you do for the Forest Service?

20        A.   I was on what was called a brush crew.  In

21   that area of Idaho they did select-cut logging.  The

22   Forest Service did timber sales to logging companies.

23   They marked out the timber.  Logging companies would

24   come in, and rather than clear-cut, they would cut

25   mature timber, leaving the younger growth.  And our

Page 35

1    job basically was to go in and kind of clean up after

2    the loggers and cut the slash and logs that they left

3    and the trees that they damaged and thin out the

4    existing trees to a set spacing so that the remaining

5    timber would grow up into harvestable timber.

6           And there was other associated things with

7    that, the burning.  Mainly it was running a chain

8    saw, thinning.  But we also burned in the fall,

9    planted trees in the spring, and did fire fighting in

10   the summer as needed.

11       Q.    And that's the U.S. Forest Service?

12       A.    Yes.

13       Q.    Did you work for anyone prior to the Forest

14   Service?

15       A.    No.  That was my first job out of high

16   school other than, you know, part-time jobs in high

17   school as -- like mowing lawns, raking leaves, that

18   kind of thing.

19       Q.    Have you ever gone to college?

20       A.    No, I haven't.

21       Q.    Did you go to high school in Idaho?

22       A.    No.  I went to high school in Bethesda,

23   Maryland.

24       Q.    What caused you to end up in Idaho?

25       A.    I was from Idaho originally and liked it

CONITZ v. TECK COMINCO                                      GREGG CONITZ
                                                           8/2/2007

1    there and wanted to return.  When I was in junior

2    high and high school my dad had this job in the State

3    Department and in Washington, D.C., and so we lived

4    Back East in the suburbs, in Bethesda, Maryland,

5    suburbs of Washington, D.C.

6              Shortly after I graduated he was on his way

7    overseas, and I at that time didn't want to go to

8    Africa and wanted to go back to Idaho.  So my

9    grandparents were in the area.  I went back and

10   stayed with them and looked around for a job until I

11   found that job with the Forest Service.

12        Q.   How old are you?

13        A.   I am 46 currently.  If you want to add up

14   those years, if it makes any difference, I graduated

15   from high school when I was 16.  I graduated early.

16        Q.   What year did you graduate in?

17        A.   1977.  My normal class was '78.

18             (Exhibit 34 marked.)

19   BY MR. HALLORAN:

20        Q.   Do you recognize Exhibit 34?

21        A.   Yes, I do.

22        Q.   What is Exhibit 34?

23        A.   It is a letter that I wrote after being

24   turned down for the mine supervisor position that I

25   had applied for.  Mr. Scott, who was the general

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 37

1  manager of the Red Dog property at that time, had

2  instituted this policy of dispute resolution where if

3  you had a complaint, that you would file that

4  complaint with your immediate supervisor, and then

5  there was a process for that if you didn't -- didn't

6  get a satisfactory resolution to that complaint, you

7  could work your way up the chain of command with it.

8        Q.   Is this the complaint that you referenced

9  that you said when you went to the EEOC you had made

10  a complaint before and essentially exhausted the

11  resolution possibilities at the mine?

12       A.   Yes, it is.

13       Q.   And in Exhibit 34, you say that you don't

14  want to be perceived as disagreeing with the NANA

15  shareholder hiring preference as a whole.  What do

16  you understand the NANA shareholder hiring preference

17  to be?

18       A.   Well, I understand that there is the

19  intent, which is stated in the contract between Teck

20  Cominco and NANA, for the mine to ultimately, to the

21  extent feasible, be 100 percent shareholder hire, and

22  I believe that they do what they can to achieve that

23  goal.

24       Q.   Did you support that goal?

25       A.   In so much as it can be done fairly and

Page 38

```
 1   without discrimination to other people, I do.  I do
 2   believe that inherently that's somewhat impossible to
 3   achieve without treating somebody else unfairly
 4   somewhere along the line.
 5        Q.   And how is it that people are treated
 6   unfairly or discriminated against?
 7        A.   Not allowed to progress into a position
 8   that they're qualified for because someone else who
 9   is a shareholder is given the preference.  I believe
10   that there is a number of people that would like --
11   that are non-shareholders that would like to work at
12   the mine if they had the opportunity, but they're
13   unable to because of the shareholder preference.
14             For example, an entry level position.  I
15   have people in town ask me all the time when they ask
16   me what I do, and they say, "Well, gee, could I get
17   on up there?"  And I ask them what their experience
18   is, and if they don't have mining experience or
19   applicable college, I think their chances of getting
20   a job at Red Dog are virtually nonexistent.
21        Q.   Why is it unfair -- NANA shareholders are
22   the owners of the mine; isn't that correct?
23        A.   That's correct.
24        Q.   Why is it unfair for the owners of the mine
25   to want to have the owners of the mine employed at
```

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 39

1    the mine?

2        A.   Well, they may own the ground, but they

3    don't own the infrastructure of the mine.  Teck

4    Cominco owns the infrastructure of the mine, and I

5    work for Teck Cominco, and I don't believe that it's

6    fair for Teck Cominco to make that discrimination on

7    their behalf just because they're operating on land

8    that NANA owns.

9            NANA doesn't own the mill or any of the

10   equipment that I operate or the building that I sleep

11   in when I'm there or anything -- any of that

12   infrastructure.

13       Q.   Is it your claim in this litigation that

14   Teck Cominco has any hiring preferences other than a

15   shareholder hiring preference?

16       A.   I have seen in their contract with NANA

17   where it stipulates that preference.  I do not

18   believe that I've seen any preference other than the

19   NANA shareholder preference exercised in the time

20   that I've been there.

21       Q.   When you said you have seen their contract

22   with NANA, you're referring to the -- I believe it's

23   Exhibit 4, the Development and Operating Agreement

24   Between NANA Regional Corporation and Cominco

25   American, Inc.?

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 40

1        A.    Yes.

2        Q.    And then when you say -- and I'm trying to

3    remember the exact words here, but you said something

4    to the effect of you haven't seen anything other than

5    the shareholder preference actually employed.  Am I

6    understanding you correctly?

7        A.    Yes, I believe so.  I can't -- for example,

8    the next -- if you look at the writing in that

9    contract, the next preference is supposed to be

10   residents of the NANA region, I think it says, for at

11   least two years that are not NANA shareholders.  I

12   don't know of anybody -- there may be, there may have

13   been, but I don't personally know of anybody that's

14   ever been hired at Red Dog that is a resident of the

15   NANA region that is not a NANA shareholder.

16       Q.    Okay.

17       A.    And then the next one down the list is

18   residents of northwest Alaska.  I know of very few

19   people that have been hired out of northwest Alaska.

20       Q.    You're not aware of anyone being preferred

21   because they were in northwest Alaska?

22       A.    Not to my knowledge.

23       Q.    You're not aware of anyone being preferred

24   because they were from Alaska as a whole?

25       A.    Not to my knowledge.

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 41

1       Q.    How well did you know John Kells?

2       A.    Reasonably well.  I knew him through work

3    only.  He was an engineer with the mine department

4    for some time, and I didn't work with him a lot at

5    that point in time.  My association with him became

6    more frequent when he became the mine foreman and I

7    was working as a relief supervisor and we worked

8    together.

9       Q.    Is he still a mine foreman?

10      A.    I believe he is a mine -- he works at

11   Usibelli coal mine now, to my knowledge, and I think

12   they -- their management structure is a little bit

13   different than it is at Teck Cominco, and they have

14   some kind of a combination of engineering and

15   supervision positions, and I believe he's a shift

16   supervisor slash engineer of some kind.

17      Q.    Okay.  But he doesn't work at Red Dog

18   anymore?

19      A.    No, he doesn't work at Red Dog.

20      Q.    How long has he been gone from Red Dog?

21      A.    He left approximately the beginning of

22   January of 2005.

23      Q.    All right.  Did you ever know him to be a

24   racist?

25      A.    No.

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 42

1        Q.   Did you ever hear him make remarks that

2    would be considered derogatory toward Alaska Natives?

3        A.   No.

4        Q.   Did you ever hear him discuss the

5    shareholder hire preference that Teck Cominco has in

6    place?

7             MR. COVELL:  I'm going to make an objection

8    here as to potential privilege and work product

9    issue.

10            MR. HALLORAN:  What privilege could there

11   possibly be with respect to what he's heard Mr. Kells

12   say?

13            MR. COVELL:  Attorney/client.

14            MR. HALLORAN:  Mr. Kells isn't an

15   attorney.

16            MR. COVELL:  I'd' like to -- just want to

17   think about this.  Okay?  Okay?

18            MR. HALLORAN:  I would like to have him

19   answer the question that I just put to him.

20            MR. COVELL:  And the question is has

21   Mr. Kells what?

22            MR. HALLORAN:  Has he ever heard Mr. Kells

23   say anything about the shareholder hire preference in

24   effect at Red Dog mine.

25            MR. COVELL:  I think I've got a work

Page 43

1    product issue there that I'm going to, at this point,

2    direct him not to answer on.  I'll think about it,

3    and we'll come back.  Okay?

4              MR. HALLORAN:  We can get the judge if you

5    want.

6              MR. COVELL:  I'd like to take a recess and

7    think about it.

8              MR. HALLORAN:  I would not like to take a

9    recess right now.

10             MR. COVELL:  Okay.  Let's get the judge.

11   I'm going to the rest room.

12             MR. HALLORAN:  Excuse me, sir.  Don't leave

13   the room.

14             THE WITNESS:  Okay.  I was just going to

15   get a glass of water.

16             (Off record.)

17             MR. COVELL:  If you want to ask the

18   question of other than when his attorney was present,

19   if he heard Mr. Kells say whatever, I won't object to

20   that, and he'll answer the question.  And then we can

21   reserve that, and if we get the judge, then we can go

22   from there with it.

23             MR. HALLORAN:  I'd rather just get a ruling

24   from the Court at this point.

25             MR. COVELL:  All right.  Well, it might

Page 44

1    take some time.

2              Do you need to go to the bathroom?

3              MR. HALLORAN:  I do not want him to leave

4    this room.

5              MR. COVELL:  All right.  Well, if he's got

6    to go to the bathroom, he's got to go to the

7    bathroom.

8              (Off record.)

9              THE CLERK:  I have gotten ahold of the

10   judge.  The judge will not be calling you back.  He

11   told me to instruct you if you have reached an

12   impasse to file a motion on shortened time, and he

13   will be in chambers this afternoon and would be able

14   to consider it.

15             He did also ask me to inform you that if

16   there is discovery that is being withheld and a

17   deposition -- the deposition needs to be reset, that

18   whoever is withholding the discovery will have to

19   bear the cost of the deposition being reset.

20             So at this time he's not going to call you

21   back.  You will need to put something in writing or

22   file it electronically with the court.

23             MR. HALLORAN:  All right.  Thank you.

24             THE CLERK:  Thank you.  Bye.

25             (Off record.)

CONITZ v. TECK COMINCO                                      GREGG CONITZ
                                                             8/2/2007

Page 45

1          MR. HALLORAN:  The judge is not going to be

2  calling us back.  Says we have to file a motion, and

3  if the deposition has to be reconvened, then whoever

4  is the wrongful party will bear the cost of it.

5          MR. COVELL:  Okay.  We're still on record?

6          MR. HALLORAN:  We're still on record.

7          MR. COVELL:  All right.  And are you going

8  to incur costs if we continue this for some period of

9  time?

10         MR. HALLORAN:  I'm sure we will.

11         MR. COVELL:  What might they be?  I mean,

12 we're here now at your office.  So I don't know what

13 additional costs you're going to have continuing this

14 from today until another day.  You don't have travel

15 costs or hotel costs or anything of that nature.

16         MR. HALLORAN:  We're certainly going to

17 continue to get an answer to this question.

18         MR. COVELL:  That's fine.

19         MR. HALLORAN:  And I can't see how it is

20 that a witness in this case, any conversations that

21 that witness may have ever had, whether it's with you

22 or with the plaintiff or with anyone else,

23 constitutes work product.

24         MR. COVELL:  I've reviewed this area a

25 number of different times and spent a lot of time on

CONITZ v. TECK COMINCO                                      GREGG CONITZ
                                                           8/2/2007

Page 46

```
 1   it.  I don't have the briefing here with me, and I
 2   don't know if I can dredge it up easily.  But I think
 3   it is, because I've explored this in the past.  So
 4   I'm going to say the following thing and try to work
 5   this out, because I'm trying to work this out.  Okay?
 6             Number 1, I've offered for you to continue
 7   the deposition, ask him the question about any
 8   statements he made when his attorney, meaning me,
 9   wasn't present.  So we can work around a lot of it.
10   Number 2 -- and if you want to do that, we'll just
11   keep going.
12             Number 2, I'm going to go make a couple
13   more phone calls and see if I change my mind or I
14   have another thought about it, because I told you,
15   I'm trying to think about it.  Okay?  And I don't
16   like to have these things coming up like this
17   broadsiding us, but sometimes they do, and I
18   apologize for that, because I prefer to have it
19   thought through earlier.
20             So those are my proposals for trying to
21   navigate around this somehow.  And then I guess
22   thirdly, he's here at least till -- I forget what he
23   said.  Another week, and then he's back another
24   rotation.  And we'll come back and continue the
25   deposition right here.  So I'm willing to do all
```

CONITZ v. TECK COMINCO                                           GREGG CONITZ
                                                                8/2/2007

Page 47

1   those things to try to make it work.

2          MS. OLANNA:  Should I get a copy of the

3   rules?

4          MR. COVELL:  Yeah, you're more than welcome

5   to.  I have no objection to that.  I think you'll

6   find when you start thinking it through and trying to

7   do it, it gets to be punching a tar baby, but

8   you're -- I don't have any objection to that.

9          MR. HALLORAN:  We have lots of copies of

10  rules if you want one.

11         MS. OLANNA:  I'm just thinking it might be

12  helpful.

13         MR. COVELL:  And if you want to think about

14  all that, I'll go outside and make another phone call

15  while you think about that, come back, and I may have

16  something new, and maybe you'll have thought about

17  those issues.

18         MR. HALLORAN:  Well, I'll go ahead and ask

19  him the question with respect to conversations

20  outside your presence, but we're going to go to the

21  judge.

22         MR. COVELL:  That's fine.

23         MR. HALLORAN:  We're going to get a ruling

24  unless you tell him he can answer with regard to any

25  conversations that he may have had with Mr. Kells.

CONITZ v. TECK COMINCO                                           GREGG CONITZ
                                                                8/2/2007

Page 48

1          MR. COVELL:  That's fine.  And I'm -- you

2    know, I'm not trying to embroil this any more than

3    litigation gets to be.

4    BY MR. HALLORAN:

5          Q.    Do you remember the question, Mr. Conitz?

6          A.    Vaguely, but I would appreciate it if you

7    restated it.

8          Q.    I want to know if you've ever heard

9    Mr. Kells make any comments about the shareholder

10   hire preference at Red Dog mine.

11         MR. COVELL:  And that will be outside of

12   the presence of counsel, right, Mr. Halloran?

13         MR. HALLORAN:  Well, you're instructing him

14   to answer it with that limitation.  I understand

15   that.

16         MR. COVELL:  Okay.  All right.  Then I'm

17   instructing you to answer it with that limitation.

18         THE WITNESS:  Okay.  I can't say that I

19   have a specific recollection that would directly

20   answer your question of him making any comments to me

21   about that.

22   BY MR. HALLORAN:

23         Q.    Do you have a nonspecific recollection?

24         A.    I don't know exactly how far nonspecific

25   would go and still be relevant.  There would have

Page 49

1    been possibly circumstances that arose at work where

2    we may have to some degree discussed the shareholder

3    preference.  I could only generalize about that.  I

4    couldn't remember anything very specific.

5         Q.   What do you mean generally?

6         A.   Well, I would say generally -- and it

7    wouldn't be any different from any discussion that I

8    had with anybody else.

9              One of the frustrations in dealing with the

10   shareholder preference in mine operations at Red Dog

11   is absenteeism and difficulty in dealing with people

12   that live in the region and whether they show up for

13   work or not on travel day, and that's been a historic

14   problem at Red Dog.

15             And so if you're filling in as a relief

16   supervisor, you have a list of people that are

17   supposed to show up for work, and they don't always

18   all show up, and then that subsequently involves

19   sometimes long, drawn-out problem of dealing with,

20   you know, finding out whether the person has a valid

21   excuse for not being there.  If they don't, dealing

22   with discipline and up to termination of the

23   individual.

24             And there is a lot of that that goes on,

25   and I may have discussed that at one point with John

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 50

1   as a result of day-to-day dealings at work.  Wouldn't
2   be any different than what I've discussed with Butch
3   Draper or any of the other supervisors.  You know,
4   anybody in the management of the mine operations
5   department.
6       Q.   What is it about NANA shareholders that
7   they tend to not show up for work?
8       A.   I don't know specifically.  It happens.  I
9   know all of us, you know, have a problem wanting to
10  go back to work.  There's -- there's often family
11  issues.  I would say the family structure of
12  shareholders in the region might tend to be a little
13  different than a non-Native living in Anchorage.
14  There is more extended family situations involved,
15  and so there may be nieces or nephews that they're
16  dealing with or grandparents or uncles or -- you
17  know.  The family situations arise that they -- they
18  don't feel that they can leave.
19          And/or subsistence-related issues, such as
20  I know several instances of people being out hunting
21  and getting -- you know, getting stuck due to
22  weather, their snow machine breaks down or they, you
23  know, had to go back and get a snow machine that
24  broke down or -- there is a number of things like
25  that that happen.

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 51

1       Q.    If you look at Exhibit 34, the last
2   sentence of the first paragraph.
3       A.    This is 38 that I have in -- okay.  It's
4   34.  I'm sorry.  Never mind.
5       Q.    You make a representation -- this was
6   authored by you, correct?
7       A.    Yes.
8       Q.    You make a representation that Ted
9   Zigarlick approved your appointment into the job.
10          MR. COVELL:  Just for the record, it says
11  apparently approved.
12  BY MR. HALLORAN:
13      Q.    I'm wondering what it is that caused you to
14  write that Mr. Zigarlick had approved you.
15      A.    John Kells told me that when he made his
16  selection, he went to Ted with it, and he said that
17  Ted didn't appear to have any problem with that, that
18  he agreed with it, and it was subsequent to that that
19  there was a disagreement.
20      Q.    And in the next sentence, you say that
21  you're sure that Mr. Scott's decision is final.  What
22  caused you to believe that Mr. Scott had any role in
23  making the hiring decision?
24      A.    Mr. Kells told me that he was involved.  He
25  told me that he discussed it with him personally and

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 52

1    that ultimately there was a meeting between

2    Mr. Kells, Mr. Zigarlick and Mr. Scott about the

3    issue, which I believe was -- it was prior to this

4    dispute, and then there was also further meetings

5    after this -- I filed this dispute.  Ted told me that

6    he discussed it with him, with Rob Scott.

7         Q.   And did Mr. Kells make any representations

8    to you as to why a decision was made that you would

9    not be selected for that job?

10             MR. COVELL:  And again, you're directed to

11   answer only the remarks made outside the presence of

12   counsel.

13             THE WITNESS:  It was somewhat vague.  My

14   memory may not be 100 percent clear on that.  To the

15   best of my recollection, the first thing that he said

16   was that he -- that Mr. Scott had a problem with it,

17   and there was no specifically stated reason as to

18   what that problem was at that point in time.

19   BY MR. HALLORAN:

20        Q.   In your complaint you say that Mr. Kells'

21   decision was overturned by the general manager,

22   Mr. Rob Scott, who was required to give hiring

23   preference to a Native American.

24             Did anyone ever tell you that Mr. Scott was

25   required to give a hiring preference to a Native

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 53

1  American?

2      A.   That's certainly stated in the contract

3  that, you know, company policy, if you could call it

4  that, had been stated to me on a number of occasions

5  in the past in my dealings in trying to get -- to get

6  promotion.  So perhaps that was an inference of mine

7  and maybe not a directly stated point that I heard

8  directly from Mr. Scott.

9      Q.   Did Mr. Kells tell you that they're

10  required to give a hiring preference to Native

11  Americans?

12      A.   Yes, I believe that was understood between

13  us.  Or NANA shareholders.  I don't know if that term

14  is interchangeable here, but NANA shareholders

15  anyway.

16      Q.   In your mind, is it an interchangeable

17  term?

18      A.   Yes and no.  I mean, a NANA shareholder is

19  a Native American.  But a Native -- you can have

20  Native Americans that aren't NANA shareholders, and

21  we're specifically talking about NANA shareholders

22  here.

23      Q.   But we're not talking about all Native

24  Americans, then, right?

25      A.   Right.

CONITZ v. TECK COMINCO                                                    GREGG CONITZ
                                                                            8/2/2007

Page 54

1     Q.   Only those people who own shares in NANA

2  Regional Corporation?

3     A.   Yes.

4     Q.   Are you aware that there are people who own

5  shares in NANA Regional Corporation that are not

6  Alaska Natives?

7     A.   Yes, I am.

8     Q.   So NANA shareholder isn't necessarily an

9  Alaska Native, right?

10    A.   The only way that I understand that that

11  can be a NANA shareholder without blood is by

12  marriage, that if a person who is a non-Native

13  American marries a NANA shareholder who is a NANA --

14  a Native American by ancestry, then that's the only

15  way that someone who is not a Native American can

16  become a NANA shareholder.

17    Q.   You're saying if you marry a NANA

18  shareholder, you become a NANA shareholder?

19    A.   Yes, according to the -- I believe it's

20  stated in the agreement under the definition of

21  shareholder.

22    Q.   There is nothing in the agreement between

23  Teck Cominco American and NANA Regional Corporation

24  that defines how it is that a person comes to own

25  shares in NANA corporation, is there?

Page 55

1        A.   Other than the initial definition of what a

2    shareholder is there.

3        Q.   There's not a definition --

4        A.   I guess it --

5        Q.   There is not a definition of shareholder in

6    that agreement, is there?

7        A.   Yes, there is.  Right on the first page, I

8    believe there is, isn't it?

9        Q.   Would you take a look at Exhibit 4.  The

10   exhibits are in front of you here.

11       A.   Exhibit 4.  Okay.

12       Q.   Can you show me where in there is the

13   definition of NANA shareholder?

14       A.   On page 2, 1.17 where it says natives of

15   the NANA region means the stockholders of NANA.

16   Perhaps in your mind that's not a definition.  It's

17   maybe a definition of what NANA -- natives of the

18   NANA region means.

19       Q.   Okay.  So they define natives of the NANA

20   region, but they don't define shareholders, do they?

21       A.   Possibly that could be interpreted that

22   way.

23       Q.   Well, it's a definition of natives of the

24   NANA region; isn't that right?  It says natives of

25   the NANA region includes shareholders, and it also

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 56

1    includes descendants and spouses of shareholders.

2    Isn't that right?

3              MR. COVELL:  Just for the record, it says

4    means stockholders.  It doesn't say shareholders at

5    1.17.  But go ahead and ask the question, and answer

6    if you understand it.

7              THE WITNESS:  Could you repeat the

8    question, please.

9    BY MR. HALLORAN:

10       Q.   Doesn't 1.17 effectively say that natives

11   of the NANA region are NANA shareholders and also the

12   spouses of NANA shareholders and also the descendants

13   of NANA shareholders?

14       A.   Yes, I guess it does.

15       Q.   Doesn't define a shareholder, though, does

16   it?

17       A.   Possibly not.

18       Q.   Well, if it does, please tell me where you

19   see a definition of shareholder.

20       A.   Well, I would think that where it's

21   underlined and says natives of the NANA region means

22   stockholders.  That could be the other way around,

23   stockholders means natives of the NANA region.  That

24   would be interchangeable, wouldn't it?  If one thing

25   means the other, then they're both equivalent in my

1    mind.

2        Q.    Are there NANA shareholders who live in

3    Anchorage?

4        A.    Yes, there are.

5        Q.    So if we said that Anchorage residents

6    means NANA shareholders and other people living in

7    Anchorage, that would be a correct statement, right?

8        A.    I guess so.

9        Q.    So then according to your logic, we could

10   turn that around and say shareholders means Anchorage

11   residents?

12       A.    No, because you're eliminating the other

13   residents part of that.

14       Q.    Well, here --

15       A.    If you wanted to state it as NANA

16   shareholders and other residents, then yes.

17       Q.    And here we're saying it's the stockholders

18   and other people, which the other people are the

19   descendants and spouses, right?

20       A.    Yeah.

21       Q.    So we're eliminating the descendants and

22   spouses when we turn it around the way you do, aren't

23   we?

24       A.    I don't believe so.

25       Q.    Okay.  What else did Mr. Kells tell you

  1    about why you didn't get the job?

  2            MR. COVELL:  Same restriction applies.

  3            THE WITNESS:  It was pretty limited.  When

  4    he told me that I didn't get the job, he told me that

  5    the person, Larry Hanna, that was selected for the

  6    job was not his choice.  I asked him who his choice

  7    was.  He said it was me, and then he went on to say

  8    that he didn't really want to explain in detail the

  9    process of how that came about but he would answer

 10    any questions that I had about it.

 11            And I don't remember very specifically what

 12    the questions were that I asked him at that point.

 13    There weren't too many.  But I think I asked him if

 14    Ted had approved the decision, if he had gone to --

 15    you know, who it was that changed his mind, and he

 16    briefly described, to my recollection, having gone to

 17    Ted.  Ted told him that it was okay with him but he'd

 18    have to confer with Rob Scott, get final approval for

 19    it.  And then there was some time lag there with the

 20    rotation schedule, I believe, that Ted went out.

 21            He said that Ted was supposed to get back

 22    to him on it.  Ted did not get back to him on it.

 23    Ted told him that he was going to talk to Rob.  He

 24    waited to hear from Rob for a few days, didn't hear

 25    from Rob.  So he directly contacted Rob Scott, and

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                               8/2/2007

Page 59

1    then it went on from there.

2            I believe then -- I believe it was at that

3    point that he said that Rob Scott told him that he

4    had a problem with it, and then it went on into the

5    meeting between Kells and Zigarlick and Scott.

6    BY MR. HALLORAN:

7        Q.   So you're saying Mr. Kells told you that he

8    never even dealt with Mr. Zigarlick regarding this

9    hiring decision?

10       A.   Yes, he did.  He went through him, but

11   having not gotten an answer back from him and him

12   being on R and R, he was -- the way he put it to me

13   was that he was expecting an answer from Mr. Scott

14   and wondered why he hadn't heard from him, so he took

15   it upon himself to contact him directly.  But then

16   that went back into a meeting with Ted, so --

17       Q.   What went back into a meeting with Ted?

18       A.   Mr. Kells asking Rob Scott about the issue.

19       Q.   You're saying Mr. Kells told you that he

20   went to Mr. Zigarlick.  He did not get an answer from

21   Mr. Zigarlick, so he went over Mr. Zigarlick's head

22   to Mr. Scott, right?

23       A.   No, that's not exactly correct.  I said

24   that he talked to Mr. Zigarlick.  Mr. Zigarlick said

25   the decision was okay with him but he had to okay the

Page 60

1    decision with Mr. Scott.

2         Q.    Okay.

3         A.    And then that he would subsequently get --

4    that Mr. Zigarlick would subsequently get ahold of

5    Mr. Scott and discuss the issue.  And that's when I

6    said there was a time lag there that Kells didn't

7    hear back from Zigarlick.  Zigarlick went on R and R.

8    So then he expected -- Kells expected to hear from

9    Scott directly, and he didn't, so he called him up

10   and asked him.

11        Q.    And then when he called Mr. Scott and asked

12   him, did he make any representations that he then

13   dealt with Mr. Zigarlick further?

14            MR. COVELL:  I've just got to object to the

15   form of the question because I'm unclear on the

16   question.  I'm getting confused on which he is he.

17   If you can understand it, you can answer.

18   BY MR. HALLORAN:

19        Q.    Did you understand the question?

20        A.    Could you repeat it, please.

21        Q.    Mr. Kells told you that Mr. Kells went to

22   Rob Scott because he didn't get an answer from Mr.

23   Zigarlick; is that correct?

24        A.    Yes.

25        Q.    When Mr. Kells told you that Mr. Kells went

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 61

1    to Mr. Scott, did Mr. Kells tell you that he, after

2    that time, dealt with Mr. Zigarlick any further on

3    this decision?

4         A.    Yes.  Yes, that they had a meeting between

5    the three of them.

6         Q.    Didn't you tell me that when he went to

7    Mr. Scott, it was because Mr. Zigarlick was on R and

8    R?

9         A.    Yes.  So this meeting occurred later in

10   time, apparently back when they were all back on site

11   again.

12        Q.    Okay.  And what did Mr. Kells tell you

13   about this supposed meeting?

14             MR. COVELL:  I'm just going to state you

15   have an ongoing direction here to answer only

16   information you gained outside of the presence of

17   counsel so I don't have to keep interrupting.  Okay?

18             THE WITNESS:  Okay.  Yeah, and I don't

19   believe that -- in that context, I don't believe that

20   that was discussed at the time.  Like I said, it was

21   a fairly brief discussion when Mr. Kells informed me

22   that I hadn't been selected for the job.  So I don't

23   believe I would have asked that or been told that at

24   that point in time.

25             It's possible -- like I say, my memory is a

CONITZ v. TECK COMINCO                                      GREGG CONITZ
                                                           8/2/2007

Page 62

1    little vague on this whole thing exactly what

2    occurred when, but I filed this -- subsequently filed

3    this dispute, and the first thing that happened after

4    me filing this dispute was that, as per the

5    procedure, I discussed it with Mr. Kells, who was the

6    next person up the chain of command.  I gave it to

7    him.

8              As I said, the procedure here is that you

9    start with your supervisor.  If you don't get an

10   adequate answer from your supervisor, you go up the

11   chain of command one step at a time.  I asked John, I

12   said, "Well, I don't think this is an issue that

13   involves my supervisor.  It's above that level.  So

14   can I just skip that and go directly to you?"  And he

15   said, "Yeah.  That's correct."

16             So he was the first person that got this

17   dispute of mine, and then he called me into the

18   office to have a meeting about it, and --

19             MR. COVELL:  I'm sorry.  Go ahead.

20             THE WITNESS:  It may have been at that time

21   that we discussed him having a meeting with Ted and

22   Rob over the issue.

23             MR. COVELL:  And for the record, the first

24   time he said "this dispute" in his answer, the

25   witness appeared to be referring to Exhibit 34.

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                                    8/2/2007

Page 63

1   BY MR. HALLORAN:

2       Q.   Who was ultimately hired into that job?

3       A.   Larry Hanna.

4       Q.   Do you believe that Larry Hanna was

5   qualified for that position?

6       A.   I believe he's somewhat qualified.  I don't

7   believe he's well-qualified.

8       Q.   Why would he not be well-qualified?

9       A.   Because he had not worked in the mine for a

10  very long period of time and, to my knowledge, had

11  never done any supervision in the mine and had no

12  other mine experience.

13      Q.   What do you know about his experience?

14      A.   I met Larry when he was working in the

15  mill, and I was working in the mill, as well.  So,

16  you know, to some degree we saw each other at work.

17  So I knew, am familiar with what he was doing at that

18  point in time and knew when he -- I worked with him

19  when he worked in the mine department.  I knew when

20  he went to the surface crew.  I was in the mine

21  during the whole time that he was in the trainer

22  position.  So I think I'm pretty familiar with his

23  overall experience at Red Dog.

24           I've talked with him.  He's discussed his

25  other experience a little bit, which the only thing I

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 64

1    know of is working on the North Slope as a -- on a

2    drill rig as a laborer or something like that.

3         Q.    Approximately how long had he worked at Red

4    Dog before he was selected for that position?

5         A.    I would guess it was in the neighborhood of

6    14 to 15 years.  He started pretty close to the same

7    time that I did.  I believe he quit his job and left

8    for a period of time, and I don't recall how long

9    that period of time was.  So, you know, I couldn't

10   say exactly what it was, but I would say no more than

11   15 years at that point in time.  Probably less.

12        Q.    Is there any other reason why you believe

13   he was unqualified or not very qualified?

14        A.    Any other reason?  Well, I guess that

15   depends on how subjective you want to get about that.

16             A matter of opinion.  In my belief, it's

17   very important when you're the supervisor to have the

18   respect of the people that work for you, and I don't

19   believe, through my knowledge of the crew and the

20   people that I work with, that there was a lot of

21   people in the department that had much respect for

22   Larry at that point in time because I believe that

23   they knew that he was fairly lacking in experience in

24   the mine, and I don't believe he was seen as a good

25   candidate by my peers.

Page 65

1      Q.    By your peers.  You're referring to the

2 people who worked on your crew?

3      A.    Yes.

4      Q.    Would you agree that the hiring decision

5 was Mr. Zigarlick's decision to make?

6      A.    I was told initially that it was Mr. Kells'

7 decision to make, and I was told that by Mr. Kells, I

8 was told that by Mr. Zigarlick.  So I don't really

9 know.  I'm a little confused as to exactly whose

10 decision it was.

11          It obviously ultimately did not turn out to

12 be Mr. Kells' decision.  Mr. Zigarlick has told us

13 that it's his, but through what Mr. Kells has told

14 me, I believe that Mr. Scott was involved in that

15 decision.  So I don't personally believe that it was

16 strictly Mr. Zigarlick's decision.

17      Q.    Normally, in your experience at Red Dog,

18 hiring decisions for persons -- or for positions such

19 as that are made by the superintendents; isn't that

20 correct?

21      A.    Well, I'm not -- I don't have intimate

22 personal knowledge of how those decisions are made

23 because I've never actually been involved in one of

24 those decisions.  I can only speculate, from the

25 point of view of an employee working there, how and

CONITZ v. TECK COMINCO                                                    GREGG CONITZ
                                                                          8/2/2007

Page 66

1   who comes up with the decisions, and it appears to me

2   that it varies from department to department to each

3   particular instance.  Maybe seems to have a degree of

4   variation.  I wouldn't say that there is a consistent

5   across-the-board policy at Red Dog that there is one

6   person that makes that decision.

7       Q.   With respect to the departments that

8   Mr. Zigarlick oversees, would you agree that hiring

9   decisions of that type for that level position is

10  normally a decision made by the superintendent?

11      A.   Well, not necessarily.  I mean, he may

12  ultimately be responsible for that decision, but I

13  believe that if he trusts the group that he has

14  working for him and believes what they tell him, that

15  he should at least consider the input of such people

16  as foreman and supervisors into that decision.  That

17  doesn't mean that it -- ultimately it would

18  necessarily be somebody else's decision, but they

19  should certainly have input on it.

20      Q.   Assume that they do have input on it.  It

21  would still be his decision, right?

22           MR. COVELL:  I'm just going to object to

23  the form of the question.  It's vague, because I

24  don't know what specific instance we're talking about

25  here, whether or not someone's arguably been

Page 67

1    designated the decision-maker.

2    BY MR. HALLORAN:

3         Q.    You can answer the question.

4              MR. COVELL:  You can go ahead and answer.

5              THE WITNESS:  My perception of it is it is

6    somewhat of a group thing to where I think it would

7    be hard to define as ultimately one person's

8    decision.

9              I believe that Mr. Kells told me ultimately

10   that this was somewhat of a consensus reached by

11   three people, all of whom did not necessarily agree,

12   and that he was the minority one out of the three

13   that didn't agree with the decision, and --

14   BY MR. HALLORAN:

15        Q.    But that's talking about your specific

16   application for that particular position at that

17   particular time, right?

18        A.    Yes, right.

19        Q.    I'm saying in general, positions of this

20   level.  Normally Mr. Zigarlick would be the

21   decision-maker, wouldn't he?

22        A.    Well, as I said before, I don't really have

23   inside knowledge of how those decisions have been

24   made in other circumstances.

25        Q.    Okay.  You have an allegation in your

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 68

1    complaint regarding mail that you received at the

2    mine.  Tell me about it.

3         A.   I received a letter that came from my

4    attorney, Ken Covell, that was mailed from his

5    Fairbanks office on his office stationery, letterhead

6    on the envelope.  It was mailed to my home address

7    here in Anchorage.  Due to the fact of being gone

8    from home for four weeks at a time, what I do is have

9    my mail forwarded.  It's forwarded through the

10   company, through the Anchorage office to the mine

11   site.

12        When I received the letter, it had been

13   opened, clearly, completely across the top of the

14   envelope, stapled shut.  The person at the mine site

15   who received the letter and distributes the letter

16   into the mail, Grace — I don't know her last name.

17   She works at the billeting office with NANA

18   Management Services — initialed the front of the

19   envelope and wrote on it that she had received it

20   opened and stapled shut.

21        Q.   What was that person's name?

22        A.   Grace is her first name.  I don't know her

23   last name.  She goes by Gracie.

24        Q.   Is she a Teck Cominco employee?

25        A.   No.  She's a NANA Management Services

CONITZ v. TECK COMINCO                                        GREGG CONITZ
                                                             8/2/2007

Page 69

1    employee.

2         Q.    NANA Management handles the mail at Red

3    Dog?

4         A.    They handle the mail when it gets to the

5    living facility.  Teck Cominco handles the mail that

6    comes into the warehouse, and then they take it over

7    to the living -- the pack, which is the living

8    facility, and then this NANA Management Services

9    person distributes it into the mailboxes which are in

10   the living facility.

11        Q.    Is it the billeting office that takes care

12   of that?

13        A.    Yes, it is.

14        Q.    Do you have a mailbox?  How do they

15   distribute the mail?

16        A.    Yeah.  You've got a little mailbox, kind of

17   like what they have at the post office, with a key

18   and a little box, and they put your mail in there.

19        Q.    And did you tell anyone or complain to

20   anyone about the fact that you had received the

21   letter that had been opened and stapled shut?

22        A.    I believe I asked Gracie about it.  She

23   told me that she had received it that way.  I can't

24   specifically remember whether I complained to Joanne

25   Bozek in the Anchorage office or not.  I don't

Page 70

1    remember whether I did or not.

2        Q.    And I'm assuming, then, if you don't

3    remember whether you complained, do you remember

4    whether anyone gave you any explanation for what

5    might have happened?

6        A.    No, I do not remember getting an

7    explanation from anybody.

8        Q.    And do you remember if you complained to

9    anyone at Red Dog?

10       A.    I don't remember for certain, but I don't

11   believe that I did.

12       Q.    Did anyone at Red Dog give you any sort of

13   explanation as to what might have happened?

14       A.    No.

15       Q.    Is there any other occasion when you've

16   received mail that's been opened?

17       A.    In the time that I've worked there, I

18   believe there have been three.  This was one of them.

19   Prior to that, the only other time that anything

20   happened was regarding a workman's comp issue, a

21   letter from workman's comp insurance company, and

22   that was opened.  And I believe I complained to the

23   Anchorage office about that.

24             And then the other time was another letter

25   from Mr. Covell that appeared to have been opened and

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                               8/2/2007

Page 71

1    then taped shut.  It appeared to me that it was glued

2    shut, and it was opened where the glue was and then

3    taped back shut.

4         Q.   There was tape on it?

5         A.   Yes, there was tape on it.

6         Q.   With regard to the workers' comp letter,

7    when did that occur?

8         A.   I don't remember exactly, but I believe it

9    would have been in the neighborhood of three years

10   ago.

11        Q.   Three years ago from now?

12        A.   Yeah.

13        Q.   Do you recall what kind of injury you had

14   at that time?

15        A.   Yes.  I have a back problem.  It was with

16   regards to that.

17        Q.   Was that the only workers' comp injury

18   you've had?

19        A.   No.

20        Q.   Were there other workers' comp injuries

21   that were also back injuries?

22        A.   No.

23        Q.   So if I was to look up when you had a

24   workers' comp back injury, that would more or less

25   pinpoint for me the time at which you might be

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 72

1   receiving letters regarding that injury?

2       A.   I believe it would, yes.

3       Q.   Okay.  And then when did the incident occur

4   with the stapled-shut envelope?

5       A.   That was around the time that we were

6   working on the EEOC complaint, I believe.  I don't

7   remember exactly if it was prior to or after.  It was

8   in that neighborhood somewhere.  I have the letter

9   and the envelope.

10      Q.   You still have it now?

11      A.   Yes, I do.

12      Q.   And then the third incident that you

13  mentioned, when someone had put tape on an envelope,

14  when did that occur?

15      A.   That was after the one that was stapled by

16  maybe a month or two.

17      Q.   And who was that letter from?

18      A.   Ken Covell.

19      Q.   Was that also addressed to you at your

20  home?

21      A.   Yes, I believe it was.

22      Q.   And forwarded to you by the Postal Service

23  directly?

24      A.   Yeah.  The Postal Service forwards it to

25  the Anchorage office, and then it's in the company's

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 73

1    hands going from the Anchorage office to Red Dog.

2         Q.    Have you ever known anyone else at Red Dog

3    to receive mail that had been opened prior to the

4    time it was delivered?

5         A.    Not to my knowledge.

6         Q.    On the third incident that you mentioned

7    with the envelope that had tape on it, did you make

8    any complaints to anyone about that incident?

9         A.    I don't remember that I did.

10        Q.    And did anybody ever give you any

11   explanations as to what might have happened with

12   regard to that?

13        A.    Not that I recall.

14        Q.    And other than complaining, did you bring

15   it to anyone's attention either at Red Dog or in the

16   Anchorage office?

17        A.    Well, my wife knew about both of those

18   instances.  Possibly I would have mentioned it to

19   somebody that I work with, but not that I

20   specifically remember.

21        Q.    But no supervisors or --

22        A.    No.

23        Q.    You didn't call Joanne Bozek and let her

24   know or anything like that?

25        A.    No, not at that time.  I guess I just told

CONITZ v. TECK COMINCO                                                      GREGG CONITZ
                                                                           8/2/2007

Page 74

1    Ken about it and took his advice as to how to deal

2    with it.

3         Q.    Who is Joanne Bozek?

4         A.    She is -- her title is the controller, I

5    believe.  She's the head of the financial department

6    for Teck Cominco Alaska.

7         Q.    And your wife is Karen Conitz; is that

8    right?

9         A.    That's correct.

10        Q.    You were telling us before that Mr. Kells

11   had told you it was his preference that you be hired

12   into the job that Mr. Hanna got.  Did anyone from the

13   mine ever come and tell you essentially that it's not

14   Mr. Kells' place to tell you things like that and

15   that, you know, the hiring decision would be made in

16   the normal course of the way hiring decisions are

17   made?

18        A.    No.

19        Q.    Did anyone ever have a conversation with

20   you more or less in that regard with respect to the

21   other position that's at issue here?

22        A.    With the trainer position?  No.  Mr. Kells

23   was gone when that decision was made.

24        Q.    Did anyone ever have a conversation with

25   you substantially like that with regard to any

1  position that you may have sought or hoped to attain?

2          MR. COVELL:  I'm going to object to the

3  form of the question as vague because it arguably

4  includes Mr. Kells, who at least part of the time

5  wasn't there.  You can answer if you can answer.

6          THE WITNESS:  You're saying that did

7  anybody tell me that it was -- that it was

8  inappropriate?  Are you saying that --

9  BY MR. HALLORAN:

10     Q.   Did anybody ever come and say, "Mr. Kells

11  can't be telling you things like that.  The decision

12  is going to be made the way the decision is going to

13  be made.  It's not for Mr. Kells to say," you know,

14  "essentially that you might get a job."

15     A.   No, because it was never an issue.  That

16  never happened.  It never came up.  That was -- I

17  don't know where that comes from, but that never

18  happened.  So nobody would have come and said to me

19  anything about something that didn't happen.

20     Q.   What is it that didn't happen?  That

21  Mr. Kells never indicated to you that you were

22  basically selected for a job prior to the time that a

23  final decision was made?

24     A.   Yes, that's correct.

25     Q.   Didn't you tell me that Mr. Kells told you

CONITZ v. TECK COMINCO                                        GREGG CONITZ
                                                             8/2/2007

Page 76

1    that he had selected you for this job and that it

2    still had to be run through Mr. Zigarlick and

3    Mr. Scott before the decision could be final?

4         A.   After it was announced that Larry was

5    selected for the job.

6         Q.   Okay.

7         A.   Well, let me qualify that by saying that

8    John Kells told me that Larry Hanna was selected for

9    the job before it was announced, and he did that, I

10   feel, as a courtesy to me.  He called me into the

11   office the night before he made the announcement to

12   the crew that Larry Hanna had been selected, and he

13   told me that we've made a selection, and I wanted you

14   to hear it from me first before I make the

15   announcement so that you get it directly from me.

16        Q.   Do you know if Mr. Kells talked to any of

17   the other unsuccessful candidates for that position

18   prior to the time that the decision was announced?

19        A.   I'm sure he talked to them, but talked to

20   them in regard to something particular?

21        Q.   About the decision.

22        A.   Not to my knowledge.

23        Q.   With regard to the mine trainer position

24   that Mr. Baker was hired into, is it your position

25   that Mr. Baker was qualified or unqualified for that

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 77

1    job?

2        A.    I believe that basically he was

3    unqualified.  I understand that he had some

4    qualifications for the job, but in my mind inadequate

5    qualifications.

6        Q.    What qualifications do you understand that

7    he had?

8        A.    He had training experience, that he'd

9    formerly held a position of trainer.  So he did have

10   experience in training people.

11       Q.    Did he any other qualifications that you

12   believe he had?

13       A.    I believe that his experience on the

14   surface crew qualified him in terms of the operation

15   of some of the equipment that we use in the mine.  I

16   would say primarily a grader, which we use, but it's

17   certainly not our primary production piece of

18   equipment.  So grader.  I don't know what experience

19   he has on a backhoe.  I imagine it's probably fairly

20   minimal.  I would say that those are the only -- the

21   only pieces of equipment that he had much experience

22   dealing with, in reality, that would be applicable to

23   a mine situation.

24       Q.    What qualified you for that position?

25       A.    I believe my experience working in the mine

Page 78

1   at Red Dog and operating.  To some degree my previous

2   operating experience has contributed, working for

3   other mining operations.  I feel that I have a pretty

4   good in-depth knowledge of all of the major pieces of

5   equipment that we use at Red Dog both in terms of the

6   safety of operating the equipment, the mechanics of

7   how it's put together, and the application, how to

8   operate it and what we do with it.

9          In my mind, a lot of preparing a person to

10  work in the mine is not just knowing the piece of

11  equipment that the person is going to use but the

12  circumstances surrounding the area where they're

13  going to be working when they're in there, and there

14  is certain rules, regulations, communications, things

15  like flagging, surveying, staking, that you need to

16  know in that situation, and I don't believe that a

17  person that has not worked in that situation would

18  know many of those things.

19     Q.   What is flagging with respect to what you

20  just used that term?

21     A.   Well, as one example, we have crest line

22  stakes.  When we do a shot, survey comes in and

23  stakes the theoretical line that was the outside

24  perimeter of that shot.  So as you're digging that

25  shot with a loader, you're 25 feet below that bench

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                               8/2/2007

Page 79

1   above you, and there are stakes on that bench that

2   tell you where the edge of that shot is.  There is

3   two different circumstances.  They are:  One is an

4   in-pit high wall, which is delineated by a stake with

5   yellow and orange ribbon on it.  The other is a final

6   high wall stake, which would have blue ribbon on it.

7           The difference there being that with a shot

8   that's within the perimeters of the pit, you want

9   to -- when you dig that shot out to the high wall,

10  you want to get all the material that's loose that

11  you possibly can off of that high wall for, No. 1,

12  you paid to drill and shoot it and it's production so

13  you want to use it; No. 2, there is an ultimate issue

14  of safety that later on at some point in time there

15  is going to be another shot behind that, and you're

16  going to start up there with a dozer pushing the berm

17  off.  So a dozer is going to be right on the edge of

18  the top of that high wall, and then after that there

19  is going to be a drill there.

20          So it's not safe to leave loose material

21  hanging on the top of that high wall because someone

22  is ultimately going to be on top of that with another

23  piece of equipment.  So you need to get all the

24  material out that you can.

25          In the case of a final wall, that is a

Page 80

```
 1    little different because oftentimes it can be in

 2    looser shaley waste material.  You don't want to dig

 3    as far as you can because you need to leave a catch

 4    bench that is ultimately a safety issue that -- the

 5    final wall of the pit is supposed to be designed

 6    where each 25-foot level has a catch bench on it of a

 7    certain width so that any rock that, in time, falls

 8    off the high wall has a chance of getting caught and

 9    not rolling down and hitting somebody that's working

10    down below it.  So you need to -- with that blue

11    stake, you need to stop when you get to it.

12        Q.   Is there anything else that would have

13    qualified you for that position?

14        A.   Yeah.  I've spent quite a bit of time as

15    part of my duties as a level six operator with the

16    mine.  It's stated within the job criteria for a

17    level six operator that you have the ability to train

18    others, and I've been used for that on a number of

19    occasions.

20             And I believe I've helped out in training

21    of a number of the people that I work with

22    specifically for the mine application.  Possibly not

23    in the same context that a trainer would, starting

24    from beginning to end, but, you know, there is a

25    number of times when my supervisor has designated me
```

Page 81

```
 1   to say, "Hey, you know, okay, we want to get this guy

 2   on a haul truck, but he hasn't run this haul truck.

 3   So can you please go through a walk-around with him

 4   and show him safety features of the equipment and

 5   whatnot."  So I've done that.

 6            As a relief supervisor, I believe I've

 7   helped out a lot of people that work in the pit in

 8   terms of giving them instructions as to how to go

 9   about a job.  I believe is training.

10            When a person hasn't been in a particular

11   situation before, you're putting him in a situation,

12   in a task that you know is new to them and there is

13   not a trainer there to tell them how to do that,

14   there is, from my experience, kind of a fine line of

15   distinction between where the trainer's

16   responsibility ends and where the supervisor's picks

17   up.

18            But a lot of times the supervisor will tell

19   somebody how to do something, which is, in my

20   opinion, part of the training process, part of the,

21   you know, teaching somebody how to go about doing the

22   work.

23       Q.   Is there anything else that qualified you

24   for that job?

25       A.   I believe that my relief supervisor
```

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

Page 82

1   experience to some degree has given me experience at

2   the supervisory level of management of the company,

3   which is somewhat applicable to the trainer position.

4   Things like computer knowledge of the computer system

5   at Red Dog and how to access that and what we do with

6   it.  So, you know, there is computer skills which I'm

7   not real strong at but have some experience, you

8   know, through that job and knowledge of how the

9   department works at the management level and who's

10  responsible for what and who you go see when you have

11  a question that you need to get answered.  Who's

12  responsible for what.

13          And so in my mind, a person that knows the

14  system within the mine department is in a much better

15  position to train people to fit into that system than

16  somebody that doesn't know that system.

17      Q.   You mentioned that your experience as a

18  relief supervisor is qualification that you had for

19  that position.  Did you feel the same with respect to

20  the supervisor position that you had?

21      A.   Yes, I do.

22      Q.   Or that you had applied for?

23      A.   Yes.  Yeah.

24      Q.   Are there a large number of people assigned

25  to work as relief supervisors at Red Dog?

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                            8/2/2007

Page 83

1       A.   I wouldn't say a large number, no.  It's

2   been a fairly limited group over the years.  There

3   has been several people, Martin Parillon, Jerry

4   Gibson, that have been kind of -- that have been in

5   the department from about the beginning of the mine.

6   And those two have been in and out of that position

7   over the years, along with other people.

8            But I wouldn't say there is a large number.

9   At this point, if you want to define that in terms of

10  at this point in time, I would say that there are

11  three people that are designated as relief

12  supervisors right now.

13      Q.   And you're just talking in that one

14  department?

15      A.   Yeah, in mine operation.

16      Q.   How about at Red Dog as a whole with Teck

17  Cominco Alaska's operation there?

18      A.   Yeah, Red Dog as a whole, there would be a

19  significantly larger number because every department

20  has that same need, and I'm not exactly familiar with

21  how all the departments fill that need, but I believe

22  it's somewhat similar in most cases.

23      Q.   During the time that you were being

24  considered for the supervisor position and the

25  subsequent trainer position, isn't it the case that

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 84

1   everyone who had applied for those jobs was assigned

2   some amount of time as a relief supervisor?

3        A.   You said both the supervisor and the

4   trainer position?

5        Q.   What?  About a year and a half or so from

6   the time you applied for the first time till the time

7   the second one was filed, right?

8        A.   No, it was more like nine or ten months

9   because --

10       Q.   Okay.

11       A.   It started in June of '04, and I believe

12  Mike Baker was hired in March of '05, say.  Something

13  like that.

14       Q.   Okay.  During that nine- or ten-month

15  period, all the applicants that were employees of

16  Teck Cominco Alaska -- because Mr. Baker was not then

17  an employee of Teck Cominco Alaska, right?

18       A.   Right.

19       Q.   Weren't all of the people who were

20  applicants for those jobs that were employees of Teck

21  Cominco Alaska, all of them were given relief

22  supervisor duty on one or more occasions during that

23  ten-month period, weren't they?

24            MR. COVELL:  This is presupervisor or

25  pretrainer?

CONITZ v. TECK COMINCO

GREGG CONITZ
8/2/2007

Page 85

1          MR. HALLORAN:  Both.

2          MR. COVELL:  Okay.

3          THE WITNESS:  I'm not entirely sure of the

4    status of Tommy Sheldon and whether he was or wasn't

5    an applicant for the supervisor position, but I don't

6    believe that he was doing any acting supervision

7    during any of that period of time.  I believe that

8    they first tried him out as relief supervisor

9    sometime after Mike Baker was hired.  So with him, I

10   would say no.  With Martin and Jerry, to some degree,

11   yes.

12          And am I missing anybody else that applied

13   for the trainer job?  I.e., I don't know exactly who

14   the applicants for the trainer job were.  I've heard

15   people at Red Dog tell me that they applied for it,

16   and I haven't seen their name on the list that was

17   provided to us by Teck Cominco.  So I don't really

18   know whether they were or weren't applicants or

19   considered applicants.

20          Doug Chase, for example, works on the

21   surface crew, told me that he applied for the trainer

22   position.  He hasn't been a relief supervisor in the

23   mine department, and I don't know whether he applied

24   for that job or not, but he told me that he did.

25   Q.    Who is he?

Page 86

 1        A.    He's an operator on the surface crew whose

 2   previously worked in the mine department.

 3        Q.    And he says he applied for the job that

 4   Mr. Baker got?

 5        A.    Yes, he's told me that.

 6        Q.    Anyone else whose told you that they

 7   applied for the job that Mr. Baker got?

 8        A.    Nobody that personally told me themselves.

 9   There is -- you hear lots of rumors at Red Dog, and

10   so I like to not take something secondhand as fact.

11   I believe that I've been told that a couple other

12   people applied for it, both people who were on the

13   surface crew.  Robert Merculief and Doug Howe, and

14   they're both sometimes acting supervisors on the

15   surface crew.

16            So I've heard that as a rumor.  Whether in

17   fact they applied for that job, I do not have

18   personal knowledge, direct personal knowledge of.

19        Q.    When you say you don't like to take rumors

20   as fact, isn't that because a lot of the rumors that

21   circulate at Red Dog are just flat-out not true?

22        A.    That does turn out to be the case, yes.

23        Q.    At Red Dog, isn't there -- isn't it pretty

24   common that people who apply for supervisory jobs

25   that are not already supervisors are given

Page 87

```
 1    opportunities to work as relief supervisors in one

 2    department or another?

 3         A.   That would be a difficult question for me

 4    to ask, not really knowing whose applied for what

 5    supervisor positions.  In general, I would say that

 6    might be a fair statement to say, yes.

 7              MR. HALLORAN:  We can take a five-minute

 8    break or so if you want.

 9              (Recess held.)

10    BY MR. HALLORAN:

11         Q.   You still have Exhibit 4 in front of you?

12         A.   Exhibit 4.  Yes, I do.

13         Q.   Mr. Zigarlick showed you -- first of all,

14    that's not -- I'll represent to you that that's a

15    redacted version.  It's not the entire contract.

16              Mr. Zigarlick showed you essentially the

17    information that's in that document at one time,

18    didn't he?

19         A.   Yes, he did.

20         Q.   And that was basically in response to your

21    complaint when you were saying there was nothing in

22    writing anywhere about shareholder preference and you

23    were wondering why shareholder preference might

24    exist?

25         A.   Not exactly.  It came up in the meeting.  I
```

Page 88

1    had -- subsequent to my filing this dispute here in

2    Exhibit 34, I discussed with John Kells, and then we

3    had a meeting between myself, John Kells and Ted

4    Zigarlick about the issue.  And during that meeting,

5    the issue of shareholder preference with regard to

6    Larry being selected for that job as opposed to my

7    being selected for the job came up.

8              And Ted, I believe, referred to the

9    contract, saying that the contract says that we have

10   the right to use the shareholder preference

11   specifically within the company for a promotion.  You

12   know, for differentiating between two candidates for

13   a promotion.

14             And I told him that I had previously read

15   the contract, and I didn't believe that it said that.

16   And he said, "Oh, yes, it does."  And I'll -- and I

17   said, "Well, can you show it to me?"  And he said

18   yeah.

19        Q.   You said you have read the contract between

20   Cominco American and NANA, the Development and

21   Operating Agreement?

22        A.   Not the whole thing, but I've read portions

23   of it.

24        Q.   What occasions did you ever have to read

25   portions of that contract?

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                                  8/2/2007

Page 89

1       A.    As we've previously discussed, from the

2    time that I hired on with Teck Cominco Alaska in

3    1990, I made numerous attempts to transfer from where

4    I was in the mill department into the mine

5    department, and I was rejected on those attempts a

6    number of times by a combination of Ted Zigarlick and

7    Ron McLean, who was the -- at that point in time was

8    the human resources superintendent, or the title may

9    have been different then, but that's effectively what

10   it was.

11          And both of them often referred to the

12   contract as a reason for my not being able to attain

13   a transfer, and for their support of their saying

14   that they had a shareholder preference and -- for

15   example, I could not get an entry level job in the

16   mine department because I was not a shareholder, and

17   that was a shareholder position.

18          So after hearing that from him a number of

19   times, I said, "Well, I haven't seen this in the

20   company policy, which is the only information that

21   I've been given.  You've referred to this contract a

22   number of times, but I've never seen it.  Can I get a

23   copy of it?"  I asked Ron McLean that, and he said,

24   "No, it's a secret agreement.  I'm not going to give

25   you a copy of it."

CONITZ v. TECK COMINCO                                                GREGG CONITZ
                                                                        8/2/2007

Page 90

1            And so then I asked him, "Well, can I read

2      it?  Can I see it?"  And he said, "Yeah, you can do

3      that."  And I later made an arrangement to go to his

4      office.  And I went to his office, sat down, he

5      pulled it out, gave it to me, and he turned to this

6      section -- what is it?  Ten point -- 10.1, I believe.

7      Yeah, 10.1.1.  And said I think this is -- something

8      to the effect of, "I think this is what you're

9      looking for.  This is what you want to see.  But if

10     you want to, you're free to read through it."  And so

11     I did.

12            I read that section, and I kind of looked

13     around at the rest of it, and a lot of it was, you

14     know, stuff that maybe didn't pertain to what I was

15     interested in or was just -- you know, pretty

16     lengthy.  And so I didn't read the entire thing, but

17     I briefed over it and read what I thought I was

18     interested in.

19        Q.   Was there anything other than Section 10

20     that you were interested in?

21        A.   Yes, there was.

22        Q.   What was that?

23        A.   Well, there was -- I don't know what to

24     start with here exactly, but with regards to

25     personnel and in relation to what we're talking about

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 91

1   here and shareholder preference, there was a number

2   of stipulations of how the company would deal with

3   employees at Red Dog for circumstances, say, other

4   than directly work.  Living accommodations, travel,

5   et cetera.  And there -- I believe, you know, this

6   was in 1993 I read this, so I'm -- you know, memory

7   is a little fuzzy from then.

8            But, you know, I believe that there were

9   stipulations like for travel, that the

10  non-shareholder employees hired -- there is two

11  points of hire, and I think even that point-of-hire

12  issue was established there in the contract.  That

13  there would be points of hire that there is -- within

14  the region, that all the people within the NANA

15  region would have points of hire at their particular

16  village where they live.  Everybody else outside the

17  region's point of hire would be Anchorage.

18           And so, you know, everybody outside the

19  region's point of hire, Anchorage, would be flown

20  directly to the mine and out of the mine without --

21  without landing anywhere else in the NANA region if

22  at all possible.

23           I believe that there was something that

24  kind of vaguely said the company wouldn't -- either

25  would discourage or would not encourage workers at

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 92

1   the mine to move to the region and live in the

2   region, that nobody working at the mine would live

3   anywhere on NANA property other than the living

4   facility provided at the mine.  And some other things

5   like that.  So that was what interested me with

6   regards to personnel.

7            There was -- I was somewhat interested in

8   the -- you know, how the royalty agreement was set up

9   between the two companies.  I might have briefed over

10  that a little bit.  And things like environmental

11  issues, the caribou policy, that, you know, NANA has

12  some control over that of, you know, that they don't

13  want the natural caribou migration to be disturbed.

14  And so there is a policy of how that's dealt with on

15  the road, hauling the concentrate from the mine to

16  the port, that, you know, dictates if there is

17  caribou that are migrating, that the trucks have to

18  stop at a certain distance.

19           And I think that's set forth in there and

20  some -- some degree of oversight by NANA of some or

21  all of those issues, which I'm pretty vague on how

22  that was, but -- and things like the committees that

23  we discussed yesterday and the day before with Ted

24  and Jim Somers.  I think there was some things about

25  that, and the personnel officer and other things like

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                          8/2/2007

                                                          Page 93

1    that.

2         Q.   Anything else you recall being in that

3    agreement?

4         A.   Not specifically off the top of my head.

5         Q.   And when Mr. McLean -- is that how you say

6    his name?

7         A.   McLean.

8         Q.   McLean.  When he allowed you to look at

9    this document, did he tell you that it was secret and

10   that it had to be maintained as secret?

11        A.   He told me initially that he wouldn't give

12   me a copy of it because it was a secret agreement.  I

13   don't recall him giving me any specific instructions

14   when I read it other than that he didn't want me

15   leaving the room with it.  That's the only thing I

16   remember him saying at that point in time.

17        Q.   Can you pull out Exhibit 9 for a moment.

18        A.   Okay.

19        Q.   What is your wife's position at -- she

20   works at Red Dog; is that correct?

21        A.   Yes, she does.

22        Q.   She's a Teck Cominco Alaska employee?

23        A.   Yes, she is.

24        Q.   What is your wife's position up at the

25   mine?

CONITZ v. TECK COMINCO                                                    GREGG CONITZ
                                                                          8/2/2007

                                                                          Page 94

 1      A.    Currently?

 2      Q.    Yes.

 3      A.    Currently she is with the environmental

 4  department as an environmental tech.  There is a

 5  level associated with that.  I'm not sure exactly

 6  what it is.

 7      Q.    Do you know when it is that she got -- she

 8  was promoted to that position, right?

 9      A.    She applied for a transfer.  It was

10  actually a demotion for her.  Well, not a demotion,

11  but it was a step down in pay for her, significantly.

12      Q.    Okay.  When she was put into that position,

13  do you know about when that was?

14      A.    Yes.  I believe it was -- she applied for

15  it sometime in the fall of '06, I think, and there

16  was a, you know, period of time that it took to

17  resolve who was going to get the position, and I

18  don't remember exactly when she was told that she had

19  the position.  I'm thinking it was -- it was December

20  of '06.  I'm not -- I don't remember exactly.  But

21  she didn't actually physically move into the position

22  until later in the spring of 2007.  I believe it was

23  probably May, maybe as early as late April.  There

24  was issues with her needing to continue doing the job

25  that she was doing until they got a replacement and

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                         8/2/2007

Page 95

 1    had that situation covered before she could actively

 2    start doing her new job with the environmental

 3    department.

 4        Q.    Are you aware that Exhibit 9 is essentially

 5    a complaint from NANA with respect to your wife being

 6    given the job that she was given in the late fall of

 7    2006?

 8        A.    Yes, I am.

 9        Q.    How is it that you're aware of that?

10        A.    Through this lawsuit, Ken gave this to me.

11        Q.    All right.  Do you know Ralph Hargrave?

12        A.    Yes, I do.

13        Q.    Who is Ralph Hargrave?

14        A.    He was -- his title was president of

15    Cominco Alaska, Inc., and I believe he was there at

16    the startup of the mine.  I don't know exactly when

17    he started.  I think he was there, you know,

18    somewhere around 1987 or '88 prior to the startup and

19    was president when I started working there, and I

20    don't remember exactly what year he left.  I think he

21    was there up until roughly 2005, but I don't remember

22    exactly.  I mean, excuse me, 1995.

23        Q.    Okay.  And when you say he was up there,

24    you mean Red Dog?

25        A.    At Red Dog, uh-huh.

CONITZ v. TECK COMINCO                                              GREGG CONITZ
                                                                    8/2/2007

Page 96

1      Q.   He was also the general manager of Red Dog
2  operations when he was up there; is that right?
3      A.   Well, as I recall, at that point in time
4  the position was called president.  They referred to
5  him as president, and I don't believe at that time
6  there was anybody that was referred to as general
7  manager.  In my mind it was the same position
8  effectively, just a different title.
9      Q.   All right.  I'll represent to you that he
10 was the president of the corporation at that time.
11     A.   Yes.
12     Q.   The current general manager is not the
13 president of the corporation.
14     A.   Okay.
15     Q.   But he performed the same duties as the
16 current general manager; isn't that correct?
17     A.   Yes, I believe so.
18     Q.   I mean, he performed that job that --
19 someone is now called general manager in that job?
20     A.   Yes, that's correct.
21     Q.   Okay.  And you think it was in about 1995
22 when he left?
23     A.   To the best of my memory, it was somewhere
24 in there, yes.
25     Q.   Might have even been earlier?

CONITZ v. TECK COMINCO                                                      GREGG CONITZ
                                                                           8/2/2007

Page 97

1       A.   Yeah, could have been earlier or later.  I
2   don't remember.
3       Q.   All right.
4       A.   But it's -- that would have been five years
5   into the time I worked there, and I think that was
6   about what it was.
7       Q.   Can you pull out Exhibit 32?
8       A.   Exhibit 32.  Must be close to the bottom of
9   the pile here.  Okay.
10      Q.   Before we get to that, when Ralph Hargrave
11  was with the company, what was the company's actual
12  name at that time?
13      A.   It was Cominco Alaska, Inc., I believe.
14      Q.   Okay.  He was gone prior to the time it
15  became Teck Cominco Alaska, right?
16      A.   Yes, he was.
17      Q.   All right.  In Exhibit 32, if you could
18  turn to the page that has a Bates stamp 007.
19      A.   Okay.
20      Q.   This is basically a printout of someone's
21  PowerPoint presentation; is that right?
22      A.   It looks like it, yes.
23      Q.   Is this a NANA PowerPoint presentation, do
24  you know?
25      A.   I don't know.

CONITZ v. TECK COMINCO                                    GREGG CONITZ
                                                              8/2/2007

Page 98

1       Q.    How is it that you came to possess this

2   PowerPoint presentation?

3       A.    This was somewhere on the database of the

4   company computer system at Red Dog.

5       Q.    So you just went rifling through the

6   database, looking for this and found it.  Is that --

7       A.    Actually my wife gave this to me.  She

8   does, in her prior position, very -- did a lot of

9   computer work, and it was her business to be on the

10  computer.  And she was looking for something and

11  happened to run into this and thought it was

12  interesting and printed it.

13      Q.    Approximately when was it that she printed

14  this out?  Do you know?

15      A.    I don't remember exactly, but I would guess

16  it may have been somewhere in 2004, possibly 2005.

17            MR. HALLORAN:  All right.  Why don't we go

18  off record for just a minute.

19            (Recess held.)

20  BY MR. HALLORAN:

21      Q.    Sir, you live in Anchorage; is that

22  correct?

23      A.    Yes, that's correct.

24      Q.    And you're in town for another week before

25  returning to Red Dog; is that right?

CONITZ v. TECK COMINCO                                        GREGG CONITZ
                                                              8/2/2007

Page 99

1        A.    That's correct.

2        Q.    And you'll serve a regular rotation then

3    when you --

4        A.    Yes.  I should be back up for four weeks at

5    work when I go back.

6              MR. HALLORAN:  Okay.  I'm going to continue

7    this deposition at this time until we get a ruling

8    from the Court on the question that came up earlier,

9    and I'll be asking the Court for expedited

10   consideration so that we can reconvene this

11   deposition within the next week.  That's it.  We're

12   off record.

13             MR. COVELL:  Well, I'd like to stay on

14   record for a minute, please.  This is Thursday today,

15   right?

16             MR. HALLORAN:  That's correct.

17             MR. COVELL:  Okay.  I'm available the rest

18   of today.  I'm not going to be able to do any written

19   response to anything.  I'm down here.  I'm on leave.

20   You're here till next Wednesday; is that right?

21             THE WITNESS:  Yeah, Wednesday midday.

22             MR. COVELL:  You know, I'll do whatever I

23   can to accommodate this.  I'm leaving town tonight or

24   tomorrow, and I don't have any objection to you

25   continuing this deposition for the purposes of

CONITZ v. TECK COMINCO                                          GREGG CONITZ
                                                                    8/2/2007

                                                              Page 100
1   answering questions about the subject that was

2   raised, but if you've got any other subject matter,

3   I'd like you to take care of that today, and that the

4   continuation will be limited to questions concerning

5   the subject matter the Court's going to rule on.

6            MR. HALLORAN:  Well, I'm not going to enter

7   into a stipulation to that effect.

8            MR. COVELL:  Well, if there are other

9   questions, then I'm going to object to them.  So I

10  guess we can get the Court to rule on that, as well.

11           You know, I'll do everything I can to

12  accommodate you, but I think it's impractical that

13  we're going to receive a decision on that in that

14  amount of time.

15           I'll be back in Fairbanks between Monday

16  and Thursday of next week.  I'll be in the office

17  probably Thursday, Friday, Monday, Tuesday, and then

18  I'm going to be out again till the 20th.  If it's

19  necessary, we could possibly do it by telephone,

20  whatever.  But that's my statement for the record,

21  and if you want to talk about it on or off the

22  record, I'm happy to do so.

23           MR. HALLORAN:  We're done.

24           (Deposition concluded at 11:50 a.m.)

25           (Signature reserved.)

Page 101

```
 1                    CERTIFICATE
 2          I, DIANE M. BONDESON, Registered
 3  Professional Reporter and Notary Public in and for
 4  the State of Alaska, do hereby certify that the
 5  witness in the foregoing proceedings was duly sworn;
 6  that the proceedings were then taken before me at the
 7  time and place herein set forth; that the testimony
 8  and proceedings were reported stenographically by me
 9  and later transcribed by computer transcription; that
10  the foregoing is a true record of the testimony and
11  proceedings taken at that time; and that I am not a
12  party to nor have I any interest in the outcome of
13  the action herein contained.
14          IN WITNESS WHEREOF, I have hereunto set my
15  hand this SIXTH day of AUGUST, 2007.
16
17
18
19          _____
            Diane M. Bondeson, RPR
20          My Commission Expires 9/6/10
21
22
23
24
25
```

CONITZ v. TECK COMINCO                                              GREGG CONITZ
                                                                     8/2/2007

                                                              Page 102
 1                        WITNESS CERTIFICATE

 2

     RE:  GREGG CONITZ vs. TECK COMINCO ALASKA, INC.
 3   CASE NO.:  4:06-CV-00015 RRB
     DEPOSITION OF:  GREGG CONITZ
 4   DATE TAKEN:  AUGUST 2, 2007

 5

          I hereby certify that I have read the foregoing
 6   deposition and accept it as true and correct with the
     following exceptions:

 7

     =====================================================
 8   Page    Line   Description/Reason for Change
     =====================================================
 9

10   _____   _____  _____

11   _____   _____  _____

12   _____   _____  _____

13   _____   _____  _____

14   _____   _____  _____

15   _____   _____  _____

16   _____   _____  _____

17   _____   _____  _____

18   _____   _____  _____

19   _____   _____  _____

20   _____  _____

21                    Signature                         Date

22

     Please sign your name and date it on the above line.
23   (As needed, use additional paper to note corrections,
     dating and signing each page.)                    (DMP)

24

25            .

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com